UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PROPECIA (FINASTERIDE) PRODUCT LIABILITY LITIGATION

Master File No.: 12-md-2331 (BMC)(PK)

THIS DOCUMENT APPLIES TO:

PAUL DAWSON,
Plaintiff,

**DEFENDANTS' MEMORANDUM IN SUPPORT OF (1) MOTION TO PRECLUDE THE EXPERT TESTIMONY OF PLAINTIFF'S EXPERTS, ABDULMAGED M. TRAISH, PH.D., IRWIN GOLDSTEIN, M.D., AND MAHYAR ETMINAN, PHARM.D., M.S.C., AND (2) REQUEST FOR *DAUBERT* EVIDENTIARY HEARING**

**(CERTAIN EXHIBITS FILED UNDER SEAL)**

v.
MERCK & CO., INC. and
MERCK SHARP & DOHME CORP.,
Defendants.

Case No.: 1:12-cv-01876 (BMC)(PK)

i

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................... iv

I.    INTRODUCTION ............................................................................................... 1

II.    APPLICABLE LAW ......................................................................................... 5

III.    BACKGROUND FACTS ................................................................................. 6

    A.  Male Sexual Dysfunction.................................................................... 7

    B.  Finasteride ........................................................................................... 8

        1.  Mechanism of Action................................................................. 8

        2.  Drug Development..................................................................... 9

        3.  Establishing Causation............................................................. 10

    C.  Scientific Methods ............................................................................ 11

IV.    ARGUMENT ................................................................................................... 12

    A.  There is No Reliable Scientific Evidence That Propecia Causes Sexual Dysfunction During Use Which Persists After Drug Discontinuation. ........................................... 12

    B.  The General Causation Opinions of Drs. Traish, Goldstein, and Etminan Are Not Based Upon Reliable Methods and Data. ........................................ 12

        1.  Abdulmaged M. Traish, Ph.D. ................................................. 12

            a.  Background ...................................................................... 12

            b.  General causation opinion............................................... 13

            c.  Basis of general causation opinion ................................. 13

            d.  Dr. Traish's opinion that finasteride causes penile fibrosis in men is not based upon reliable scientific data. ........................................... 14

            e.  Conclusion as to Dr. Traish ............................................ 17

        2.  Irwin Goldstein, M.D. .............................................................. 18

            a.  Background ...................................................................... 18

            b.  General causation opinion............................................... 18

            c.  Basis of general causation opinion ................................. 18

            d.  Dr. Goldstein's penile fibrosis opinion is not based upon reliable scientific methods or data. ........................................... 19

                i.  No Peer-Reviewed Publication ............................... 20

ii.  Unreliable Testing.................................................................................. 21

iii. No Error Rates .................................................................................... 32

iv. No Consensus...................................................................................... 32

e.  Conclusion as to Dr. Goldstein ................................................................ 32

3.  Mahyar Etminan, Pharm.D., M.S.C. (Epidemiology) ............................................ 34

a.  Background ............................................................................................ 34

b.  General  causation opinion...................................................................... 35

c.  Basis of opinion ..................................................................................... 35

d.  Dr. Etminan's opinion is not based upon adequate scientific evidence.......... 36

i.  Ali 2015 .............................................................................................. 37

ii.  Guo 2016............................................................................................. 39

iii. Hagberg 2016 and Unger 2016 ............................................................ 41

iv. Kiguradze 2017 ................................................................................... 42

v.  Propecia randomized clinical trials ........................................................ 42

vi. Epidemiologic surveys ......................................................................... 43

e.  Conclusion as to Dr. Etminan ................................................................. 43

C.  Plaintiff's Specific Causation Expert Opinion Is Also Subject to Exclusion. ............ 43

1.  Without general causation, specific causation fails. ............................................ 43

2.  Dr. Goldstein's case specific opinion should be excluded. ................................. 44

a.  Background ............................................................................................ 44

b.  Dr. Goldstein's case specific opinion is not based on a proper differential diagnosis. ............................................................................................... 45

V.  CONCLUSION........................................................................................................ 49

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .................................................................................... 5, 6, 22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579, 113 S. Ct. 2786 (1993) ....................................................................... 5, 35, 46

*Ellis v. Appleton Papers, Inc.*,
No. 94-CV-558(LEAD), 2006 WL 346417 (N.D.N.Y. Feb. 14, 2006) ............................ 20, 50

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
No. 11CV6201 DLC, 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015) ................................... 23

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136, 146, 118 S. Ct. 512 (1997) ..................................................................... 5

*Golod v. La Roche*,
964 F. Supp. 841 (S.D.N.Y. 1997) ............................................................................. 34

*Hogan v. Novartis Pharm. Corp.*,
No. 06 CIV. 0260 (BMC) (RER), 2011 WL 1533467 (E.D.N.Y. Apr. 24, 2011) ............... 5, 20

*In re Agent Orange Prod. Liab. Litig. MDL No. 381*,
818 F.2d 187 (2d Cir. 1987) ....................................................................................... 17

*In re Agent Orange Prod. Liab. Litig.*,
611 F. Supp. 1223 (E.D.N.Y. 1985) ............................................................................ 17

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D. N.Y. 2009) ........................................................................ 35

*In re Fosamax Products Liab. Litig.*,
924 F. Supp. 2d 477 (S.D.N.Y. 2013) ......................................................................... 47

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*,
227 F. Supp. 3d 452 (D.S.C. 2017) ............................................................................. 11

*In re Mirena IUD Prod. Liab. Litig.*,
No. 16-2890-CV(L), 2017 WL 4785947 (2d Cir. Oct. 24, 2017) ................................... 5, 44, 50

*In re Mirena IUD Products Liab. Litig.*,
169 F. Supp. 3d 396, 459 n.57 (S.D.N.Y. 2016) ........................................................... passim

*In re Rezulin Prods.*,
00 CIV. 2843 (LAK), 2004 WL 2884327 (S.D.N.Y. Dec. 10, 2004) ............................... 46

*In re Viagra Prod. Liab. Litig.*,
658 F. Supp. 2d 936 (D. Minn. 2009) ......................................................................... 33, 47

*Morritt v. Stryker Corp.*,
973 F. Supp. 2d 177 (E.D.N.Y. 2013) ......................................................................... 47

*Munafo v. Metro. Transp. Auth.*,
00-CV-0134 (ERK), 2003 WL 21799913 (E.D.N.Y. Jan. 22, 2003) ............................... 47, 49

iv

*Norris v. Baxter Healthcare Corp.*,
397 F.3d 878 (10th Cir. 2005) ...................................................................... 20

*Ruggiero v. Warner-Lambert Co.*,
424 F.3d 249 (2d Cir. 2005).......................................................... 5, 20, 46, 50

*Valente v. Textron, Inc.*,
559 F. App'x 11 (2d Cir. 2014) .................................................................... 50

*Zwillinger v. Garfield Slope Hous. Corp.*,
No. CV 94-4009 (SMG), 1998 WL 623589 (E.D.N.Y. Aug. 17, 1998)................ 17, 24, 34, 46

## Rules and Statutes

Fed. R. Evid. 702 .................................................................................... 5, 50

Fed. R. Evid. 703 .................................................................................... 5, 50

## Other Authorities

Ali, A. K., Heran, B. S., & Etminan, M. (2015). Persistent sexual dysfunction and suicidal ideation in young men treated with low-dose finasteride: A pharmacovigilance study. *Pharmacotherapy: The Journal of Human Pharmacology and Drug Therapy*, *35*(7), 687-695 ...................................................................................................... 36

Bradford, A. (1965). The environment and disease: Association or causation? *Proceedings of the Royal Society of Medicine*, *58*, 295-300 .................................... 11

Capogrosso, P., Colicchia, M., Ventimiglia, E., Castagna, G., Clementi, M. C., Suardi, N., ... & Montorsi, F. (2013). One patient out of four with newly diagnosed erectile dysfunction is a young man—worrisome picture from the everyday clinical practice. *The Journal of Sexual Medicine*, *10*(7), 1833-1841 .................................... 8

Corradi, L. S., Góes, R. M., Carvalho, H. F., & Taboga, S. R. (2004). Inhibition of 5-α-reductase activity induces stromal remodeling and smooth muscle de-differentiation in adult gerbil ventral prostate. *Differentiation*, *72*(5), 198-208 .......................................................... 22

Donatucci, C. F., & Lue, T. F. (1993). Erectile dysfunction in men under 40: Etiology and treatment choice. *International Journal of Impotence Research*, *5*(2), 97-103 .................................... 8

Federal Judicial Center, Reference Manual on Scientific Evidence 218, 220, 222 (3d ed.2011) ........................................................................................ 23

Ganzer, C. A., Jacobs, A. R., & Iqbal, F. (2015). Persistent sexual, emotional, and cognitive impairment post-finasteride: A survey of men reporting symptoms. *American Journal of Men's Health*, *9*(3), 222-228 .................................... 23

Gormley, G. J., Stoner, E., Bruskewitz, R. C., Imperato-McGinley, J., Walsh, P. C., McConnell, J. D., ... & Vaughan, E. D. (1992). The effect of finasteride in men with benign prostatic hyperplasia. *New England Journal of Medicine*, *327*(17), 1185-1191 ...................................... 10

Guo, M., Heran, B., Flannigan, R., Kezouh, A., & Etminan, M. (2016). Persistent sexual dysfunction with finasteride 1 mg taken for hair loss.
*Pharmacotherapy: The Journal of Human Pharmacology and Drug Therapy*, *36*(11), 1180-1184 .................................................................................................................... 36

Hagberg, K. W., Divan, H. A., Persson, R., Nickel, J. C., & Jick, S. S. (2016). Risk of erectile dysfunction associated with use of 5-α reductase inhibitors for benign prostatic hyperplasia or alopecia: population based studies using the Clinical Practice Research Datalink.
*BMJ*, 354, i4823, 1-15 ................................................................................................ 41

Herbener, T. E., Seftel, A. D., Nehra, A., & Goldstein, I. (1994). Penile ultrasound.
*Seminars in Urology, 12*(4), 320-332) ...................................................................... 26

Heruti, R., Shochat, T., Tekes-Manova, D., Ashkenazi, I., & Justo, D. (2004). Prevalence of erectile dysfunction among young adults: Results of a large-scale survey.
*The Journal of Sexual Medicine*, *1*(3), 284-291 ....................................................... 8

Imperato-McGinley, J., Guerrero, L., Gautier, T., & Peterson, R. E. (1974). Steroid 5α-reductase deficiency in man: An inherited form of male pseudohermaphroditism.
*Science*, *186*(4170), 1213-1215 ............................................................................... 10

Imperato-Mcginley, J., Peterson, R. E., Gautier, T., & Sturla, E. (1979). Male pseudohermaphroditism secondary to 5α-reductase deficiency—a model for the role of androgens in both the development of the male phenotype and the evolution of a male gender identity.
*Journal of Steroid Biochemistry*, *11*(1), 637-645 ...................................................... 10

Imperato-McGinley, J., Shackleton, C., Orlic, S., & Stoner, E. (1990). C19 and C21 5 beta/5 alpha metabolite ratios in subjects treated with the 5 alpha-reductase inhibitor finasteride: comparison of male pseudohermaphrodites with inherited 5 alpha-reductase deficiency.
*The Journal of Clinical Endocrinology and Metabolism*, *70*(3), 777 ...................................... 10

Imperato-McGinley, J., & Zhu, Y. S. (2002). Androgens and male physiology the syndrome of 5α-reductase-2 deficiency.
*Molecular and Cellular Endocrinology*, *198*(1), 51-59 .......................................... 10

Kiguradze, T., Temps, W. H., Yarnold, P. R., Cashy, J., Brannigan, R. E., Nardone, B., ... & Belknap, S. M. (2017). Persistent erectile dysfunction in men exposed to the 5α-reductase inhibitors, finasteride, or dutasteride.
*PeerJ, 5*, e3020 ......................................................................................................... 42

Köhler, T. S., & McVary, K. T. (2008). The evolving relationship of erectile dysfunction and lower urinary tract symptoms.
*Current Sexual Health Reports*, *5*(1), 9-16 ............................................................... 11

McVary, K. T., Carrier, S., & Wessells, H. (2001). Smoking and erectile dysfunction: Evidence based analysis.
*The Journal of Urology*, *166*(5), 1624 ...................................................................... 11

Nehra, A., Goldstein, I., Pabby, A., Nugent, M., Huang, Y. H., de las Morenas, A., ... & Moreland, R. B. (1996). Mechanisms of venous leakage: A prospective clinicopathological correlation of corporeal function and structure.
*The Journal of Urology*, *156*(4), 1320-1329) ........................................................... 21

Öztekin, Ç. V., Gur, S., Abdulkadir, N. A., Lokman, U., Akdemir, A. Ö., Cetinkaya, M., & Hellstrom, W. J. (2012). Incomplete recovery of erectile function in rat after discontinuation of dual 5-alpha reductase inhibitor therapy.
*The Journal of Sexual Medicine*, *9*(7), 1773-1781) ................................................................ 14

Pinsky, M. R., Gur, S., Tracey, A. J., Harbin, A., & Hellstrom, W. J. (2011). The effects of chronic 5-alpha-reductase inhibitor (dutasteride) treatment on rat erectile function.
*The Journal of Sexual Medicine*, *8*(11), 3066-3074) ............................................................ 14

Reed-Maldonado, A. B., & Lue, T. F. (2016). A syndrome of erectile dysfunction in young men?.
*Translational Andrology and Urology*, *5*(2), 228-234 ............................................................. 8

Reference Manual on Scientific Evidence 600 (3d. ed. 2011) .................................................... 11

Singh, M. K., & Avram, M. (2014). Persistent sexual dysfunction and depression in finasteride users for male pattern hair loss: A serious concern or red herring?.
*The Journal of Clinical and Aesthetic Dermatology*, *7*(12), 51-55 ......................................... 23

Unger, J. M., Till, C., Thompson, I. M., Tangen, C. M., Goodman, P. J., Wright, J. D., ... & Hershman, D. L. (2016). Long-term consequences of finasteride vs placebo in the Prostate Cancer Prevention Trial.
*JNCI: Journal of the National Cancer Institute*, 108(12) ........................................................ 41

Wessells, H., Roy, J., Bannow, J., Grayhack, J., Matsumoto, A. M., Tenover, L., ... & Parra, R. (2003). Incidence and severity of sexual adverse experiences in finasteride and placebo-treated men with benign prostatic hyperplasia.
*Urology*, 61(3), 579-584) ........................................................................................................ 43

Zhang, M. G., Wang, X. J., Shen, Z. J., & Gao, P. J. (2013). Long-term oral administration of 5α-reductase inhibitor attenuates erectile function by inhibiting autophagy and promoting apoptosis of smooth muscle cells in corpus cavernosum of aged rats.
*Urology*, *82*(3), 743.e9-743.e15) ......................................................................................... 15

Pursuant to Federal Rules of Evidence 702-703 and *Daubert* and its progeny, Merck moves to exclude Plaintiff's three general causation medical experts in this case: (1) Abdulmaged M. Traish, Ph.D., (2) Irwin Goldstein, M.D. and (3) Mahyar Etminan, Pharm.D., M.S.c. Merck also seeks to exclude Dr. Goldstein on his specific causation opinions concerning Mr. Dawson. Merck respectfully requests that the Court conduct an evidentiary hearing to evaluate whether Plaintiff can establish admissibility of his experts' opinions.

