Confidential - Subject to Protective Order

1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF NEW YORK
3                        -  -  -
4

IN RE: PROPECIA          :   Master File
5   (FINASTERIDE) PRODUCTS :   No.
    LIABILITY LITIGATION    :   1:12-md-02331
6                          :   -BMC-PK
    _____ :
7                          :   MDL No. 2331
                           :
8   This Document Relates   :   Honorable
    to:                     :   Brian M.
9                          :   Cogan
    ALL CASES               :
10                          :   Magistrate
                           :   Judge Peggy
11                          :   Kuo
12

                        -  -  -

13

                   April 19, 2016

14

                        -  -  -

15

                Confidential videotape
16   deposition of CYNTHIA GROSSEL SILBER,
    M.D., taken pursuant to notice, was held
17   at the law offices of Morgan, Lewis &
    Bockius LLP, 1701 Market Street, 18th
18   Floor, Philadelphia, Pennsylvania,
    beginning at 8:14 a.m., on the above
19   date, before Kimberly A. Cahill, a
    Federally Approved Registered Merit
20   Reporter and Notary Public.
21                        -  -  -
22

            GOLKOW TECHNOLOGIES, INC.
23        877.370.3377 ph| 917.591.5672
                deps@golkow.com
24

Golkow Technologies, Inc.                    Page: 1

1  that -- how did you learn how to

2  interpret this data?  Where did you learn

3  that skill?

4      A.    I learned how to look at

5  data from my medical training; and

6  specifically postmarketing data, I

7  learned when I joined Merck.  I was

8  trained by my colleagues in management.

9      Q.    So to the extent that you

10  were evaluating data from an

11  epidemiological perspective, that was all

12  on-the-job training; correct?

13      A.    I would not say that I was

14  evaluating data from an epidemiologic

15  perspective.

16      Q.    What is a safety signal?

17      A.    A safety signal is the

18  combination of a product and an adverse

19  event that may represent an association

20  between the two or may not.

21      Q.    In a given patient

22  population; correct?

23      A.    Not necessarily.

24      Q.    Well, you have users of a

1   particular drug.  Right?

2          A.    Well, if that's your sense.

3   You can't have a combination of an

4   adverse event with a drug without having

5   the population defined as those people

6   who take the drug.

7          Q.    So you are in effect

8   studying the outcome of a particular drug

9   on a patient population; correct?

10            (Pause.)

11            THE WITNESS:  But that was

12        -- yes, but that was not the --

13        the extent of that work.

14   BY MR. BECKER:

15          Q.    And that study of the

16   outcome of a drug on a patient population

17   is the hallmark of epidemiology, is it

18   not?

19            MR. HARRELL:  Object to

20        form.

21            THE WITNESS:  I don't know

22        what the hallmark of epidemiology

23        is.

24   BY MR. BECKER:

Confidential - Subject to Protective Order

1       Q.    It's a form of epidemiology;
2   correct?
3       A.    I don't know.
4       Q.    Do you know what
5   epidemiology is?
6       A.    I can't give you a
7   definition.
8       Q.    As a medical doctor, have
9   you ever heard the term epidemiology?
10      A.    Yes, I have.
11      Q.    What's your understanding of
12  that term?
13      A.    My understanding of that
14  term is that it is the science of the
15  study of populations.
16      Q.    So let's go back to where we
17  started.  If you didn't have any formal
18  training in epidemiology, to the extent
19  you were studying a patient population at
20  Merck related to the use of Propecia, all
21  that knowledge came from on-the-job
22  training; correct?
23      A.    No, not all that knowledge
24  came from on-the-job training.

Confidential - Subject to Protective Order

1          Q.     Where did you get it then

2     beyond --

3          A.     I --

4          Q.     -- at Merck?

5          A.     No, a lot of the knowledge

6     that we use comes from our past medical

7     training.

8          Q.     Like what?

9          A.     Like knowledge about disease

10    states, knowledge about drug use,

11    knowledge about medical conditions.

12         Q.     But it's fair to say you

13    have no formal education in epidemiology

14    or the study of patient populations;

15    correct?

16              MR. HARRELL:  Object to

17         form.