## I.    INTRODUCTION

This MDL involves the prescription drug, finasteride. In 1992, Merck first obtained FDA approval to market a 5-mg dose of finasteride, under the brand name Proscar®, for treatment of benign prostatic hypertrophy ("BPH")—i.e., enlarged prostates in men. In 1997, Merck obtained FDA approval to market a 1-mg dose of finasteride, under the brand name Propecia®, for treatment of male pattern hair loss ("MPHL")—i.e., premature hair loss. Conservatively, over the 25+ years since finasteride was first approved for sale in the United States, more than 10 billion tablets of Propecia and Proscar have been distributed worldwide. Both Propecia and Proscar are still on the market today.

Plaintiffs in the First Bellwether Tranche are men who *formerly* used Propecia to treat hair loss. They assert that the labeling of Propecia was inadequate and caused them to suffer sexual dysfunction while taking the drug that persists *after* drug discontinuation, along with assorted cognitive and emotional disorders. Plaintiffs claim that Propecia is responsible for their persistent sexual and emotional injuries, despite the fact that every plaintiff deposed to date has a

1

pre-Propecia history of psychological, emotional, and/or social problems which bear no temporal or other connection to Propecia.[1]

Sexual dysfunction is very common in men. While older men develop sexual dysfunction due to age-related co-morbidities (e.g., hypertension, atherosclerosis, dyslipidemia), sexual dysfunction in young men is more often due to psychosocial factors, such as insecurity, anxiety, depression, and inter-personal and partner issues. Premature hair loss itself, the very condition for which Propecia is prescribed, is associated with low self-esteem, poor body image, and depression. Rather than attribute their sexual difficulties to the common reasons why young men with premature hair loss experience these problems, Plaintiffs instead assign blame to a drug that, once discontinued, is no longer pharmacologically active in the body.

In this case, Plaintiff ("Mr. Dawson") designated three expert witnesses who offer general causation opinions.[2] One of them also offers a case-specific opinion on Mr. Dawson. None of these opinions passes muster under *Daubert*.

Two of the general causation experts offer a proposed biological mechanism that attempts to explain how Propecia, when it is no longer in the bloodstream, affects erectile function. Dr. Traish, a biochemist, and Dr. Goldstein, a sexual medicine physician, contend that the use of Propecia, even for as little as two days, produces physical alterations in penile anatomy, i.e. fibrosis, in some men. We refer to this contention as the "penile fibrosis theory."

For support of the "penile fibrosis theory," Dr. Traish largely relies upon laboratory rodent studies.[3] In one series of experiments he cites, researchers report changes in penile tissue

---

[1] (Nov. 27, 2017 Declaration of Charles F. Morrow, Exh. 1: Dep. of Paul Dawson (Aug. 12, 2016) ("Dawson Dep.") 7-12, 81-83, 87-88, 90-91, 97, 169-175). Record citations in this Memorandum are attached to the Morrow Declaration and cited as "Exh." with an abbreviated description.

[2] Plaintiffs previously designated an expert in the field to give an opinion as to neurosteroids, Dr. Cheryl Frye, but withdrew her as an expert.

of rats administered either finasteride or dutasteride, a drug that is structurally similar to but more potent than finasteride. The researchers electrically stimulated the cavernosal nerve of anesthetized rats administered high doses of drug. Then, they dissected the penises, excised erectile tissue, applied chemical baths and electrical charges, and examined the functioning and morphology of the tissue. Dr. Traish also cites penile alterations occurring in experiments with castrated animals. Castration is a procedure that completely abolishes testosterone. For many reasons, including the constructs of the experiments and the fact that Propecia use does not even reduce testosterone, these laboratory animal experiments do not furnish a reliable scientific basis for the men in this litigation.

Dr. Goldstein, a clinician, embraces the "penile fibrosis theory" as well. He largely relies upon an unpublished ultrasound study performed on 27 patients in his clinic who presented with erectile dysfunction.[4] Penile ultrasound is a two-part test which includes (a) imaging of the architecture of the penis using grey-scale mode and (b) measurement of blood flow into and out of the penis during a pharmacologically-induced erection using color Doppler mode. Dr. Goldstein contends that the images obtained using grey-scale mode represent evidence of penile fibrosis. His opinion is not based upon reliable methods or data for two reasons.

***First***, as Dr. Goldstein himself has shown in his own published research, penile fibrosis is diagnosed histologically using microscopic examination of properly stained tissue samples. Here, Dr. Goldstein offers no histological evidence to confirm his opinion of penile fibrosis in any of the Propecia subjects in his ultrasound study. This is hardly surprising, as Dr. Goldstein

---

[3]   (Exh. 2: Expert Report of Abdulmaged M. Traish, MBA, Ph.D (Dec. 16, 2016) ("Traish Rep.")); (Exh. 3: Dep. of Abdulmaged M. Traish, MBA, Ph.D (Sept. 26, 2017) ("Traish Dep.")).

[4]   (Exh. 4: Expert Report of Irwin Goldstein, M.D. (Dec. 16, 2016) ("Goldstein Rep."); Exh. 5: Supplemental Expert Report of Irwin Goldstein, M.D. (Oct. 25, 2017) ("Goldstein Supp. Rep."); (Exh. 6: Dep. of Irwin Goldstein, M.D. (Oct. 3, 2017) ("Goldstein Dep. I")); (Exh. 7: Dep. of Irwin Goldstein, M.D. (Oct. 14, 2017) ("Goldstein Dep. II")) (FILED UNDER SEAL); (Exh. 8: Dep. of Irwin Goldstein, M.D. (Nov. 14, 2017) ("Goldstein Dep. III")).

also does not identify any reports in the peer-reviewed medical literature documenting penile fibrosis in men using finasteride.

***Second,*** Dr. Goldstein's unpublished ultrasound study does not adhere to ordinary scientific standards. Among a number of problems, the study relies upon operator-dependent acquisition of grey-scale images and subjective interpretation of them by "eyeballing" (Dr. Goldstein's word). The study also lacks baseline imaging, randomization, blinding of assessments, and corroboration by any form of physical evidence. Dr. Goldstein's testimony based on such a study cannot withstand *Daubert* scrutiny.

Plaintiff's epidemiologist expert, Dr. Etminan, ignores the "penile fibrosis theory" and instead focuses on a selection of available epidemiological evidence concerning Propecia and persistent sexual dysfunction.[5] He principally relies upon two published studies on which he is a co-author. One of the studies involves a disproportionality analysis using the FDA's adverse event database. By design, and as set forth in the study itself, the approach can serve to generate a hypothesis but cannot answer questions about causality. Moreover, Dr. Etminan never examined the underlying reports in the FDA database to determine whether they even document persistence of the purported sexual side effects of finasteride. Dr. Etminan's second study involves an analysis of sexual dysfunction events occurring only *after* finasteride was discontinued, regardless of whether sexual dysfunction either existed *before* drug use or first occurred *during* drug use. As designed, this study cannot support the claims of the men here who assert that Propecia causes sexual dysfunction *during* drug use which persists *after* discontinuation.

---

[5] (Exh. 9: Expert Report of Mahyar Etminan, Pharm.D, M.SC (Dec. 15, 2016) ("Etminan Rep.")); (Exh. 10: Deposition of Mahyar Etminan, Pharm.D, M.SC (Oct. 10, 2017) ("Etminan Dep.")).

Merck moves to exclude the general causation opinions of each of these experts. Merck also moves to exclude Dr. Goldstein's case-specific opinion as to Mr. Dawson based on a "differential diagnosis" which failed to account for alternative causes of Mr. Dawson's current sexual complaints.

## II.    APPLICABLE LAW

Plaintiff must establish both general and specific causation through expert testimony. *E.g., In re Mirena IUD Prod. Liab. Litig.*, No. 16-2890-CV(L), 2017 WL 4785947, *3-4 (2d Cir. Oct. 24, 2017) (Summary Order). Merck acknowledges this Court's familiarity with the admissibility of expert witness testimony and the framework under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct. 2786 (1993).[6] Briefly stated, *Daubert* requires that an expert be sufficiently qualified, and further considers whether (1) the testimony is grounded on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702; Fed. R. Evid. 703.

The Second Circuit has stated that "[w]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co*., 424 F.3d 249, 253 (2d Cir. 2005); *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 266 (2d Cir. 2002). "Nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Amorgianos*, 303 F.3d at 266 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512 (1997)). *Daubert* is a flexible inquiry that provides the district court with

---

[6]  *Hogan v. Novartis Pharm. Corp.,* No. 06 CIV. 0260 (BMC) (RER), 2011 WL 1533467 (E.D.N.Y. Apr. 24, 2011).

discretion to ensure "the courtroom door remains closed to junk science, while admitting reliable expert testimony that will assist the trier of fact.  To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step."  *Id.* at 267.  "*Any* step that renders the analysis unreliable" renders the testimony inadmissible.  *Id*.

Here, none of the challenged witnesses is unqualified to serve as an expert *per se*.  Each one has a *curriculum vitae* attesting to a career in his respective field.  But qualifications alone are not a substitute for scientific knowledge, which requires adherence to scientific methods and data.  It is ironic that while Plaintiff's proposed expert witnesses display adherence to the principles and methods of science in their professional work, the causation opinions they offer in this litigation depart sharply from these norms.[7]

### III.    BACKGROUND FACTS

Background medical and scientific information for this motion is presented below.  It is based upon (1) the Rule 26 reports and deposition testimony of Drs. Traish, Goldstein, and Etminan, (2) published, peer-reviewed scientific literature, and (3) the Rule 26 reports of some of Merck's expert witnesses,[8] none of whom was deposed by Plaintiffs.  Merck's experts include physicians and scientists in the fields of epidemiology (James Schlesselman, Ph.D., David Margolis, M.D., Ph.D.), urology and sexual medicine (John P. Mulhall, M.D., Gerald Brock, M.D., Pat Fox Fulgham, M.D., DABU, FACS, Kevin McVary, M.D.), endocrinology (Glenn Cunningham, M.D.), psychiatry (Robert Taylor Segraves, M.D.), dermatology (George Cotsarelis, M.D.), and neuroscience (Donald Pfaff, Ph.D.).[9]

---

[7]    *See Amorgianos*, 303 F.3d at 268 (affirming district court's exclusion of plaintiff's general causation expert where the expert "failed to apply his own methodology reliably.").

[8]    (Exh. 11: Merck's Iden. of Expert Witnesses & Disclosure of Expert Reports (Feb. 15, 2017)).

[9]    (Exh. 12: Expert Report of James J. Schlesselman, Ph.D. (Feb. 14, 2017) ("Schlesselman Rep."); (Exh. 13: Supplemental Expert Report of James J. Schlesselman, Ph.D. (Aug. 8, 2017) ("Schlesselman Supp. Rep."); (Exh. 14: Expert Report of David J. Margolis, M.D., Ph.D. (Feb. 6, 2017) ("Margolis Rep."); (Exh. 15: Expert Report of

A.    **Male Sexual Dysfunction**

Male sexual dysfunction includes multiple forms, is caused by a large number of organic, psychological, and social factors, and has been documented in numerous prevalence and incidence studies of many different populations.  (Exh. 16: Brock Rep. pp. 2-4; Exh. 15: Mulhall Rep. ¶¶11-40; Exh. 19: McVary Rep. pp. 3-6; Exh. 12: Schlesselman Rep. §§4.1-4.9).  It is one of the most common disorders afflicting men.  (Exh. 6: Goldstein Dep. I 57:21-24).  Included in this broad category of disorders are those of desire (low libido), erection (erectile dysfunction), and ejaculation (Exh. 6: Goldstein Dep. I 59:20-60:7).

Psychiatric and psychological disturbances, such as depression, anxiety, or stress, can interfere with male sexual function.  (Exh. 21: Segraves Rep. ¶¶25-28; Exh. 6: Goldstein Dep. I 65:10-66:24).  Social factors can also interfere with male sexual function.  (Exh. 10: Etminan Dep. 106:17-107:3); (Exh. 6: Goldstein Dep. I 65:20-66:24).  In contrast to older men, young men are more commonly affected by non-organic factors (e.g., stress, anxiety, and inter-personal conflict).  (Exh. 16: Brock Rep. p. 4).  The prevalence of sexual dysfunction is age-related: as men age, they develop co-morbidities which themselves have been associated with sexual dysfunction.  (Exh. 16: Brock Rep. pp. 3-4); (Exh. 19: McVary Rep. pp. 7-8); (Exh. 12: Schlesselman Rep. §4.9).  Men under the age of 40 develop sexual or erectile dysfunction at prevalence rates ranging from 10% to 25%.  (Exh. 16: Brock Rep. p. 4); (Exh. 12: Schlesselman Rep. §4.7.2).  Dr. Goldstein does not dispute that 5 to 15% of men will develop sexual

---

John P. Mulhall, M.D. (Feb. 10, 2017) ("Mulhall Rep."); (Exh. 16: Expert Report of Gerald B. Brock, M.D. (Feb. 7, 2017) ("Brock Rep."); (Exh. 17: Expert Report of Pat Fox Fulgham, M.D., DABU, FACS (Feb. 13, 2017) ("Fulgham Rep."); (Exh. 18: Supplemental Expert Report of Pat Fox Fulgham, M.D., DABU, FACS (July 31, 2017) ("Fulgham Supp. Rep."); (Exh. 19: Expert Report of Kevin T. McVary, M.D. (Feb. 13, 2017) ("McVary Rep."); (Exh. 20: Expert Report of Glenn R. Cunningham, M.D. (Feb. 9, 2017) ("Cunningham Rep."); (Exh. 21: Expert Report of Robert Taylor Segraves, M.D. (Jan. 31, 2017) ("Taylor Rep."); (Exh. 22: Expert Report of George Cotsarelis, M.D. (Feb. 8, 2017) ("Cotsarelis Rep."); (Exh. 23: Expert Report of Donald W. Pfaff, Ph.D. (Feb. 5, 2017) ("Pfaff Rep.").

dysfunction at some point in early life.  (Exh. 6: Goldstein Dep. I 61:16-62:1).  Dr. Etminan believes that the prevalence of sexual dysfunction in young men is at least 5% and is not a rare event.  (Exh. 10: Etminan Dep. 105:17-20).  Multiple articles in the peer-reviewed medical literature document the presentation, diagnosis, prevalence, and risk factors for sexual dysfunction in young men.[10]

Men with complaints of sexual dysfunction should be examined using a "biopsychosocial" approach.  (Exh. 6: Goldstein Dep. I 45:16-22).  This means that all known organic, psychological, and social risk factors must be considered when patients are presented for evaluation.  (*Id.* 62:19-63:6); (Exh. 16: Brock Rep. p. 4).