18              THE WITNESS:  I do not have

19         a degree in epidemiology.

20    BY MR. BECKER:

21         Q.     Did you ever take any

22    courses in epidemiology?

23         A.     Yes, I did.

24         Q.     How many?

Confidential - Subject to Protective Order

1    A.    One.

2    Q.    How many credits?

3    A.    It was in medical school.

4    There are no credits in medical school.

5    Q.    So like a semester or a year

6    --

7    A.    Uh-hum.

8    Q.    -- or a quarter?

9    A.    Yes.

10   Q.    Which one?

11   A.    I believe it was a semester.

12   Q.    So your formal education

13   regarding the study of epidemiology is

14   one semester of study for one class in

15   medical school; correct?

16   A.    That is my formal education.

17   Q.    Go back to your resume, if

18   you would.

19   A.    Yes.

20   Q.    Well, let me ask you a

21   question about that:  Because you have

22   relatively little formal education in

23   epidemiology, you understand that signals

24   can be calculated to a numerical value;

Confidential - Subject to Protective Order

1    correct?

2               MR. HARRELL:  Object to

3         form.

4               THE WITNESS:  Signals can be

5         calculated in different ways.  It

6         depends upon the source of the

7         data.

8    BY MR. BECKER:

9         Q.    One of those is a numerical

10   value; correct?

11        A.    I -- I don't know to what

12   you're referring.  I can't answer a

13   general question like that.

14        Q.    Okay.  If -- you have an

15   understanding, though, that signals can

16   be calculated; correct?

17        A.    Again, I don't know to what

18   type of data you're referring.

19        Q.    Well, when you're looking

20   for a particular safety signal, what are

21   you looking for?

22        A.    We're looking for evidence

23   that the particular adverse event either

24   is related to the drug or is not.

1    Q.    And how do you calculate

2    that or how do you quantify it?

3    A.    We do not necessarily

4    quantify it.  It depends on the data

5    source.

6    Q.    Let's take Propecia, for

7    example.

8    A.    Uh-hum.

9    Q.    Okay?  One of the adverse

10   events that's been alleged in this case

11   is that sexual dysfunction can continue

12   after discontinuation of the drug.

13          You have an understanding of

14   that; correct?

15   A.    Yes.

16   Q.    So how would you quantify

17   whether or not the data that Merck has in

18   its possession does or does not

19   demonstrate a safety signal?

20          MR. HARRELL:  Object to

21          form.

22          Go ahead.

23          THE WITNESS:  If you are

24          asking for quantification, the

Confidential - Subject to Protective Order

1    place I would go would be the

2    clinical trial data.

3  BY MR. BECKER:

4        Q.    What if you wanted to -- but

5  you can evaluate safety signals not just

6  based on clinical trial data.  Right?

7        A.    Yes, but it's much more

8  difficult to quantify and I thought

9  that's what we were discussing.

10       Q.    I am.  So I'm asking you, if

11 you were going to look at a drug safety

12 profile over time, from launch to today,

13 how would you quantify that?

14       A.    I would go to the clinical

15 trial data.

16       Q.    And that's all you would

17 look at.  You wouldn't look at any --

18       A.    For quantification, that's

19 the best data.

20       Q.    Would you defer -- you're

21 not claiming to be an epidemiologist;

22 correct?

23       A.    I am not.

24       Q.    As a person -- you don't

Confidential - Subject to Protective Order

1   claim your expertise is in epidemiology;

2   correct?

3        A.    Correct.

4        Q.    Would you defer to the

5   testimony of -- or to the findings of

6   epidemiologists regarding safety signals

7   over your own?

8        A.    I would work with an

9   epidemiologist on my team.

10        Q.    Okay.  But would you

11   ultimately defer to their calculations

12   and computations, quantifications over

13   your own?

14        A.    I would need to see a

15   specific example.

16        Q.    Let's go back to your

17   resume.  Directing you to bullet point

18   number 1 on page 7 under "Major

19   Responsibilities at Merck Research

20   Laboratories," it says, "Signal detection

21   and safety surveillance for multiple

22   marketed products and for products

23   currently in development."