**B.    Finasteride**

**1.    Mechanism of Action**

Finasteride is a 5-alpha reductase inhibitor.  It works by inhibiting the activity of the 5-alpha reductase type II enzyme.  This enzyme is responsible for converting the hormone testosterone into one of its metabolites, dihydrotestosterone ("DHT").  When finasteride is used, the drug binds to the enzyme, forming the enzyme-inhibitor complex, and competitively blocking this conversion process.  As a result, testosterone conversion to DHT still occurs, but is reduced, and serum DHT levels fall by 60 to 80%.  (Exh. 3: Traish Dep. 184:14-18); (Exh. 6: Goldstein Dep. I 86:10-19).  Testosterone levels remain stable or are slightly increased.  (Exh. 3: Traish Dep. 230:1-5); (Exh. 6: Goldstein Dep. I 86:1-4); (Exh. 16: Brock Rep. pp. 4-5); (Exh. 20:

---

[10] (Exh. 24: Donatucci, C. F., & Lue, T. F. (1993). Erectile dysfunction in men under 40: Etiology and treatment choice. *International Journal of Impotence Research*, *5*(2), 97-103. ("Donatucci 1993")); (Exh. 25: Heruti, R., Shochat, T., Tekes-Manova, D., Ashkenazi, I., & Justo, D. (2004). Prevalence of erectile dysfunction among young adults: Results of a large-scale survey. *The Journal of Sexual Medicine*, *1*(3), 284-291. ("Heruti 2004")); (Exh. 26: Capogrosso, P., Colicchia, M., Ventimiglia, E., Castagna, G., Clementi, M. C., Suardi, N., ... & Montorsi, F. (2013). One patient out of four with newly diagnosed erectile dysfunction is a young man—worrisome picture from the everyday clinical practice. *The Journal of Sexual Medicine*, *10*(7), 1833-1841 ("Capogrosso 2013")); (Exh. 27: Reed-Maldonado, A. B., & Lue, T. F. (2016). A syndrome of erectile dysfunction in young men?. *Translational Andrology and Urology*, *5*(2), 228-234. ("Reed-Maldonado 2016")).

Cunningham Rep. ¶¶35-41); (Exh. 19: McVary Rep. pp. 19-20); (Exh. 15: Mulhall Rep. ¶¶41-47).

Another 5-alpha reductase inhibitor is dutasteride, which is structurally similar to finasteride. Dutasteride is used to treat BPH. It inhibits the 5-alpha reductase enzyme type I and II and reduces serum DHT levels by 90 to 95%. (Exh. 3: Traish Dep. 237:15-239:2); (Exh. 20: Cunningham Rep. ¶37).

### 2.    Drug Development

Finasteride was developed from the biological model of males in the Dominican Republic born without the 5-alpha reductase type II enzyme.[11] This small cohort of men has been extensively studied and followed since the 1970s by Dr. Imperato-McGinley at Cornell Medical School. (Exh. 6: Goldstein Dep. I 78:25-80:11); (Exh. 3: Traish Dep.65:21-66:12). These enzyme-deficient males are born with ambiguous genitalia and are often raised as girls. (Exh. 3: Traish Dep. 68:5-16). At puberty, when testosterone levels rise dramatically, these individuals develop more obvious masculine characteristics, such as deep voice, male musculature, facial hair, and a more prominent phallus. (Id. 68:12-69:6) As they age, it was observed, their prostates do not enlarge and they do not develop male pattern hair loss. (Exh. 6: Goldstein Dep. I 80:12-16) Biochemical studies revealed that due to the absence of the enzyme, testosterone levels in these men are normal, or slightly increased, and DHT levels are very low. (Id. 80:17-19); (Exh. 3: Traish Dep.66:8-18); (Exh. 16: Brock Rep. p. 4); (Exh. 20: Cunningham Rep. at ¶¶35-36); (Exh. 19: McVary Rep. p. 19); (Exh. 15: Mulhall Rep. ¶46).

Based upon the observations in these enzyme-deficient men, it was postulated that low DHT levels could prevent both prostate growth and premature hair loss in men. In an effort to

---

[11] These men lack the type II form of the enzyme, which is responsible for a significant amount of testosterone conversion to DHT.

reduce morbidity from surgeries on enlarged prostates, Merck scientists synthesized finasteride in the laboratory with the goal of inhibiting the 5-alpha reductase type II enzyme.  In doing so, the drug was intended, initially, to be used as a treatment for BPH and associated lower urinary tract symptoms in older men.  Finasteride was later approved to treat male pattern hair loss in young men.[12]  Male pattern hair loss has been associated with psychological disturbances, such as stress, low self-esteem, and self-consciousness.  (Exh. 22: Cotsarelis Rep. ¶¶16-18).

### 3. Establishing Causation

Epidemiology is the study of diseases in populations and includes their incidence, prevalence, distribution, causes, and natural history.  Epidemiologists evaluate meta-analyses, clinical trials, observational studies, and descriptive studies.  (Exh. 14: Margolis Rep. 2-3). Establishing whether a drug can cause disease or injury is a complex scientific process.  Its foundation is the scientific method, which applies controlled studies designed specifically to rule out incorrect explanations for phenomena and rule in the proper answer.  (Exh. 12: Schlesselman Rep. §2).

Association does not equate to causation, even when an association is statistically significant.  (Exh. 10: Etminan Dep. 84:1-4); (Exh. 6: Goldstein Dep. I 136:24-137:10).  Two factors can be associated without either one causing the other.  (Exh. 12: Schlesselman Rep. §3). Once a statistically significant association is observed, it must then be evaluated to determine

---

[12]  Exh. 28: Imperato-McGinley, J., Guerrero, L., Gautier, T., & Peterson, R. E. (1974). Steroid 5α-reductase deficiency in man: An inherited form of male pseudohermaphroditism. *Science*, *186*(4170), 1213-1215; Exh. 29: Imperato-McGinley, J., Peterson, R. E., Gautier, T., & Sturla, E. (1979). Male pseudohermaphroditism secondary to 5α-reductase deficiency—a model for the role of androgens in both the development of the male phenotype and the evolution of a male gender identity. *Journal of Steroid Biochemistry*, *11*(1), 637-645; Exh. 30: Gormley, G. J., Stoner, E., Bruskewitz, R. C., Imperato-McGinley, J., Walsh, P. C., McConnell, J. D., ... & Vaughan, E. D. (1992). The effect of finasteride in men with benign prostatic hyperplasia. *New England Journal of Medicine*, *327*(17), 1185-1191; Exh. 31: Imperato-McGinley, J., Shackleton, C., Orlic, S., & Stoner, E. (1990). C19 and C21 5 beta/5 alpha metabolite ratios in subjects treated with the 5 alpha-reductase inhibitor finasteride: comparison of male pseudohermaphrodites with inherited 5 alpha-reductase deficiency. *The Journal of Clinical Endocrinology and Metabolism*, *70*(3), 777; Exh. 32: Imperato-McGinley, J., & Zhu, Y. S. (2002). Androgens and male physiology the syndrome of 5α-reductase-2 deficiency. *Molecular and Cellular Endocrinology*, *198*(1), 51-59.

whether it is the product of biases, confounding factors, chance, or coincidence. (*Id.* §2); (Exh. 14: Margolis Rep. at pp. 3-4). Criteria such as the Bradford-Hill points of view can then be applied to support a judgment of whether the association is causal or not.[13] (Exh. 14: Margolis Rep. pp. 15-16); (Exh. 12: Schlesselman Rep. §§2, 11).

In the field of sexual medicine, scientists and physicians have relied on controlled epidemiological studies and the application of the Bradford-Hill criteria to determine whether exposures increase the risk of male sexual dysfunction. These methods, for example, have been used to answer the question of whether cigarette smoking causes erectile dysfunction.[14] (Exh. 10: Etminan Dep. 93:1-14; 183:4-8). Dr. Etminan has employed these methods in his own research. (*Id.* 183:4-12). In one study, he concluded that "further research" is necessary "to elucidate the nature of this association and potential causation."[15] (*Id.* 84:5-17).

## C.    Scientific Methods

In their professional work, Plaintiff's experts use and teach the methods of science. These include testing hypotheses through experiments, the use of control groups, and the evaluation of statistical significance. (Exh. 10: Etminan Dep. 93:20-95:15, 140:21-23); (Exh. 6: Goldstein Dep. I 54:12-56:3); (Exh. 3: Traish Dep. 90:20-93:1, 96:9-22). They publish their results in peer-reviewed literature. (Exh. 10: Etminan Dep. 60:25-61:9); (Exh. 6: Goldstein Dep. I 55:25-56:13); (Exh. 3: Traish Dep. 90:3-19).

---

[13] The Bradford Hill criteria include strength of the association, consistency of the association, specificity of the association, temporality, biological gradient, plausibility, coherence, experiment, and analogy. (Etminan Dep. 87:8-17). Case law confirms use of these considerations. *See, e.g. In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*, 227 F. Supp. 3d 452, 482 & n. 20 (D.S.C. 2017). *See also* Reference Manual on Scientific Evidence 600 (3d. ed. 2011); (Exh. 33: Bradford, A. (1965). The environment and disease: Association or causation? *Proceedings of the Royal Society of Medicine*, *58*, 295-300).

[14] (Exh. 34: McVary, K. T., Carrier, S., & Wessells, H. (2001). Smoking and erectile dysfunction: Evidence based analysis. *The Journal of Urology*, *166*(5), 1624); (Exh. 35: Köhler, T. S., & McVary, K. T. (2008). The evolving relationship of erectile dysfunction and lower urinary tract symptoms. *Current Sexual Health Reports*, *5*(1), 9-16).

## IV.    ARGUMENT

**A.    There is No Reliable Scientific Evidence That Propecia Causes Sexual Dysfunction During Use Which Persists After Drug Discontinuation.**

As set forth in the Rule 26 reports of Merck's expert witnesses, submitted in support of this motion, application of the scientific method to finasteride data in the published, peer-reviewed literature reveals an absence of reliable scientific evidence that Propecia causes sexual dysfunction that persists after drug discontinuation. (Exh. 16: Brock Rep. pp. 5-10); (Exh. 19: McVary Rep. pp. 24-25); (Exh. 15: Mulhall Rep. ¶¶48-89, 101-102); (Exh. 12: Schlesselman Rep. §11); (Exh. 13: Schlesselman Supp. Rep. §§1.9, 2.1); (Exh. 14: Margolis Rep. pp. 15-16).

**B.    The General Causation Opinions of Drs. Traish, Goldstein, and Etminan Are Not Based Upon Reliable Methods and Data.**

Examination of the testimony and other materials relied on by Plaintiff's experts reveals that their opinions are subject to exclusion.

### 1.    Abdulmaged M. Traish, Ph.D.

#### a.    Background

Dr. Traish earned a degree in chemistry and botany from Tripoli University in Libya. (Exh. 3: Traish Dep. 76:14-20). He has a Ph.D. in biochemistry from Boston University. (*Id*. 77:4-7). He is a Professor in the Department of Urology at Boston University. (*Id*. 37:4-10). Dr. Traish stopped performing laboratory research in 2010. (*Id*. 85:11-17). He is making the transition from a bench researcher and classroom teacher to "an educator." (*Id*. 84:19-23).

Dr. Traish has written six review articles on finasteride and co-authored a clinical study on Proscar with a research group in Germany. (Exh. 3: Traish Dep. 58:5-76:13, 111:9-120:4). He is not a physician, has no medical training, and has never diagnosed or cared for men with sexual dysfunction. (*Id*. 104:17-108:14).

12

### b.    General causation opinion

Dr. Traish's opinion is that Propecia causes sexual adverse effects in susceptible individuals which persist after drug discontinuation.  (Exh. 3: Traish Dep. 136:3-9).  In support of this opinion, he proposes that finasteride, by reducing DHT levels, causes penile fibrosis.  (*Id*. 158:20-160:5).

### c.    Basis of general causation opinion

Although Dr. Traish's 68-page report relies upon basic research studies, epidemiological studies, and clinical evidence, at his deposition Plaintiff's counsel agreed to withdraw Dr. Traish's reliance upon epidemiological and clinical data and, instead, to limit the scope of Dr. Traish's opinion to "biomechanical plausibility." (Exh. 3: Traish Dep. 285:4-287:3).

Dr. Traish presents pharmacokinetic data on finasteride's effects on DHT, the hormone that is most affected by the drug, and finasteride's effects on 5-alpha reductase, the enzyme onto which the drug binds.  According to Dr. Traish, finasteride suppresses serum DHT by 60 to 80%. (Exh. 3: Traish Dep. 184:14-18).  He argues that it is the suppression of the signaling molecule DHT which "leads to a host of physiological processes, including the scarring."  (*Id*. 158:20-159:9-14)

Dr. Traish also refers to the half-life of finasteride's binding to the 5-alpha reductase enzyme, which is reported to be approximately 31 days.  (Exh. 3: Traish Dep. 70:11-71:3, 157:19-158:10, 194:2-196:3).  According to Dr. Traish, this half-life means that the drug's effects in the body are longer than the drug's 4 to 6-hour half-life in the serum.  (*Id*. 263:12-19). He acknowledges that the 31-day half-life of the drug-enzyme complex is consistent with the published scientific data showing that serum DHT levels return to within baseline levels approximately four to five weeks after discontinuation of finasteride.  (*Id*. 190:15-191:13).

Dr. Traish specifically relies upon (i) animal studies involving the administration of 5-alpha reductase inhibitors (i.e., dutasteride and finasteride) and (ii) animal castration studies, to assess the effects of androgen (i.e., testosterone and/or DHT) deprivation on animal penile tissue. (Exh. 2: Traish Rep. pp. 35-53).