24             Do you see that?

Confidential - Subject to Protective Order

1          A.      Yes, I do.

2          Q.      My questions, by the way,

3      throughout the deposition, unless I

4      direct you otherwise, are going to be

5      solely related to Propecia and Proscar.

6      Okay?

7          A.      Yes.

8          Q.      Can we have that

9      understanding?

10         A.      Yes.

11         Q.      Okay.

12                 What -- in terms of your

13     work on Propecia, what does bullet point

14     -- or number 1 reference or refer to?

15         A.      Can you be a bit more

16     specific?

17         Q.      Yeah, what did you do to,

18     quote, unquote, engage in signal

19     detection and safety surveillance for

20     Propecia?

21         A.      I participated in the

22     processes that we have at Merck that were

23     extant at the time for postmarketing

24     signal detection and postmarketing data

Confidential - Subject to Protective Order

1    oversight.

2         Q.    And what does that mean?

3         A.    That means that I was

4    responsible for the oversight of the

5    interpretation -- but not by myself.  I

6    was part of a team that oversaw the

7    interpretation of the postmarketing data

8    that Merck received from Propecia.

9         Q.    So let's see if we have some

10   areas of agreement here.  A safety signal

11   can identify an association between a

12   drug and a particular outcome.  Do you

13   agree with that?

14        A.    It can.

15        Q.    So, for example, you could

16   have a safety signal based on the

17   clinical trial data and the postmarketing

18   reports that Merck received establishing

19   an association between Propecia and

20   persistent sexual dysfunction; correct?

21             I'm not saying that one

22   exists, but you could -- you could reach

23   that conclusion.

24             MR. HARRELL:  Object to

Confidential - Subject to Protective Order

1           form.

2                   Go ahead.

3                   THE WITNESS:  It would be

4           very difficult to reach the

5           conclusion from postmarketing

6           data.

7    BY MR. BECKER:

8           Q.    All I'm asking you is this:

9    You can evaluate -- when looking at to

10   determine whether or not a safety signal

11   exists, you're evaluating data to see if

12   an association exists between a drug and

13   a particular outcome; correct?

14          A.    Yes.

15          Q.    So you could evaluate data

16   to look at whether or not Propecia is

17   associated with persistent sexual

18   dysfunction; correct?

19          A.    We can evaluate reports of

20   patients on Propecia who have persistent

21   erectile dysfunction.  Whether or not we

22   can come to any firm conclusions is

23   highly dependent on the type of data that

24   we have.

Confidential - Subject to Protective Order

1        Q.    So that is a, yes, you could

2   evaluate that question based on the data

3   you have; correct?

4             MR. HARRELL:  Object to

5        form.

6             THE WITNESS:  No, that is

7        that I could evaluate the data.

8             MR. BECKER:  I'm ask --

9        that's all I'm asking.

10             THE WITNESS:  Okay.

11   BY MR. BECKER:

12        Q.    You could look at a given

13   data set --

14        A.    Uh-hum.

15        Q.    -- and evaluate whether that

16   data set has enough information in it to

17   establish an association between Propecia

18   and a negative outcome; correct?

19        A.    I'm sorry.  Could you repeat

20   the question?

21        Q.    Sure.

22             Merck has certain adverse

23   events that it receives once a drug is

24   launched in the community; correct?

Confidential - Subject to Protective Order

1          A.      Correct.

2          Q.      And it chronicles those

3    adverse events as they come in in

4    realtime.   True?

5          A.      Yes.

6          Q.      And part of your job is to

7    evaluate those adverse events as they

8    come in over time; correct?

9          A.      Yes.

10         Q.      And part of the reason

11   you're evaluating those adverse events is

12   to determine whether or not there is an

13   association between an alleged adverse

14   event and the particular drug that you're

15   looking at; correct?

16         A.      Yes.

17         Q.      And you use that

18   postmarketing data to reach the

19   conclusion of yes, maybe, or no.  Right?

20         A.      We use that postmarketing

21   data as part of a larger package of data.

22   We don't often use the postmarketing data

23   in a vacuum.