> **d.      Dr. Traish's opinion that finasteride causes penile fibrosis in men is not based upon reliable scientific data.**

**5-alpha Reductase Animal Studies.**    Two of the laboratory animal experiments were performed with dutasteride and used nearly identical study designs.[16] These studies do not provide reliable scientific evidence that Propecia causes penile fibrosis in men.

In the two studies, small groups of rats were administered dutasteride or saline (controls) and had their cavernosal nerves electrically stimulated during anesthesia; the rats were killed; their penises were dissected from their bodies; the cavernosal tissue of the penis was excised into strips, treated chemically in various organ baths, and electrically stimulated.  The researchers then examined relaxation of the smooth muscle in the tissue strips.  (Exh. 3: Traish Dep. 242:14-20, 243:16-245:10, 247:16-23, 260:7-261:21).   In one of the studies, histological samples were obtained, stained, and described.[17]

Dr. Traish admits that the dose of dutasteride administered to these rats was 100 times the human dose, when calculated by differences in weight.  (Exh. 3: Traish Dep. 239:23-242:5).  He admits that electrical stimulation of the rat cavernosal nerve is not how erections occur in men. (*Id*. 243:12-15) ("Of course, but this is an experimental animal model.")  He agrees with the researchers, who wrote:  "'Further molecular studies in human models are warranted.'"  (*Id*.

---

[16] (Exh. 36: Pinsky, M. R., Gur, S., Tracey, A. J., Harbin, A., & Hellstrom, W. J. (2011). The effects of chronic 5-alpha-reductase inhibitor (dutasteride) treatment on rat erectile function. *The Journal of Sexual Medicine*, *8*(11), 3066-3074); (Exh. 37: Öztekin, Ç. V., Gur, S., Abdulkadir, N. A., Lokman, U., Akdemir, A. Ö., Cetinkaya, M., & Hellstrom, W. J. (2012). Incomplete recovery of erectile function in rat after discontinuation of dual 5-alpha reductase inhibitor therapy. *The Journal of Sexual Medicine*, *9*(7), 1773-1781).

[17] (Exh. 36: Pinsky 2011, 3066-3074).

14

256:18-257:5).    Finally, he acknowledges that although one of the studies contains figures showing histopathological data, the researchers did not perform a "quantitative assessment" of the tissue.  (*Id.* 248:19-24; 252:2-9).  By contrast, his own penile fibrosis studies, which did not involve finasteride, do provide quantitative histopathological data demonstrating fibrosis, as well as clinical data of "venous leak and erectile dysfunction."  (*Id.* 251:20-25).

Because these rodent studies involve exceedingly high doses of a different drug, were performed in an experimental setting, and did not quantify the histological changes, they do not provide a reliable scientific basis for asserting that Propecia causes penile fibrosis in men.  (Exh. 15: Mulhall Rep. ¶¶91-96); (Exh. 16: Brock Rep. p. 9).  "The rat penis, driven electrically and pharmacologically, yields data but not medical insight."  (Exh. 23: Pfaff Rep. ¶¶31-35).

Dr. Traish also relies on a laboratory animal experiment performed with finasteride, Zhang 2013.[18]  In this study, researchers randomly divided a small group of aged rats into two groups.  One group was administered finasteride orally for 16 weeks, the other group received no treatment.  In both groups, the cavernous nerve was electrically stimulated and erectile function was measured and compared.  All rats were then sacrificed and their penises and prostates were collected and histopathologically examined using Masson's trichrome staining.  (Exh. 38: Zhang 2013 p. 743.e10); (Exh. 3: Traish Dep. 269:9-20).  According to Dr. Traish, the study suggests "histological changes in the trabecular smooth muscle and the connective tissue" in the penises of the finasteride-treated rodents.  (Exh. 3: Traish Dep. 268:14-19).

Dr. Traish concedes that the dose of finasteride used in the study was "much, much, much bigger" than the equivalent human dose.  (Exh. 3: Traish Dep. 268:22-269:6).  He had previously agreed that electrical stimulation of the cavernosal nerve bears no resemblance to how

---

[18] (Exh. 38: Zhang, M. G., Wang, X. J., Shen, Z. J., & Gao, P. J. (2013). Long-term oral administration of 5α-reductase inhibitor attenuates erectile function by inhibiting autophagy and promoting apoptosis of smooth muscle cells in corpus cavernosum of aged rats. *Urology*, *82*(3), 743.e9-743.e15).

erection occurs in men.  (*Id*. 243:12-15).  He also confirms that the study did not include a wash-out period from which to draw conclusions regarding persistence.  (*Id*. 270:24-271:10) ("The issue of after drug discontinuation cannot be answered by this study…").

Dr. Traish acknowledges that the "major limitation" of the study, as the researchers state, was the absence of cellular-based experiments.  (Exh. 3: Traish Dep. 272:21-24).  "They're saying this study alone does not answer every single question in the pathway.  In other words, there's a cascade of pathways that they have not explored."  (*Id*. 273:13-16).  He explains:  "So they -- in other words, they said this study has done only very limited experiments, and if you want to really explore this, you have to go and do all the other studies."  (*Id*. 273:23-274:2).  According to Dr. Traish, "as a basic scientist I -- in many of my reports, when I've done [an] animal study, we do mention that this does not tell the whole story.  There are other, you know, other experiments that could and will and should be done."  (*Id*. 274:2-7).

Dr. Traish concedes that the study authors made no conclusions applicable to the men in this litigation:

> Q:   Do the authors of the Zhang study make any conclusions about whether their data supports an opinion that penile fibrosis occurs in men taking finasteride 1 mg?
>
> A:   No…

(*Id*. 274:22-275:1).   Dr. Traish recognizes that animal testing, while useful to generate hypotheses, must be confirmed through additional testing in humans before results can be applied to humans.  (*Id*. 96:9-22; 166:12-167:23).

**Animal Castration Studies.**  Dr. Traish also relies on laboratory animal studies where castrated rodents suffer penile fibrosis due to androgen deprivation caused by the castration. (Exh. 2: Traish Rep. pp. 36-37).  As he conceded in his testimony, however, castration produces

a hormonal state in animals that finasteride does not produce. (Exh. 3: Traish Dep. 266:18-267:15).

### e.    Conclusion as to Dr. Traish

Based upon Dr. Traish's testimony, these laboratory animal studies cannot reliably support an opinion that Propecia causes penile fibrosis in men. Dr. Traish has published that the uncertainty generated by results from animal studies are "'further complicated by the paucity of available human data.'" (Exh. 3: Traish Dep.178:12-21). Dr. Traish concedes that there are no human data showing that finasteride causes penile fibrosis in men. (*Id*. 203:22-206:7). He has furnished no scientific basis upon which to extrapolate the data from laboratory rodent experiments involving very high doses of dutasteride or finasteride to men ingesting Propecia at the recommended daily dose of 1 mg.[19]

Dr. Traish's opinion of persistent sexual dysfunction through a permanent anatomical change to the penis is also inconsistent with his own scientific research. Animal studies performed in his laboratory have demonstrated that fibrosis in rodents during androgen deprivation (i.e., due to castration) for short periods of time was ***reversible*** upon androgen replacement. (Exh. 3: Traish Dep. 280:6-23). Dr. Traish concedes that, even if 5-alpha reductase inhibitors cause penile fibrosis, the question of whether fibrosis is reversible is "unanswered." (*Id*. 280:24-281:7).

---

[19]    *See Zwillinger v. Garfield Slope Hous. Corp.,* No. CV 94-4009 (SMG), 1998 WL 623589, at *13 (E.D.N.Y. Aug. 17, 1998) (excluding testimony where plaintiff failed to provide evidence that data generated from the animal studies may be reliably extrapolated to humans); *In re Agent Orange Prod. Liab. Litig.,* 611 F. Supp. 1223, 1241 (E.D.N.Y. 1985) ("There is no evidence that plaintiffs were exposed to the far higher concentrations involved in both the animal and industrial exposure studies. . . . The animal studies are not helpful in the instant case because they involve different biological species. They are of so little probative force and are so potentially misleading as to be inadmissible"), *aff'd sub nom. In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 187 (2d Cir. 1987).

2.      **Irwin Goldstein, M.D.**

a.      **Background**

Dr. Goldstein is a sexual medicine physician who operates his own clinic in San Diego, California, which he established in 2007. (Exh. 6: Goldstein Dep. I 39:6-8) He is the only attending physician at the clinic, which also employs nurse practitioners, fellows, and a psychotherapist. (*Id*. 40:13-19; 46:12-14). Before starting the clinic, Dr. Goldstein had worked in the Department of Urology at Boston University. (*Id*. 39:9-12). Dr. Goldstein has diagnosed and treated patients, as well as performed scientific research, in the field of sexual medicine since the 1970s. (*Id*. 33:12-14, 48:24-49:5).

b.      **General causation opinion**

Dr. Goldstein's opinions are primarily directed at "erectile dysfunction and fibrotic activity seen after or during finasteride use." (Exh. 6: Goldstein Dep. I 144:24-145:2). He believes that Propecia causes phenotypic changes in the penis and prostate manifesting as fibrosis. (*Id*. 145:11-21).

c.      **Basis of general causation opinion**

Dr. Goldstein's general causation opinion is based upon what he calls a "differential diagnosis of men who presented [to him] with finasteride and sexual dysfunction." (Exh. 6: Goldstein Dep. I 146:2-6). He developed this opinion in the early 2000s, when he "realized there's something going wrong in these patients more than psychology." (*Id*. 145:22-25). He emphasizes: "My reliance was on my patient population." (*Id*. 171:11-13).

In his Rule 26 report, Dr. Goldstein describes "a retrospective case study" from "a convenience sample of patients with erectile dysfunction in my clinic." (Exh. 4: Goldstein Rep. ¶49) He states that 22 men, who had been on "finasteride therapy" and met certain inclusion and exclusion criteria, were "[a]ssessed by Grey-scale and color duplex Doppler ultrasound

18

(Aixplorer 15.4 MHz transducer) during maximal pharmacologic erection, performed using axial B-mode imaging at multiple gains/multiple locations."  (Goldstein Rep. ¶49)  He reports the results as follows:  "Twenty one patients (95%) had lack of homogeneity with obvious hyperechoic/hypoechoic regions in erectile tissue consistent with mild to mild-moderate corporeal erectile tissue fibrosis."  (*Id*. ¶51).  He also describes "a control group of men" but does not provide the results of grey-scale imaging for them.  (*Id*. ¶53).  Despite this omission, Dr. Goldstein reaches the following conclusion: "Thus, history of finasteride treatment was significantly associated with corporal erectile tissue fibrosis, as assessed by high resolution ultrasound." (*Id*.).

The data in Dr. Goldstein's "retrospective study" have been produced in response to a Rule 45 subpoena *duces tecum*, notices of deposition, and follow-up requests from counsel.[20] These data include (i) excel spreadsheets containing demographic information, drug use, questionnaire results, and grey-scale and duplex Doppler ultrasound findings, (ii) de-identified ultrasound grey-scale and duplex Doppler images, (iii) Dr. Goldstein's clinic examination reports of study subjects, and (iv) email correspondence between Dr. Goldstein and Michele Bertolotto, M.D., a "world expert" radiologist with whom Dr. Goldstein consulted on his study.  (Exh. 6: Goldstein Dep. I 278:16-279:15); (Exh. 39: Emails).

### d.    Dr. Goldstein's penile fibrosis opinion is not based upon reliable scientific methods or data.

The only human data Dr. Goldstein has produced to support his opinion that men who use Propecia develop penile fibrosis are the ultrasound data from his "retrospective study."  As he confirms, this study was based upon a sample of patients in his clinic on whom he performed an

---

[20] Initially, Dr. Goldstein did not produce any ultrasound information on the controls and any information identifying Dr. Bertolotto, his expert consultant and co-author on the study.  On October 3, 2017, Merck's counsel advised Plaintiffs' Counsel of the production deficiencies.  (Exh. 40: 10/30/17 Ltr. from C. Morrow to Pl. Counsel) Plaintiffs' Counsel furnished additional documents.  (Exh. 41: 11/3/17 Ltr. from Pl. Counsel to C. Morrow).

analysis that he dubs a "differential diagnosis." [21]  This methodology is not a reliable basis for reaching a general causation opinion in this case.  Moreover, a review of the "retrospective study" reveals that it lacks the indicia of good science.

### i.    No Peer-Reviewed Publication

As Dr. Goldstein explained, original peer-reviewed papers, such as those which appear on his *curriculum vitae*, reflect that a "manuscript was conceived, performed, written, and submitted to a journal where it gets distributed to peer-reviewed [sic] – or to peers, colleagues, who then review it, make comments, accept or reject, and if we respond appropriately, it gets accepted and it gets published."  (Exh. 6: Goldstein Dep. I 49:15-22).  Sometimes the peer reviewers reject the manuscript:  "That has happened multiple times."  (*Id*. 56:4-6).[22]

Dr. Goldstein has not published his retrospective study in a peer-reviewed medical journal.  (Exh. 6: Goldstein Dep. I 183:22-184:7).  Initially, Dr. Goldstein testified that a manuscript had not been submitted because it had not been written.  (Exh. 8: Goldstein Dep. III 565:23-566:2; 526:10-527:6).  He later testified that his fellow was in charge of drafting the manuscript and that it is in a "very, very rough draft" form, which is why he did not ask her for a copy.  (*Id*. 527:16-528:1).  He also testified to his understanding that only "a little bit of [the] introduction, and that is the extent of it" has been drafted.  (*Id*. 555:3-17)  The written record includes an email sent by Dr. Goldstein's fellow on September 29, 2016, to Dr. Bertolotto stating

---

[21] A differential diagnosis typically goes to the question of specific, not general, causation.  *See Ellis v. Appleton Papers, Inc*., No. 94-CV-558(LEAD), 2006 WL 346417, at *5–6 (N.D.N.Y. Feb. 14, 2006) (rejecting plaintiff's expert's general causation opinion, which plaintiff claimed was "fulfilled by [the expert's method of 'differential diagnosis").; *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005) (rejecting plaintiff's effort to establish general causation through "reliance on differential diagnosis without supporting epidemiological evidence").  The Second Circuit does not necessarily prohibit the use of a properly conducted "differential diagnosis" as a means to demonstrate general causation, but here, Dr. Goldstein's "differential diagnosis" does not demonstrate "rigor of differential diagnosis performed, the expert's training and experience, the type of illness or injury at issue, or some other case-specific circumstance . . . .." *Ruggiero* 424 F.3d at 254 (affirming district court's exclusion of plaintiff's expert's reliance on a differential diagnosis).