24         Q.      Now, when you refer to in

Confidential - Subject to Protective Order

1    bullet point 1 here on your resume of

2    signal detection and safety surveillance

3    -- do you see that?

4           A.     Uh-hum.

5           Q.     -- what did you specifically

6    do to determine whether or not there was

7    a safety signal related to an association

8    between Propecia and persistent sexual

9    dysfunction following discontinuation of

10   use?

11          A.     Whether there was a signal?

12          Q.     Yes.

13          A.     Is that the question?

14          Q.     No.  The question is, what

15   did you do to determine whether or not a

16   signal existed?

17          A.     When I picked up the

18   product, the issue was already one that

19   was under ongoing analysis in the

20   program, so I did not do signal detection

21   for this particular adverse event.

22          Q.     So let me make sure I

23   totally have that clear.  So from

24   whatever the date was, whether it was

1    2006 or '7 or '8 or whenever you joined

2    the Propecia team, is it your testimony

3    you never engaged in signal detection

4    related to Propecia and persistent

5    ongoing sexual dysfunction?

6         A.    I engaged in signal

7    evaluation.  The signal had been

8    identified by the time I joined the

9    program.  It had already been reviewed.

10        Q.    So let me go back and get a

11   sense what that means.  Are you saying

12   that there was a signal that was

13   identified between Propecia and

14   persistent sexual dysfunction prior to

15   your joining the team?

16        A.    Prior to my joining the

17   team, there was investigation of that

18   product-event combination, yes.

19        Q.    And what was the outcome?

20        A.    The outcome when I joined

21   the team was that persistent erectile

22   dysfunction was not causally associated

23   with Propecia.

24        Q.    So there was no signal by

Confidential - Subject to Protective Order

1    the time you -- when you joined the team,

2    the view of Merck was that there was no

3    signal establishing an association

4    between Propecia and persistent ongoing

5    sexual dysfunction following

6    discontinuation of use?

7           A.    I don't think I would say

8    there was -- there had been a signal and

9    we were following it on an ongoing basis.

10          Q.    Okay.  So that --

11          A.    It's a product-event

12   combination.  That's all it is.

13          Q.    I get that.  A signal, just

14   so -- let's make it clear for the jury --

15          A.    Uh-hum.

16          Q.    -- a signal does not equate

17   to causation.  Right?

18          A.    Correct.

19          Q.    But a signal is, like, if

20   you were to -- if you're building a

21   puzzle, okay, you got lots of pieces in

22   the puzzle.  Right?

23          A.    Uh-hum.

24          Q.    Yes?

Confidential - Subject to Protective Order

1          A.     Yes.

2          Q.     You got the border and then

3     you got the inner parts.  Right?

4          A.     Yes.

5          Q.     And the puzzle has a

6     picture.  Right?

7          A.     Yes.

8          Q.     And you're trying to figure

9     out what that picture is by putting those

10    pieces together.  Right?

11         A.     Yes.

12         Q.     And a signal is a piece of

13    the puzzle that might lead to a

14    conclusion that a particular outcome is

15    causative; correct?

16              MR. HARRELL:  Object to

17         form.

18              THE WITNESS:  I'm sorry.  I

19         don't follow your analogy.

20    BY MR. BECKER:

21         Q.     A signal might establish an

22    association between a drug and a negative

23    outcome; correct?

24              MR. HARRELL:  Object to

Confidential - Subject to Protective Order

1              form.

2                        THE WITNESS:  A signal is

3              the beginning of the process of

4              evaluation.

5    BY MR. BECKER:

6              Q.    Right.  It's one piece in

7    the puzzle.  Right?  As you try and build

8    this picture to get to whether or not the

9    drug causes a particular outcome.  True?

10                       MR. HARRELL:  Object to

11             form.

12                       Go ahead.

13                       THE WITNESS:  I'm sorry.

14             I'm just not -- I'm not following

15             the analogy.

16   BY MR. BECKER:

17             Q.    Okay.  Well, let me make

18   sure I understand what you're saying

19   clearly.  Had Merck identified a signal

20   -- I'm not asking if they agreed that it

21   was causative or not, but prior to your

22   arrival, when you joined the Propecia

23   team, had Merck identified a signal

24   existed between Propecia and ongoing

Confidential - Subject to Protective Order

1    sexual dysfunction following

2    discontinuation of use?