[22] *Cf. Hogan*, 2011 WL 1533467, *8 (expert's reliance on a letter to the editor of a medical journal and the number of adverse event reports were "hardly markings of a reliable methodlogy").

that she was "already deep into the manuscript…." (*Id*. 537:18-538:21).[23] Whatever the manuscript status is, to date, the study has not been published, much less submitted for publication to any peer reviewed medical journal.

### ii.    Unreliable Testing

Dr. Goldstein's grey-scale ultrasound study does not employ methods of proper scientific testing.

**No Histopathological Confirmation of Tissue Fibrosis**.   Early in his career, Dr. Goldstein published research studies on penile fibrosis in both men and animals.   (Goldstein Dep. I 202:8-12).   The human studies demonstrate the scientific methods used to document the presence or absence of penile fibrosis in men.   (*Id*. 202:16-23).

In Nehra 1996,[24] Dr. Goldstein co-authored a study using human penile tissue from men who had elected to undergo surgical placement of penile implants.   To detect fibrosis, he used Masson's trichrome staining, human microscopic evaluation, and computer-assisted quantification.   (Exh. 6: Goldstein Dep. I 203:16-204:24).   Penile fibrosis after priapism has also been confirmed using histological techniques.   (Exh. 8: Goldstein Dep. III 554:10-20).   Dr. Goldstein accepts the histological findings of penile fibrosis in other published articles describing this condition in men.   (*Id*. 656:15-657:17).[25]   Dr. Goldstein clearly knows how to perform—and has performed in the past—the type of scientific testing necessary to document penile fibrosis in men, but he has not done so with Propecia.   (Exh. 6: Goldstein Dep. I 161:25-

---

[23] In explaining why he reached out to Dr. Bertolotto in 2016, Dr. Goldstein explained:  "We were trying to write a good manuscript, and I wanted an expert involved."  (Exh. 8: Goldstein Dep. III 523:12-13).

[24]  (Exh. 42: Nehra, A., Goldstein, I., Pabby, A., Nugent, M., Huang, Y. H., de las Morenas, A., ... & Moreland, R. B. (1996). Mechanisms of venous leakage: A prospective clinicopathological correlation of corporeal function and structure. *The Journal of Urology*, *156*(4), 1320-1329).

[25] Dr. Traish confirms that fibrosis is found when "you look at it under a microscope."  (Exh. 3: Traish Dep. 197:23-198:7).  Dr. Traish has published articles describing the histopathological examination of human corpus cavernosum tissue.   (Traish Dep. 198:15-200:12)   He acknowledged the application of this scientific method for detecting fibrosis.  (Traish Dep. 203:8-15).

162:4; 209:14-17).[26]   He acknowledges that obtaining tissue histochemistry confirmation of penile fibrosis from finasteride use is "on the project to-do list."   (Exh. 8: Goldstein Dep. III 696:11-19).

Dr. Goldstein alternatively argues that finasteride has been shown to cause fibrosis in a different organ, the prostate.  (Exh. 6: Goldstein Dep. I 205:20-24).  At deposition, he identified for the first time one study to support his opinion that finasteride produces fibrosis in the prostate.  In Corradi 2004,[27] ten gerbils were treated with 100 mg of finasteride per day.  (Exh. 8: Goldstein Dep. III 690:16-692:11).  Dr. Goldstein concedes that this experiment was confined to the adult gerbil ventral prostate, used exceedingly high concentrations of finasteride, and contains no data on the penis.  (*Id*. 690:12-693:20).  The study also contains the caveat that its findings are "unique to the gerbil prostate."  (Exh. 43: Corradi 2004 p. 206).  Dr. Goldstein does not dispute this limitation but promises to "find other studies to show how finasteride changes smooth muscles in the prostate, because I really believe that it does so."  (Exh. 8: Goldstein Dep. III 696:20-697:23).

In the meantime, Dr. Goldstein confirms that he has produced no original data reflecting fibrosis in the prostates of men using finasteride ("I have not studied the prostate in men who use finasteride") and that he has not produced any original histopathological or biopsy data of either the penis or the prostate from men who have used finasteride ("I have not done those.")  (Exh. 8: Goldstein Dep. III 580:22-581:5).

---

[26]   *See Amorgianos*, 303 F.3d at 268-69 (affirming district court's exclusion of plaintiff's general causation expert who had data available but inexplicably "did not find it necessary" to include them his calculations, even though he stated a proper assessment  would include consideration of that data).

[27]   (Exh. 43: Corradi, L. S., Góes, R. M., Carvalho, H. F., & Taboga, S. R. (2004). Inhibition of 5-α-reductase activity induces stromal remodeling and smooth muscle de-differentiation in adult gerbil ventral prostate. *Differentiation*, 72(5), 198-208).

**Selection Bias**: ██████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ (FILED UNDER SEAL).  Additionally, Dr. Goldstein is listed on the webpage of a patient support group called the "Post-Finasteride Syndrome Foundation." (Exh. 6: Goldstein Dep. I 119:6-16).  Dr. Goldstein observed: "They do God's work."  (*Id*. 123:3-9).  These websites also contain pages listing the signs and symptoms of "Post Finasteride Syndrome," a condition which Dr. Goldstein treats in his clinic.  (*Id*. 124:26-127:3, 128:16-130:5).  As the scientific literature indicates, the enrollment of study subjects complaining of Propecia-induced symptoms referred from these websites is a well-recognized form of bias.[28]

**Hidden Control Group Data.**  In his Rule 26 Report, Dr. Goldstein identifies controls but says nothing about their ultrasound results.[29]  (Exh. 4: Goldstein Rep. ¶53); (Exh. 6:

---

[28] (Exh. 44: Ganzer, C. A., Jacobs, A. R., & Iqbal, F. (2015). Persistent sexual, emotional, and cognitive impairment post-finasteride: A survey of men reporting symptoms. *American Journal of Men's Health*, *9*(3), 222-228. ("Ganzer 2015") at 226-27 ("Study subjects were recruited from patients who had sought treatment for symptoms that they were experiencing and therefore selection bias and recall bias may affect the results.  Subjects were also recruited from the Propeciahelp.com, a website that hosts a forum for finasteride sufferers, and this similarly may have allowed bias to enter the sample."); Exh. 45: Singh, M. K., & Avram, M. (2014). Persistent sexual dysfunction and depression in finasteride users for male pattern hair loss: A serious concern or red herring?. *The Journal of Clinical and Aesthetic Dermatology*, *7*(12), 51-55. ("Singh 2014") at 54 ("A major concern is the level of selection bias among the participants.  Many of the individuals were recruited from an Internet website for individuals with persistent sexual side effects after using finasteride. It is probable that these individuals are more seriously affected by sexuality or have more severe sexual dysfunction and, thus, are more likely to participate in and seek out the study.").

[29] As explained in *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,* No. 11CV6201 DLC, 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015), "[a] good study design compares outcomes for subjects who are exposed to some factor (the treatment group) with outcomes for other subjects who are not exposed (the control group).... [D]ata from a treatment group without a control group generally reveal very little and can be misleading. Comparisons are essential.... Observational studies succeed to the extent that the treatment and control groups are comparable—apart from the treatment. ... There are ... some basic questions to ask when appraising causal inferences based on empirical studies[, such as,] Was there a control group? Unless comparisons can be made, the study has little to say about causation."  *Id.* at *5 (citing Federal Judicial Center, Reference Manual on Scientific Evidence 218, 220, 222 (3d ed.2011).  The court continued: "[i]ndeed, it is axiomatic that, when designing an experiment to test whether an observed result was caused by given variable, the control or benchmark group must lack that variable. That is the whole point of a control group.").  *See also Zwillinger*, 1998 WL 623589, at *15 (excluding plaintiff's expert who "is not using a control group of any type in his study. Rather, Gray's study seems to be comprised entirely of individuals who claim to have similar illnesses caused by exposure to similar chemicals, and does not include any individuals who were not exposed or who do not complain of symptoms. Gray's failure to include a control group of any type in his study raises serious concerns about the reliability of his work.").

Goldstein Dep. I 270:7-11). In response to Merck's Rule 45 subpoena *duces tecum*, he produced two Excel spreadsheets of data, none of which contain data on controls. (Exh. 6: Goldstein Dep. I 271:10-272:2, 272:19-24, 276:19-277:5). At his initial deposition, Dr. Goldstein revealed that he had performed penile ultrasounds of the "control" group. (*Id*. 269:18-270:6). After the deposition, Merck's counsel requested production of these data, which occurred on November 3, 2017. (Exh. 44: Ltr. from Pl. Counsel). When questioned about this at his follow-up deposition, Dr. Goldstein testified:

> Q:    Why didn't you tell us that you had ultrasounded the controls?
>
> A:    Why didn't I tell you what I had for dinner yesterday? I mean, you know, this is my report. My report was based on that. You can ask questions of me about my control group and I can answer them for you.
>
> Q:    Did you think it was relevant that the controls had been ultrasounded? I mean, this is an ultrasound study; right?
>
> A:    I -- I don't know how to answer that question.

(Exh. 8: Goldstein Dep. III 682:15-24). Dr. Goldstein ultimately produced a spreadsheet of 10 men as the control group and ultrasound images for these men. (*Id*. 528:14-529:14, 568:9-12).

Dr. Goldstein describes the control group as a group of men that he selected because they showed homogenous penile tissue appearance on grey-scale. (Exh. 8: Goldstein Dep. III 685:1-8). Dr. Goldstein leaves little doubt that he chose the control group to ensure that the ultrasound images for them were homogenous (as opposed to the heterogeneous images for the Propecia study subjects) (*Id*. 686:10-14). Oddly enough, Dr. Goldstein expressed reservations on whether the actual study control group was the 10 men in the spreadsheet:

> Q:    Well, then who are these controls?
>
> A:    Yeah, well, that's a good question. As it sits here now, I'm confused. But they were never intended to be the same control group. I have to find out.

(*Id*. 684:6-8).

24

**Absence of Baseline Measurements.**  Dr. Goldstein never examined or performed penile ultrasounds on any of the study subjects before they started taking Propecia.  (Exh. 6: Goldstein Dep. I 174:10-24).  He does not know whether any of the men ever had a penile ultrasound outside his clinic.  (Exh. 8: Goldstein Dep. III 646:7-15) ("It doesn't mean anything to me.").  He simply states that performing invasive penile ultrasounds on patients "who are potent" would be "unethical."  (Exh. 6: Goldstein Dep. I 174:10-24).

**Absence of Blinding.**  Dr. Goldstein made no effort to blind himself or his colleagues to the study subjects' exposure to finasteride.  (Exh. 6: Goldstein Dep. I 247:6-19).  Dr. Bertolotto was not blinded to this exposure, either.  (Exh. 8: Goldstein Dep. III 686:21-687:16).  Dr. Goldstein explained: "That is not going to influence how he reads the ultrasound."  (*Id*. 688:5-6).

**Absence of Physical Evidence of Fibrosis.**  During his physical examinations of the study subjects, Dr. Goldstein examined and stretched their penises.  (Exh. 6: Goldstein Dep. I 210:19-23).  Fibrosis, when it is severe, can be palpable.  (Exh. 8: Goldstein Dep. III 658:1-3).  Dr. Goldstein did not record a finding of palpable fibrosis on physical examination in any of the study subjects.  (Exh. 6: Goldstein Dep. I 211:5-10).

**Systemic Data Acquisition Errors.**  Dr. Goldstein acknowledges that one of Merck's expert witnesses on penile ultrasound, Dr. Fulgham, had correctly identified systemic error in the acquisition of the color Doppler images for the men in his study.  (Exh. 8: Goldstein Dep. III 636:17-637:6).  Specifically, he agrees that to obtain an accurate measure of blood flow, the angle correction indicator must be parallel to the long axis of the vessel being imaged.  Misplacement of the angle correction indicator will produce inaccurate blood flow measurements.  (*Id*. 616:9-22).  Dr. Goldstein co-authored an article on the performance of penile ultrasound in which he highlighted the importance of using the correct method: "'This is

25

accomplished by visualizing the cavernosal arteries with color Doppler and appropriately angle-correcting for spectral Doppler measurement of peak systolic velocities and eventually the end diastolic velocities.'" (*Id*. 641:5-11) (Exh. 46: Herbener 1994 p. 328).[30]

> Q:    Okay.  And that's how it is supposed to be done; right?  And if you look at figure 8, the page before, you will see an example of it -- right? -- in the figure?
>
> A:    Bang on.  Right on.
>
> Q:    Right?  The angle of --
>
> A:    Parallel to the wall.

(Exh. 8: Goldstein Dep. III 641:14-21).  Dr. Goldstein confirms five examples of this systemic error in his study.  (*Id*. 617:2-25).  He concedes:  "I agree that we didn't do a fabulous job on this." (*Id*. 641:23-24).

Dr. Goldstein contends that the poor data acquisition of the color Doppler measures does not affect the acquisition and interpretations of the grey-scale images on which his opinion of penile fibrosis is based.  (Exh. 8: Goldstein Dep. III 618:6-18).  He recognizes, however, that operator-dependency does affect the acquisition of grey-scale images on ultrasound:  "[T]he person is going to influence the interpretation."  (*Id*. 622:5-19).  And he acknowledges that operator-dependency cannot be overcome.  (*Id*. 623:24-624:8; 661:10-18) ("I never disagreed with you that there is an element of operator dependency…. [u]ltrasound is a very operator-dependent thing.").

To attempt to address the operator-dependent aspect of ultrasound, Dr. Goldstein established a procedure in which grey-scale ultrasound images were captured at three different fixed gains (45%, 55%, 65%) and a fourth image was captured at a gain, to be chosen by the person performing the ultrasound, between 20 to 35% (at dynamic range of 49).  (Exh. 6:

---

[30] (Exh. 46: Herbener, T. E., Seftel, A. D., Nehra, A., & Goldstein, I. (1994). Penile ultrasound. *Seminars in Urology, 12*(4), 320-332).

Goldstein Dep. I 223:24-224:4, 660:17-661:9).  The choice of gain in the fourth image was performed at the discretion of the ultrasound operator for the purpose of obtaining "what we thought was the best representation of contrast between black and white."  (Exh. 8: Goldstein Dep. III 223:24-224:4; 660:1-16).  Dr. Goldstein even linked the operator dependency in his study to his differential diagnosis:  "I think that's a very important part of doing an ultrasound, is the operator still has to have some capability of being there at the moment and using that person's best judgment as to what gives the best opportunity to make a differential diagnosis."  (*Id*. 661:5-9).