3           A.    Yes.

4           Q.    And you joined the team

5    sometime in the 2007-2008 timeframe to

6    the best of your recollection?

7                 MR. HARRELL:  Object to

8           form; asked and answered.

9    BY MR. BECKER:

10          Q.    Let me put it this way:  You

11   joined the team well before 2012;

12   correct?

13          A.    Yes.

14          Q.    And Merck did not amend its

15   label in the United States to tell men

16   about the association, this signal you

17   had identified, between Propecia and

18   persistent ongoing sexual dysfunction

19   following discontinuation of use until

20   April of 2012; correct?

21          A.    I --

22                MR. HARRELL:  Object to

23          form.

24                THE WITNESS:  -- object to

Confidential - Subject to Protective Order

1          the -- I object to the word

2          association.

3    BY MR. BECKER:

4          Q.    Okay.  Well, you don't get

5    the right to object.  You get to answer

6    my questions and your lawyer gets to

7    object --

8          A.    Well --

9          Q.    -- so I'll ask you again:

10   You testified earlier that somebody had

11   established a signal between Propecia and

12   persistent ongoing sexual dysfunction

13   prior to you joining the team in the mid

14   2000s; correct?

15         A.    Yes.

16         Q.    And it would take another

17   four, five, six years till that signal

18   was indicated in the warning label here

19   in the United States; correct?

20              MR. HARRELL:  Object to

21         form.

22              Go ahead.

23              THE WITNESS:  I was not

24         objecting in a legal sense to the

Confidential - Subject to Protective Order

1    use of the word association.

2         So I would say a couple of

3    things.  I would say --

4         MR. BECKER:  Stop.  I'm --

5    no, no, no --

6         MR. HARRELL:  She gets to

7    answer her question.

8         MR. BECKER:  No, she gets to

9    answer the question that I asked.

10        MR. HARRELL:  You can't cut

11   her off while she's answering.

12        MR. BECKER:  But then she

13   gets to answer -- I don't have a

14   judge here so I can't stop her as

15   nonresponsive.

16        MR. HARRELL:  I'm sorry, but

17   you asked a question and she's

18   answering.

19        MR. BECKER:  I asked a

20   yes/no question.

21        MR. HARRELL:  You let her

22   answer the question.

23        MR. BECKER:  I'm going to

24   withdraw the question.

Confidential - Subject to Protective Order

1  BY MR. BECKER:

2      Q.    When was the first time that

3  the United States warning label discussed

4  a potential signal between -- a potential

5  association between persistent ongoing

6  sexual dysfunction following

7  discontinuation of use and Propecia?

8      A.    I believe it was between the

9  end of 2010 and the beginning of 2011.

10     Q.    There was a warning label --

11 you have an understanding that Merck put

12 in a CBE regarding erectile dysfunction

13 in 2011; correct?

14     A.    Yes.

15     Q.    And you have an

16 understanding that the FDA amended the

17 language from Merck's CBE and expanded it

18 to sexual dysfunction in 2012.  True?

19     A.    Yes.

20     Q.    And that was the first time

21 that this potential association was

22 discussed in the United States warning

23 label; correct?

24     A.    Yes.

Confidential - Subject to Protective Order

1                  MR. HARRELL:  Object to

2        form.

3                  THE WITNESS:  Yes.

4    BY MR. BECKER:

5        Q.    Let me go back to your

6    resume for just one other quick second.

7    Bullet point number 2 indicates,

8    "Analysis of safety signals and

9    development of strategic response to

10   safety issues for both marketed products

11   and products in development."

12                Do you see that?

13       A.    Yes, I do.

14       Q.    As it related to Propecia,

15   what did you do to analyze the safety

16   signal?

17       A.    We followed the Merck

18   procedures that were in place at the time

19   that consisted of review of individual

20   reports, review of aggregate data, and

21   review of literature on the subject.

22       Q.    And what, if anything, was

23   the outcome of that analysis?

24       A.    With regard to --