**Inconsistency Between Objective (Blood Flow Measures) and Subjective (Grey-Scale Images) Ultrasound Data.**  Virtually none of the blood flow measures for the 27 men in the study show evidence of veno-occlusive dysfunction.  (Exh. 18: Fulgham Supp. Rep ¶19).  This is because the end diastolic velocity ("EDV") values are less than 5 cm/sec for virtually all study subjects.  (Exh. 17: Fulgham Rep. ¶18)

Regarding the objective blood flow data, however, Dr. Goldstein states:  "They don't have veno-occlusive dysfunction when you stick a needle in their penis and give them an abnormal drug.  But when they are at home with their partner trying to have sex, they have veno-occlusive dysfunction."  (Exh. 6: Goldstein Dep. I 252:18-22).  Dr. Goldstein concedes that in his clinic, these men "don't have ED anymore."  (*Id*. 253:4-7).

Dr. Goldstein believes that only severe fibrosis would demonstrate veno-occlusive dysfunction (i.e., EDVs > 5 cm/sec) after an injection to produce a pharmacologically-induced erection.  "Only in cases of severe fibrosis will the end diastolic velocity (EDV) be greater than 5 cm/sec after intracavernosal administration of vasodilator drugs."  (Exh. 5: Goldstein Supp. Rep. ¶8f).  However, yet again, his own data do not support his belief.  Dr. Goldstein confirms that

three of the 27 subjects had EDVs > 5 cm/sec.  None of the grey-scale ultrasounds for these three subjects was labeled as severe.  Instead, two were labeled "mild to moderate" and one was labeled "mild."  (Exh. 8: Goldstein Dep. III 642:25-645:2).  When queried about this discrepancy, he provided virtually no explanation.  (*Id*. 645:3-23, 645:21-23) ("In some cases there may be some exceptions, for whatever reason, but that's not going to dispute my concept.").

**Subjective Grey-Scale Image Interpretation: "Eyeballing" Quantification.**    Dr. Goldstein's interpretation of the grey-scale ultrasound images was performed by "eyeballing:"

Q:    How did you define the categories, mild, mild to moderate, moderate, and severe?

A:    By the percentage of black within or white. Most of them were hypo-color, within the gray of the image.

Q:    How did you calculate the percentage?

A:    So it was an eyeball thing.  In general, most of these patients were mild to mild-to-moderate.  Some people had moderate.  I don't think we ever saw severe in this population.

***

Q:    How do you teach eyeballing?

A:    I mean, you see gray or you see black holes in it, and you can say it is mild to moderate or mild or -- it is a percentage of the entire surface area which normally is all gray is now not gray.

Q:    Did a computer measure the percentage?

A:    No.  We didn't do it by computer.  It was by eyeballing.

Q:    No quantification whatsoever?

A:    Not by computer quantification.  By eyeballing quantification.

Q:    I'm sorry, what is eyeballing quantification?

A:    I mean, we do many of these.  I personally feel I can distinguish between severe, moderate, and mild.  At the end of day they had fibrosis.  That's the key.  Whatever we are calling it as an adjective.

(Exh. 6: Goldstein Dep. I 264:18-256:23).  Later, after Dr. Goldstein had had an opportunity to reflect on his testimony, he offered this enhancement:

28

> What I referred to as eyeballing is a term that physicians use that laypeople may conceive as guessing, which isn't guessing. It is a better term for eyeballing, because the eyes are connected to the brain. And in a skilled person, who does a lot of this, the eyeballing is a skilled judgment. If I can conclude eyeballing equals skilled judgment, I would believe that both me and Bertolotto used our version of skilled judgment.

(Exh. 8: Goldstein Dep. III 587:16-21).

**Discordant Grey-Scale Image Readings Between Clinicians.** In his Rule 26 report, Dr. Goldstein reported that 21 patients had imaging on grey scale consistent with "mild to mild-moderate corporal erectile tissue fibrosis." (Exh. 4: Goldstein Rep. ¶51). At his deposition, he confirmed that he had developed a "scoring" system comprised of four categories: "Mild, mild-moderate, moderate, and severe." (Exh. 8: Goldstein Dep. III 716:3-23). Early in his study, Dr. Goldstein also determined that he required a "world expert" to read the ultrasounds. (Exh. 6: Goldstein Dep. I 278:16-279:15; 500:25-501:3) ("I needed an international expert in penile ultrasound to corroborate or to at least review what we were doing to see if what we were doing was consistent with someone who was an expert.") Dr. Goldstein reached out to Dr. Bertolotto and, over a period of several months, supplied him with all the ultrasound images for the 27 Propecia-exposed subjects and the 10 unexposed controls. (*Id*. 278:16-279:15; III 510:24-511:11; 533:3-16; 559:25-560:13; 600:18-601:9) According to Dr. Goldstein, Dr. Bertolotto is an "internationally renowned ultrasonographer who has multiple publications on duplex Doppler ultrasound of the penis." (Exh. 8: Goldstein Dep. III 500:5-13).

Dr. Bertolotto's involvement was not mentioned in Dr. Goldstein's description of the study in his Rule 26 report, nor did Dr. Goldstein produce any of the correspondence exchanged with Dr. Bertolotto between July 2016 to the present, in response to Merck's Rule 45 subpoena *duces tecum* or notice of deposition. (Exh. 8: Goldstein Dep. III 571:19-572:18). Dr. Bertolotto's involvement with the study was not disclosed until Dr. Goldstein revealed the

meaning of "MB"—Dr Bertolotto's initials—in a column heading on the first-produced, but incomplete, spreadsheet of 25 study subjects. (Exh. 6: Goldstein Dep. I 278:16-279:15). This column does not appear in the second-produced spreadsheet, which contains data on all 27 study subjects. Dr. Goldstein cannot explain this omission. (Exh. 8: Goldstein Dep. III 570:10-23).

Now that they have been disclosed, the Bertolotto documents reveal that Dr. Goldstein and Dr. Bertolotto disagree on the assignment of Dr. Goldstein's own scoring categories in 52% of the 27 Propecia-exposed subjects. (Exh. 8: Goldstein Dep. III 589:17-596:2).[31] Dr. Goldstein vigorously protests the validity of this comparison and asserts that the important assessment is the presence or absence of fibrosis, not its degree. (*Id*. 596:3-597:3). Using this metric, Dr. Goldstein asserts that he and Dr. Bertolotto had "100 percent agreement" on the patients who had purported fibrosis. (*Id*. 596:6-15) ("Every time he says 'fibrosis,' I have said 'fibrosis.'"). The data in Dr. Goldstein's third-produced spreadsheet, however, indicates that in 6 of 27 patients labeled by Dr. Goldstein as having fibrosis, Dr. Bertolotto writes "no." (*Id*. 599:8-600:14). Moreover, the spreadsheet for the 10 so-called "controls" includes two subjects labeled as "none" by Dr. Goldstein but who were labeled as "none/mild" by Dr. Bertolotto. (*Id*. 601:4-9). Dr. Goldstein dismisses this discrepancy: "So we actually – when I interpret the interpretation of Bertolotto, we took his conservative view as none and said we had 100 percent agreement. That's how I interpreted the agreement." (*Id*. 602:2-18) ("So I don't know what to say. It is something that was new to the whole scene here.").

**Dr. Goldstein Ignores His Own Expert's Methodological Misgivings**. The belatedly produced emails and documents from Dr. Bertolotto reveal numerous misgivings concerning Dr. Goldstein's study methods. Chief among them are the following:

---

[31] Dr. Goldstein also disagrees on the interpretation of the degree of purported fibrosis on the grey-scale images with his fellow. (Exh. 8: Goldstein Dep. III 603:18-607:25).

"'I like the term 'heterogeneity' instead of 'fibrosis,' because it is indeed what we can see.'" (Exh. 8: Goldstein Dep. III 670:7-9)

"'The major shortcoming of all these data is that a confident (histological) diagnosis of fibrosis cannot be obtained in these patients. We only can correlate clinical features with tissue in homogeneity.'" (*Id*. 674:11-17)

"'The major problem is that gold standard is lacking and, honestly, I have no idea of how to obtain.'" (*Id*. 667:13-15)

"'As evaluation of fibrosis is very important (and very subjective) in many clinical situations, it might be nice to develop a more objective evaluation scale.'" (*Id*. 666:10-14).

"'The methods seem to work. However, in the control group, how were they selected? Are they age-matched? Some patients seem to have Peyronie's disease. The echotexture was much more homogenous, and this is somewhat unexpected for me as, in my practice, mild inhomogeneities of the cavernosal echotexture are not uncommon also in patients with good erectile function.'" (*Id*. 676:13-23).

Notwithstanding Dr. Goldstein's reverence for Dr. Bertolotto, these concerns reflect the flaws which, among others, render Dr. Goldstein's study data unreliable. At the final session of his deposition, instead of acknowledging the study problems, Dr. Goldstein instead chose to downgrade his hand-picked expert. (Exh. 8: Goldstein Dep. III 570:10-20) (Emphasis added.)

> Q:  But you have produced to us, that we have now marked and identified today, emails and comments from Michele Bertolotto, emails between you and Dr. Bertolotto, between your fellow, Rachel Rubin, and Dr. Bertolotto, and Dr. Bertolotto's comments back to you on these ultrasounds. And my question to you is why didn't you produce these to us when we subpoenaed the data on your retrospective case study that's described in your Rule 26 report?
>
> A:  Because it wasn't part of the intention of the study. This study was to do work, accumulate our own data. Somewhere in the middle of our data, we asked his opinion as to his view of these, but that wasn't part of the study's intention, to look at our -- he is not our. **He was just an outside reviewer. It had nothing to do with our study**.
>
> Q:  I'm sorry, he had nothing to do with your study?
>
> A:  My study was my work on my patients. The spreadsheet is my spreadsheet. We asked him to get involved, but that has nothing to do with my study. **He could have disagreed 100 percent of all these.** He actually agreed in most of it, but that wasn't the purpose. He wasn't asked to do any of this.

(*Id*. 571:19-572:18) (emphasis added).

31

> Again, my study, retrospective, stands by my diagnosis and my conclusion. When I examine patients, **I don't ask Bertolotto to tell me what to say**.

(*Id.* 600:15-17) (emphasis added).

### iii.    No Error Rates

Dr. Goldstein has not calculated rates of intra-observer variability or inter-observer variability for his subjective interpretations of grey-scale ultrasounds in Propecia study subjects. (Exh. 6: Goldstein Dep. I 285:13-286:2) ("Another thing for me to do.") Nor has Dr. Goldstein calculated any rates of sensitivity, specificity, or positive predictive value for the criteria he uses. (*Id.* 172:11-14, 173:16-25).

### iv.    No Consensus

Dr. Goldstein has presented no evidence of a consensus in the relevant scientific community that penile fibrosis occurs from the use of finasteride in either Propecia or Proscar. He concedes that there is controversy regarding this issue. (Exh. 6: Goldstein Dep. I 200:15-24).

### e.    Conclusion as to Dr. Goldstein

Dr. Goldstein's "retrospective study" lacks virtually any basic indicia of reliable scientific research. It is not published, it has not been peer-reviewed, and it does not use the methods for testing tissue fibrosis in the penis that Dr. Goldstein and others have published (i.e., quantifiable histological examination of tissue under a microscope).[32] Instead, Dr. Goldstein relies upon subjective interpretation of grey-scale ultrasound images that he acquired during medical examinations performed in his clinic. His attempt to construct a scientific study from this novel approach fails to provide assurance that his results were reliably obtained. As Dr. Goldstein acknowledges, the study suffers from selection bias, a questionable control group, the

---

[32] *See In Re Mirena IUD*, 169 F. Supp.3d at 429-30 (excluding plaintiff's general causation expert who offered an opinion on a "mechanism of injury" regarding IUD perforation but where the "mechanism" had not been subjected to peer review and publication, had not been scrutinized by the scientific community, had produced no known or potential rate of error, and had not gained general acceptance within the scientific community).

absence of baseline imaging, no blinding to exposure status, systemic errors in the acquisition of data, inconsistencies between the study's objective blood flow measures on color Doppler and the subjective interpretations on grey scale, the lack of any known rates of specificity or sensitivity for his personal classification system, and significant disagreements between Dr. Goldstein and Dr. Bertolotto, his hand-picked international expert on penile ultrasound. Evidence of the study's chief flaws undisputedly appear in Dr. Bertolotto's comments and emails, which Dr. Goldstein chose to ignore. The multitude of issues with this "study" render the opinion unreliable and inadmissible.[33]

Ultimately, Dr. Goldstein has labeled his theory of fibrosis a "hypothesis" and concedes that he has much more to do to prove it. (Exh. 4: Goldstein Rep. ¶53); (Exh. 6: Goldstein Dep. I 285:17-19; 172:1-10). Case law prohibits using the courtroom for this type of non-scientific guesswork. *In re Mirena IUD*, 169 F. Supp.3d at 431 ("[T]he courtroom is not the place for scientific guesswork, even of the most inspired sort. Law lags science; it does not lead it.'") (citations omitted); *Zwillinger v. Garfield Slope Hous. Corp.*, No. CV 94-4009 (SMG), 1998 WL 623589, at *15 (E.D.N.Y. Aug. 17, 1998) (excluding expert who "has yet to finalize the results

_____

[33] *See In Re Mirena IUD*, 169 F. Supp.3d at 432-34 (expert's reliance on study misplaced where the expert failed to account for flaws in the findings and lack of subjective comparison). In *In re Viagra Prod. Liab. Litig.*, 658 F. Supp. 2d 936, 944–45 (D. Minn. 2009), the district court determined that the plaintiff's general causation expert would be excluded in light of the flaws on a study the expert relied upon which had been revealed:

> the miscodings and errors described above effectively undermine the reliability of the McGwin Study as published. As Plaintiffs concede, there are "acknowledged inaccuracies in the published study" that need to be corrected. In light of those acknowledged inaccuracies, the Court finds good reason to vacate its original *Daubert* Order permitting Dr. McGwin to testify as a general causation expert based on the McGwin Study as published. Almost every indicia of reliability the Court relied on in its previous *Daubert* Order regarding the McGwin Study has been shown now to be unreliable. Peer review and publication mean little if a study is not based on accurate underlying data. Likewise, the known rate of error is also meaningless if it is based on inaccurate data. Even if the McGwin Study as published was conducted according to generally accepted epidemiologic research and did not result from post-litigation research, the fact that the McGwin Study appears to have been based on data that cannot now be documented or supported renders it inadmissibly unreliable. The Court concludes that under *Daubert*, Dr. McGwin's opinion, to the extent that it is based on the McGwin Study as published, lacks sufficient indicia of reliability to be admitted as a general causation opinion.

of his study, and [] his research is still in the hypothesis stage.") (citing *Golod v. La Roche*, 964 F. Supp. 841, 860 (S.D.N.Y. 1997) (the "court should not be charged with determining how a study testing a hypothesis would be conducted, since the proponent of challenged scientific evidence bears the burden of demonstrating its admissibility by a preponderance of the evidence").

### 3.    Mahyar Etminan, Pharm.D., M.S.C. (Epidemiology)

#### a.    Background

Dr. Etminan is Assistant Professor in the Department of Ophthalmology and Visual Sciences at the University of British Columbia.  He holds a doctor's degree in pharmacy and a master's degree in clinical epidemiology.  (Exh. 9: Etminan Rep. p. 2).  Dr. Etminan has published numerous drug-safety studies on many different drugs concerning different potential side effects in numerous areas of medicine.  (Exh. 10: Etminan Dep. 61:1-64:16).

Several of Dr. Etminan's recently published studies involve drugs and side effects which are the subject of U.S. product liability litigation.  These include Accutane and irritable bowel syndrome, Risperidone and gynecomastia, testosterone replacement therapy and myocardial infarction, the Mirena IUD and intracranial hypertension, and Propecia and persistent male sexual dysfunction.  (Exh. 10: Etminan Dep. 156:10-157:8).  He has also served as an expert witness or consultant for plaintiffs' counsel in these and other litigations, i.e., Mirena IUD, Risperdal, Abilify, Fosamax, and Propecia.  (*Id*. 14:11-18:24).  Dr. Etminan monitors alerts from Health Canada, the FDA, and lawyers' websites in search of inspiration for new studies.  (Etminan Dep. 157:22-160:18).  Some of his colleagues are also frequently involved as experts in litigation.  (*Id*. 167:10-21).

Dr. Etminan's involvement in U.S. product liability litigation is noteworthy.  In the Fosamax MDL litigation, Judge Keenan (S.D.N.Y.) largely excluded Dr. Etminan's causation

opinion on *Daubert* grounds.  (Etminan Dep. 14:19-15:10); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 187-88 (S.D. N.Y. 2009).   In the *In re: Mirena IUD Products Liability Litigation* (MDL No. 2676, S.D.N.Y.), Dr. Etminan resigned after admitting at his deposition to performing an erroneous analysis of the data, which also required him to issue a correction of his published study.  (Exh. 10: Etminan Dep. 174:16-176:17); (Exh. 47: 1/20/17 Etminan *Mirena IUD* Affidavit).

### b.        General  causation opinion

Dr. Etminan's describes his general causation opinion as follows:  "I believe that there is pharmacological evidence on how the drug works that it can cause sexual dysfunction.  From the first analysis there is a strong signal on sexual dysfunction.  There is the study with Ali.  I believe he also found about 134 cases of persistence, meaning reported cases after drug -- the drug was stopped.  The clinical trials are mostly one-year risk, not on persistence but on just sexual dysfunction.  So all of that when I put together -- all of that together, I believe that it's possible that some men who stopped the drug can continue to experience the side effect."  (Exh. 10: Etminan Dep. 125:10-22)

### c.        Basis of opinion

Dr. Etminan presents the following data to support his opinion: (1) Propecia randomized clinical trials ("RCTs") and meta-analyses of RCTs published in the scientific literature, as well as his own meta-analysis of Propecia RCTs; (Exh. 9: Etminan Rep. pp. 14-19); (2) epidemiologic surveys on Propecia (*id*. pp. 19-23); (3) large epidemiologic studies (*id.* pp. 23-25), including Guo 2016, on which he is the senior author, which reports an increased risk of persistent sexual

dysfunction in Propecia users compared to non-users;[34] and (4) data mining studies using FDA

Adverse Event Reports ("FAERS") data (*id*. pp. 25-28), including one published study, Ali 2015,

on which he is also the senior author,[35] and one unpublished disproportionality analysis he

performed for his Rule 26 report.

Of note, virtually all of the data presented by Dr. Etminan in his report address side

effects of Propecia while patients are using the drug.  In fact, Dr. Etminan concludes that "the

totality of the scientific evidence points towards a causal link between the risk of [sexual

dysfunction] with Propecia to a reasonable degree of epidemiological certainty." (Exh. 9:

Etminan Rep. p. 28).  Nowhere in his Rule 26 report does Etminan state that Propecia is

responsible for sexual side effects that occur during drug use and persist after discontinuation.

He remedied this oversight when he arrived at his deposition.  (Exh. 10: Etminan Dep. 125:10-

22).

### d.    Dr. Etminan's opinion is not based upon adequate scientific evidence.

Dr. Etminan identifies two studies published in the peer reviewed literature that support

his opinion that finasteride 1 mg causes persistent sexual dysfunction:  (a) Ali 2015, his own

disproportionality analysis using FAERS data, and (b) Guo 2016, his own pharmaco-

epidemiology study using health claims data.  Neither study furnishes reliable methods or data to

support the opinion that Propecia causes sexual dysfunction that persists after discontinuation.

---

[34] (Exh. 48: Guo, M., Heran, B., Flannigan, R., Kezouh, A., & Etminan, M. (2016). Persistent sexual dysfunction with finasteride 1 mg taken for hair loss. *Pharmacotherapy: The Journal of Human Pharmacology and Drug Therapy*, *36*(11), 1180-1184. ("Guo 2016")).

[35] (Exh. 49: Ali, A. K., Heran, B. S., & Etminan, M. (2015). Persistent sexual dysfunction and suicidal ideation in young men treated with low-dose finasteride: A pharmacovigilance study. *Pharmacotherapy: The Journal of Human Pharmacology and Drug Therapy*, *35*(7), 687-695. ("Ali 2015")).

### i.      Ali 2015

In Ali 2015, Dr. Etminan and colleagues performed a disproportionality analysis in which they compared the reports of sexual dysfunction ("SD") and suicidal ideation included in the FAERS database for finasteride 1 mg and/or Propecia to the reports of these same outcomes for every other drug in the database.  (Exh. 49: Ali 2015 p. 688-89).  "The FAERS is a publicly available database of redacted adverse drug event reports that are spontaneously submitted by health care professionals, patients and their caregivers, drug manufacturers, study investigators, and other sources.  The database is a significant source of postmarketing safety surveillance for all approved medicinal products in the United States."  (Exh. 49: Ali 2015 p. 688).   The researchers concluded that a signal of persistent SD had been detected in young men treated with low dose finasteride.  (*Id*. p. 689).  Dr. Ali, the first author, decided to perform the study, acquired the data, performed the analysis, and contacted Dr. Etminan to draft the manuscript. (Exh. 10: Etminan Dep. 160:22-161:19; 162:13-162:24, 166:20-25).

Dr. Etminan concedes that this type of analysis has numerous limitations and is unable and inadequate to establish causation between a drug exposure and a reported adverse event. (Exh. 10: Etminan Dep. 51:5-12).  The published study states, and Dr. Etminan confirms, that, considered "on their own," "no causal association can be inferred from these analyses." (*Id*. 193:9-19, 199:4-9).

The published study identifies several other limitations with disproportionality analyses, all of which Dr. Etminan accepts: (i) they cannot quantify the extent of the risk of sexual dysfunction—let alone the risk of persistent sexual dysfunction; (Etminan Dep. 193:20-194:4) (ii) they are affected by confounding and reporting bias, due to the voluntary reporting of events; (Exh. 10: Etminan Dep. 194:5-195:7; 195:18-196:3) (iii) their results must be interpreted within the context of all other available data, including pharmacologic class safety profile,

37

pathophysiology of the event, biological plausibility assessment, and any risk factor that could be influencing the reports (*id*. 195:8-17); (iv) data from FAERS are often incomplete and affected by patient dissatisfaction or involvement in litigation (*id*. 196:4-15); (v) the number of reports can be artificially inflated due to mass media news (*id*. 196:16-25); (vi) they are unable to eliminate confounding by indication biases (*id*. 197:16-20); and (vii) they do not usually review prior conditions or prior medication use that could affect the reported adverse event. (*Id*. 197:21-198:6).

A major methodological flaw in the study design of Ali 2015 is its inability to address "persistent" SD, the very outcome it claims to report.  Adverse event reports in the FDA database are submitted through MedWatch forms and coded under a system of MedDRA Preferred Terms. (Exh. 10: Etminan Dep. 187:15-188:21).  There is no term for "persistent erectile dysfunction," or other types of "persistent" sexual dysfunction, in the MedDRA Preferred Term dictionary. (*Id*. 190:18-191:6).  Consequently, only adverse event reports of "sexual dysfunction" can be searched in the database.  Without reviewing the actual MedWatch forms that comprise the reports of "sexual dysfunction," it is not possible to determine whether the reports provide information indicating the presence of "persistent" sexual side effects after discontinuation of finasteride.  (*Id*. 207:13-18).

Dr. Etminan did not review the MedWatch forms in Ali 2015.  (*Id*. 212:4-6).  He does not think, and consequently he does not know, whether Dr. Ali did, either.  (*Id*. 227:19-23).  As a result, Dr. Etminan confirmed that a signal of persistent sexual dysfunction cannot be confirmed from this study:

> Q:    Can you conclude that there is a signal of persistent sexual dysfunction --
> A:    No.
> Q:    -- using finasteride?

38

A:      No.

(*Id*. 208:9-12). The limitations identified by Dr. Etminan in Ali 2015 are equally applicable to Dr. Etminan's unpublished disproportionality analysis in his Rule 26 report.  (*Id*. 201:23-203:2). He likewise agrees that, without examining the underlying MedWatch forms, it is unknowable whether the adverse event reports identified in his unpublished disproportionality analysis actually reflect persistent sexual dysfunction, or simply sexual dysfunction occurring on drug. Dr. Etminan did not perform a review of the MedWatch forms that corresponded to the cases identified in his analysis.  (*Id*. 212:14-25).

At his deposition, Dr. Etminan was shown sample MedWatch forms corresponding to some of the adverse event reports in Ali 2015 and in his unpublished disproportionality analysis. He confirmed these MedWatch forms report resolution of adverse events after drug discontinuation.  (*Id*. 218:2-223:16, 226:4-227:16).  Consequently, Dr. Etminan testified:

> "My report is a very crude signal on all events.  Some of them could be persistent, some of them could have been corrected."  (*Id*. 223:18-20)

> "That signal is not all on persistent, yes.  Persistence."  (*Id*. 224:2-3)

> "[It]'s a signal for sexual dysfunction in general." (*Id*. 224:24-25).

### ii.      Guo 2016

In Guo 2016, a retrospective cohort study, Dr. Etminan and colleagues purportedly examined the risk of persistent sexual dysfunction in relation to use of finasteride 1 mg.  (Exh. 48: Guo 2016).  They used the IMS U.S. health claims database to compare the rates of sexual dysfunction between former finasteride users and users of omeprazole, a heartburn medication. (*Id*. at 1181).  They report a hazard ratio of 1.62 (95% CI: 1.14-2.29) when sexual dysfunction was defined as a "diagnosis" of sexual dysfunction, and a hazard ratio of 2.73 (95% CI 2.01-3.69) when sexual dysfunction was defined as the use of a PDE5 inhibitor.  (*Id*. at 1182)  Dr.

Etminan decided to perform this study because "after the Ali study, we thought that there isn't an epi study – an epi study on this topic and also Mr. Guo was looking for a research project, so we thought this would be a good question." (Exh. 10: Etminan Dep. 234:2-6).

Dr. Etminan testified that Guo 2016 contains a fundamental design flaw that prevents it from serving as reliable scientific evidence on the question of whether an association exists between finasteride use and persistent sexual dysfunction. He concedes that he only searched the health claims dataset for evidence of sexual dysfunction occurring after Propecia use stopped; he did not search the dataset for evidence of sexual dysfunction that first occurs while using that drug and continues after discontinuation. (Exh. 10: Etminan Dep. 279:20-280:23). Because Dr. Etminan concedes that sexual dysfunction in a man can arise at any time for any reason (*id*. 106:7-107:12) and that it is a highly prevalent condition (*id*. 76:3-9), the events of sexual dysfunction recorded in users of finasteride could not be attributed to the drug. (*Id*. 280:4-12). Although he insists that his study nonetheless measures persistence, he also acknowledges that the study design does not adhere to the "textbook example" of persistence, i.e., sexual dysfunction occurring on drug that continues after drug discontinuation. (*Id*. 137:1-12).

Dr. Etminan identifies a "third analysis" in Guo 2016 which aimed to adhere to the "textbook example" of persistence:  a "within-patient" analysis comparing sexual dysfunction on drug to sexual dysfunction off drug. (Exh. 10: Etminan Dep. 251:14-18). However, he was unable to explain his own study design and results for this "third analysis." (*Id*. 253:21-261:18). He admits that he would need to review the data, consult with his statistician, and "get back to you" with answers. (*Id*. 260:19-261:1).

It is unclear whether Dr. Etminan was already retained by Plaintiffs' counsel when the study reported by Guo 2016 was designed and performed. (*Id*. 39:18-41:23; 230:7-8; 237:3-

240:15).   The disclosure in the published study states: "While Dr. Etminan has received compensation from attorneys from the Propecia sexual dysfunction litigation, these services were separate and apart from authoring this study."  (Ex 48: Guo 2016 p. 1180).

### iii.    Hagberg 2016 and Unger 2016

Dr. Etminan is familiar with other published epidemiological studies which report evidence consistent with no increased risk of persistent sexual dysfunction with finasteride use, Hagberg 2016 (Exh. 50) and Unger 2016 (Exh. 51).

A large epidemiological study by Hagberg *et al*. employed a reputable claims database and reported an adjusted odds ratio for erectile dysfunction of 1.01 (95% CI 0.58 - 1.75) for finasteride users who stopped using Propecia for one year or less.  (Exh. 10: Etminan Dep. 284:11-17).  The study also reports an adjusted odds ratio of 1.05 (95% CI 0.60 - 1.86) for finasteride users who discontinued Propecia for one to five years. (*Id.* 285:3-10).  Dr. Etminan concedes that these adjusted odds ratios are not statistically significant.  (*Id.* 284:18-21, 285:8-10).  In his Rule 26 report, Dr. Etminan "discussed Hagberg's limitations but not the data." (*Id.* 289:12-16).

Another large epidemiological study with finasteride 5 mg, Unger 2016, studied nearly 14,000 men by linking their Medicare claims and following them up for a median time of 16 years.  Figure 1 in this study shows the cumulative incidence of sexual dysfunction between placebo and finasteride.  This figure shows two lines, one for the placebo and one for the treatment arm.  They appear superimposed on each other.  This suggests the absence of persistent sexual side effects, even though the exact percentage of men who discontinued finasteride is unknown.  (Exh. 51: Unger Ex. 5 of 7).  Dr. Etminan concedes that Unger 2016 and Hagberg 2016 reached consistent conclusions (i.e., evidence that is inconsistent with a claim of persistent sexual dysfunction from use of Propecia).  (Exh. 10: Etminan Dep. 308:12-15).

#### iv.    Kiguradze 2017

Dr. Traish and Dr. Goldstein both referred to a recently published epidemiological study that presents a prediction model of the risk of persistent sexual dysfunction with finasteride 1 mg in young men by duration of exposure (i.e., short term versus long term).  (Exh. 52: Kiguradze 2017); (Exh. 3: Traish Dep.138:12-140:24); (Exh. 8: Goldstein Dep. III 551:22-552:11).   Dr. Schlesselman, one of Merck's epidemiologic experts, served a supplemental report addressing this study, which was published after his initial Rule 26 report.  (Exh. 13: Schlesselman Supp. Rep).  After thorough analysis of the study methods, Dr. Schlesselman concludes that the study employs unorthodox statistical methods that renders the results uninterpretable.  (*Id*. at 20)

Dr. Etminan does not rely on Kiguradze 2017 to support his opinion in this litigation.  In fact, he testified that he agrees with Dr. Schlesselman's critique of this study, and offers that the study is "not really an epi study.  It is – I'm actually not sure what to call it…there's a lot of ambiguous methodology in that study."  (Exh. 10: Etminan Dep. 52:14-53:1).

#### v.    Propecia randomized clinical trials

Dr. Etminan testified that none of the finasteride 1 mg randomized clinical trials includes data on persistent sexual dysfunction:  "The clinical trials are mostly one-year risk, not on persistence, but on just sexual dysfunction."  (Exh. 10: Etminan Dep. 125:16-18, 142:5-8).  He also testified that none of the randomized clinical trials of finasteride 5 mg include data on persistent sexual dysfunction: "There are continuation of clinical trials that looked at 5 milligram dose and sexual dysfunction.  I'm not -- I don't remember if it was persistent, but sexual dysfunction was looked at."  (*Id*. 185:3-12).  Dr. Etminan is unable to identify "a single paper"

addressing persistence of sexual dysfunction in men who used finasteride 5mg. (*Id*. 185:13-20).[36]

### vi.    Epidemiologic surveys

In his Rule 26 report, Dr. Etminan identifies various surveys on finasteride use and sexual dysfunction. However, he confirms that case series and case reports do not report estimates of risk, such as relative risks or odds ratios and that they are only useful to generate hypotheses that need to be confirmed through controlled studies, which might produce "positive or negative results." (Exh. 10: Etminan Dep. 93:15-95:15).

### e.    Conclusion as to Dr. Etminan

Dr. Etminan cannot identify any epidemiological studies that can reliably demonstrate that Propecia causes sexual dysfunction that occurs during treatment and persists after discontinuation. For these reasons, Dr. Etminan's expert opinion should be excluded.

## C.    Plaintiff's Specific Causation Expert Opinion Is Also Subject to Exclusion.

### 1.    Without general causation, specific causation fails.

If Merck's motion to exclude Plaintiffs' general causation opinion testimony is granted, that determination is dispositive. *E.g., In re Mirena IUD,* 169 F. Supp.3d at 436; *aff'd, In re Mirena IUD*, 2017 WL 4785947, *3-4 (2d Cir. Oct. 24, 2017) (affirming district court's grant of summary judgment based on failure of general causation).[37] That ruling would also render Dr. Goldstein's specific causation testimony inadmissible. *Id.* Dr. Goldstein's case-specific opinions should be excluded for the independent reasons set forth below.

---

[36] Dr. Etminan fails to address data in one finasteride RCT which can provide evidence that is inconsistent with the theory of persistent sexual dysfunction. (Exh. 53: Wessells, H., Roy, J., Bannow, J., Grayhack, J., Matsumoto, A. M., Tenover, L., ... & Parra, R. (2003). Incidence and severity of sexual adverse experiences in finasteride and placebo-treated men with benign prostatic hyperplasia. *Urology*, 61(3), 579-584); (Exh. 12: Schlesselman Rep. §§ 6.5.3-6.5.4).

[37] Merck incorporates by reference its simultaneously filed Motion for Summary Judgment which likewise explains that lack of general causation terminates the case.

## 2.    Dr. Goldstein's case specific opinion should be excluded.

### a.    Background

Mr. Dawson contends that he suffers erectile dysfunction, decreased libido, reduced sexual sensation, decreased semen output, smaller flaccid penis, intense testicular pain, less-intense orgasm, rare morning erections, and no spontaneous erections. (Exh. 1: Dawson Dep. 41:1-52:24, 77:22-81:9, 102:17-104:4); (Exh. 54: Am. Pl. Profile Form (redacted) (Feb. 10, 2014) at 33).

Mr. Dawson is a 31-year-old man with a lifelong history of personality disorders (e.g., aggressive behavior pattern, isolation, distrust of physicians) and depression (e.g., lack of motivation and excitement, and the use of anti-depressants). He consumes alcohol daily and is a former smoker. (Exh. 16: Brock Rep. p. 13). Mr. Dawson lives with his mother. (Exh. 21: Segraves Rep. at ¶46).

Mr. Dawson has never had a girlfriend and has not had sexual intercourse; he has had only one date in his adult life and has not kissed a girl since age 17. (Exh. 21: Segraves Rep. at ¶46) Mr. Dawson has described having a normal frequency of erections and orgasms through masturbation, which he does three to five times per week. He has never attempted vaginal penetration. (Exh. 16: Brock Rep. p. 13).

Approximately nine years ago, in 2008, Mr. Dawson took Propecia for four months. (Exh. 1: Dawson Dep. 88:13-16). He claims his sexual dysfunction started at that time and has persisted since then. (*Id.* 22:21-23). As of his deposition in 2016, Mr. Dawson had not received any medical treatment or seen a physician regarding his allegations since 2009. (*Id.* 219:9-13) He had a scrotum ultrasound performed in June 2009, which indicated hydroceles (the accumulation of serous fluid around the testes) and a varicocele (a collection of varicose veins in the spermatic cord). (*See id.* 214:4-216:7). ███████████

44



(FILED UNDER SEAL); (FILED UNDER SEAL).

(FILED UNDER SEAL). According to Dr. Brock, the ultrasound result is consistent with focal areas of calcification, likely due to local trauma to the penis, which can occur during aggressive or excessive masturbation. (Exh. 16: Brock Rep. p. 13). Mr. Dawson had DHT levels within the normal range. (Exh. 20: Cunningham Rep. ¶75); (Exh. 7: Goldstein Dep. II 345:14-24) (FILED UNDER SEAL).

(FILED UNDER SEAL).

> **b.    Dr. Goldstein's case specific opinion is not based on a proper differential diagnosis.**

To perform a proper differential diagnosis, a physician is required to consider a patient's relevant medical history and present health status in order to rule out potential causes of injury. Dr. Goldstein manifestly did not do so when he examined Mr. Dawson.

"A differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (internal quotation marks and citations omitted) (affirming exclusion of expert's testimony that a drug caused cirrhosis of the liver where the expert purported to based his opinion on a differential diagnosis, but "was unable to point to any studies or, for that matter, anything else" that supported his conclusion). "In performing a differential diagnosis, a physician begins by 'ruling

in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." *In re Rezulin Prods.*, 00 CIV. 2843 (LAK), 2004 WL 2884327, at *3 (S.D.N.Y. Dec. 10, 2004) (citation omitted). Both the "ruling in" and the "ruling out" must be done "using scientifically valid methodology." *Ruggiero*, 424 F.3d at 254 (citation and internal quotation marks omitted).

"A differential diagnosis typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Hous. Corp.*, CV 94-4009 (SMG), 1998 WL 623589, at *19 (E.D.N.Y. Aug. 17, 1998) (excluding causation testimony where expert "failed to conduct a thorough, scientific differential diagnosis"). "While an expert need not rule out *every* potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Munafo v. Metro. Transp. Auth.*, 00-CV-0134 (ERK), 2003 WL 21799913, at *18 (E.D.N.Y. Jan. 22, 2003) (excluding causation expert where his "failure to perform a thorough and meaningful differential diagnosis is particularly troubling considering the serious alternative factors raised by the defendants").[38]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[38]    *See, also, e.g., In re Mirena IUD Products Liab. Litig.*, 169 F. Supp. 3d 396, 459 n.57 (S.D.N.Y. 2016) (excluding causation opinion where "[t]here is not the slightest indication that Dr. Strassberg undertook either prong of [the differential diagnosis] analysis."); *In re Fosamax Products Liab. Litig.*, 924 F. Supp. 2d 477, 493 (S.D.N.Y. 2013) (excluding expert's opinion on specific causation where he "admitted that he could not eliminate other potential causes, rendering his testimony inadmissible."); *Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 190 (E.D.N.Y. 2013) (excluding expert's specific causation opinion based on unreliable differential diagnosis). *See also In re Viagra Prods. Liab. Litig.*, 658 F. Supp.2d 950, 957-60 (D. Minn. 2009).

████████████████████████████████████████████████████████████

█████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

     ■     ████████████████████████████████████████████

     ■     ████

     ■     ████████████████████████████████████████████████

     ■     █████████████████████████

████████████████████████  ████████████████████████████████████

██████████████████████████████████████████████ (FILED UNDER SEAL).

       **Second**, Dr. Goldstein did not properly evaluate and "rule out" psychosocial reasons for Mr. Dawson's sexual complaints.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████ (FILED UNDER SEAL).  █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ (FILED UNDER SEAL)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

(FILED UNDER SEAL).

47

Dr. Goldstein highlights the importance of a "biopsychosocial" evaluation of a patient with sexual complaints.  (Exh. 6: Goldstein Dep. I 45:17-22).[39] ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (FILED UNDER SEAL).

████████████████████████████████████████████████

████████████ (FILED  UNDER  SEAL).  ██████████████████

████████████████████████████████████████████████

████████████ (FILED UNDER SEAL).

██████████████████████████████████████████

████████████████████████████████████████████████

████████████ (FILED UNDER SEAL).

████████████████████████████████████████████████

████████████ (FILED UNDER SEAL).  Dr. Goldstein therefore uses his "penile

---

[39] "ED is often multifactorial in origin, and the initial evaluation of ED must include a complete medical, psychosocial, and sexual history." (Exh. 15: Mulhall Rep. ¶25). "[T]he complex nature of sexual function involves physical, emotional, cultural, interpersonal, and psychological issues in an ever-changing environment.  All of these domains must be carefully considered when a man presents to clinic with complaints of sexual dysfunction."  (Exh. 16: Brock Rep. at p. 4).

fibrosis theory" to avoid any consideration of the "psychosocial" portion of his own methodology for properly diagnosing patients with sexual complaints. As such, Dr. Goldstein fails to address "obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *See Munafo*, 2003 WL 21799913, at *18.

████████████████████████████████████████████

████████████████████████████████████ (FILED UNDER SEAL). ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████ (FILED UNDER SEAL), ███████████████████████

████████████████████████████ (FILED UNDER SEAL).

Dr. Goldstein failed to perform a proper and reliable differential diagnosis for Mr. Dawson and consequently cannot conclude that his use of finasteride is responsible for his sexual dysfunction complaints. His specific causation opinions on Mr. Dawson should be excluded.

## V.    CONCLUSION

At the heart of the admissibility requirements of Rules 702 and 703 is the notion that methods and data must be scientifically relevant and reliable. As detailed, all the shortcomings in the data and methods used by Plaintiff's experts to reach their general and specific causation opinions demonstrate a failure to adhere to the data and methods of good science. When scientific sounding opinions are not based upon a reliable scientific foundation, gatekeeping requires exclusion of these opinions. *See, e.g., Ruggiero*, 424 F. 3d at 254 (affirming exclusion of general causation expert who could not point to any studies or "anything else" that suggested causation, and rejecting the expert's attempt to rely on a "differential diagnosis" to support

general causation); *In re Mirena IUD*, 2017 WL 4785947, *3 (affirming exclusion of plaintiff's general causation experts where (1) the theories offered by the experts were not accepted in the relevant scientific community, (2) the experts failed to identify any authorities that directly supported their opinion of "secondary perforation," (3) the experts developed their theories for the litigation, (4) there was no direct support in the literature, and (5) plaintiff's experts assumed the existence of the very phenomenon in dispute and then hypothesized how it could occur).[40]

Merck respectfully requests that the Court conduct an evidentiary hearing to evaluate the admissibility of these experts' opinions and exclude their testimony.

Dated: November 27, 2017.

> /s/ Charles F. Morrow
> Charles F. Morrow, Esq.
> BUTLER SNOW LLP
> Crescent Center
> 6075 Poplar Avenue, Suite 500
> Memphis, TN 38119
> Telephone: (901) 680-7200
> Facsimile: (901) 680-7201
> Email: chip.morrow@butlersnow.com
>
> Matthew T. McLaughlin, Esq.
> Michael A. Guerra, Esq.
> VENABLE LLP
> Rockefeller Center
> 1270 Avenue of the Americas, 25th Floor
> New York, NY 10020
> Telephone: (212) 307-5500
> Facsimile: (212) 307-5598
> Email: mtmclaughlin@venable.com
> Email: maguerra@venable.com
>
> ***Attorneys for Defendants Merck & Co., Inc.***
> ***and Merck Sharp & Dohme Corp.***

---

[40] *See also Valente v. Textron, Inc.*, 559 F. App'x 11, 13–14 (2d Cir. 2014) (Summary Order); *Ellis v. Appleton Papers, Inc.*, No. 94-CV-558(LEAD), 2006 WL 346417, at *9 (N.D.N.Y. Feb. 14, 2006) (excluding plaintiff's general causation expert where "not only are there no scientific tests or controlled studies demonstrating a causal link between CCP and building-related illness, there is no evidence whatsoever demonstrating such a link. The record contains a few anecdotal case reports and Dr. Thrasher's own conclusions to the effect that formaldehyde exposure can be harmful, but even Dr. Thrasher's studies do not specifically address CCP, and there is no evidence that CCP releases any amount of formaldehyde, let alone enough to do harm.").

50