Confidential - Subject to Protective Order

```
 1                UNITED STATES DISTRICT COURT

                 EASTERN DISTRICT OF NEW YORK

 2

 3   IN RE:  PROPECIA        : Master File No. 1:12-md-

     (FINASTERIDE) PRODUCTS  : 02331-BMC-PK

 4   LIABILITY LITIGATION    :

                             : MDL NO. 2331

 5   This Document Relates to:  :

                             : Honorable Brian M. Cogan

 6   ALL CASES               : Magistrate Judge Peggy Kuo

 7

 8        Confidential - Subject to Protective Order

 9

10          Videotaped Deposition of PAUL HOWES, taken

11       before and by Janis L. Ferguson, RPR, CRR, Notary

12       Public and for the Commonwealth of Pennsylvania,

13       on Tuesday, June 7, 2016, commencing at 9:34 a.m.,

14       at the Penn Stater Hotel and Conference Center,

15       215 Innovation Boulevard, State College, PA 16803.

16

17

18              Reported by Janis L. Ferguson

               Registered Professional Reporter

19              Certified Realtime Reporter

20

21

22

23

24
```

Confidential - Subject to Protective Order

1              the video record.

2              MR. BECKER:  All right.  So off the record we

3              had a brief colloquy with counsel.  We don't

4              have an ELMO, and our computer is not hooked

5              up to the screen.  So in lieu of putting --

6              we might put one picture up a little bit

7              later.  But in lieu of putting up documents

8              on the screen, we have an agreement that if

9              and when we go to trial, and if the document

10             is offered and accepted into evidence or

11             offered for use at trial, we can refer to the

12             document that we discussed during the

13             deposition, or those portions of it in the

14             picture and picture context with the

15             witnesses.  Is that basically our agreement?

16             MR. MORROW:  Agreed.

17             MR. BECKER:  Okay.

18     BY MR. BECKER:

19        Q.   All right.  Now, Mr. Howes, I'm showing you

20     an article from the Wall Street Journal dated

21     August 12th, 1997 entitled "Bet on Fewer Blockbusters".

22     Do you see that there?

23        A.   Yes.

24        Q.   Okay.  Direct -- let me direct your attention

Confidential - Subject to Protective Order

```
 1    to the first paragraph of the document.  It says, "Some
 2    of the nation's best-known prescription drugs are on
 3    the brink of a sales plunge, and drugmakers are
 4    scrambling to survive it.  About 40 drugs with
 5    16 billion in sales last year -- one-quarter of the
 6    industry's U.S. revenues and an even higher percentage
 7    of total profits for some companies -- are set to lose
 8    patent protection by the end of 2002."
 9         Did I read that correctly?
10    A.   Yes.
11    Q.   Okay.  During this period of time -- and by
12    "this period", I mean the late '90s to early 2007 --
13    Merck was facing the loss of several key patents with
14    respect to significant drugs that produced large
15    volumes of revenue for the company.  Correct?
16         MR. MORROW:  Objection.  You may answer.
17    A.   Yeah.  Patent expires are known years in
18    advance of when they occur.
19    Q.   Right.  And there were a series of drugs that
20    were going to go off patent in this 1997 to 2002 time
21    frame that Merck possessed the patent to, right?
22    A.   Yes.
23    Q.   Okay.  Now, as a relatively high-ranking
24     member at Merck, you had an understanding that
```

Confidential - Subject to Protective Order

1   patent protection affords the company a monopoly

2   on its ability to sell certain drugs.  Correct?

3           MR. MORROW:  Objection.

4       A.   Yes.

5       Q.   And as a result of that monopoly, you have

6   the ability to engage in premium pricing or brand

7   pricing for a particular pharmaceutical.  Correct?

8           MR. MORROW:  Objection.  You may answer.

9       A.   Pricing -- in this period of time, pricing on

10  an annual basis went up generally less than the rate of

11  inflation.  It was very predictable.

12      Q.   What I'm getting at is that you can't sell

13  it --

14      A.   Right.  Illegal competition is not permitted

15  until the patent expires.

16      Q.   Okay.  A couple of things -- and I didn't go

17  over the rules of deposition before, and I apologize.

18  So depositions are a very weird way of communicating.

19  You knew exactly where I was going with that question,

20  and you answered it.  But because of the fact that --

21  if we were having a real conversation, we would do

22  that.  But in a deposition, I have to ask my question,

23  and then you have to answer.  Otherwise, it reads

24  really poorly on --

Confidential - Subject to Protective Order

```
 1        A.    Okay.

 2        Q.    -- on the deposition.

 3              And the other thing, too, your lawyer from

 4    time to time is going to object.  Unless he tells you

 5    not to answer the question, allow him to put his

 6    objection on the record, and then go ahead and answer

 7    it.  Okay?

 8        A.    So if he states an objection, I should wait

 9    until he finishes --

10        Q.    When he's done with his objection, then you

11    may go ahead and answer, unless he tells you not to.

12    Okay.

13        A.    Thank you.

14        Q.    All right.  So patent protection, generally

15    speaking -- I'm not asking for a legal conclusion --

16    affords the company to be the sole distributor of that

17    product in the marketplace.  Correct?

18        A.    Yes.

19        Q.    Okay.  So, for example, you had during this

20    time period a statin that you were selling.  Right?

21        A.    Yes.

22        Q.    Okay.  And you, as the -- you were the only

23    company, as a result of your patent protection, that

24    could sell that statin.  Right?
```

1      A.   Correct.

2      Q.   Now, when that patent expired, that allowed

3   competitors to come into the marketplace.  Right?

4      A.   Yes.

5      Q.   And you could no longer sell that patent for

6   the price -- or sorry.  You could no longer sell that

7   product for the price you were selling it at.  True?

8           MR. MORROW:  Objection.

9      A.   (No response.)

10     Q.   I mean, you could sell it, but nobody would

11  buy it.  Right?

12     A.   People did buy it.  Fewer people bought it.

13     Q.   Right.  When a patent expires, is it fair to

14  say that the generics tend to take over the market?

15     A.   Over time, they do, yes.

16     Q.   And that's because the generics --

17     A.   For that single chemical entity.  There are

18  other statins.

19     Q.   Right.  I'm only talking about --

20     A.   Right.

21     Q.   -- that one product.

22     A.   Yeah.

23     Q.   And the reason that the generics tend to take

24  over the market over time is because for that same

Confidential - Subject to Protective Order

```
1    chemical entity, they are charging less than what the
2    brand manufacturer, like Merck, is charging.  True?
3        A.   Yes.
4        Q.   Okay.  So during this time period, from 1997
5    through 2002, you were aware of the fact that Merck
6    faced a large number of expiring patents related to key
7    drugs it was selling.  Right?
8            MR. MORROW:  Objection.
9        A.   Correct.
10       Q.   Okay.  In fact, if you look at Exhibit 227,
11   directing your attention to about a third of the way
12   down the page where it says "at the epicenter"?  Do you
13   see that?
14       A.   Yes.
15       Q.   "At the epicenter of the patent expiration
16   quake is giant Merck and Company, which will lose a
17   lock on four drugs that provide more than half of its
18   6.18 billion U.S. drug sales last year, including heart
19   drugs Vasotec and Mevacor."
20           Do you see that?
21       A.   Yes.
22       Q.   Okay.  So during this time period, prior to
23   the launch of Propecia, Merck was aware of the fact
24   that at least half of its revenue related to four key
```

1    drugs --

2         A.   U.S. revenue.

3         Q.   U.S. revenue -- was going to face competition

4    from generic entrants into the marketplace.  Right?

5         A.   Correct.

6         Q.   And that's not necessarily a good thing for

7    the company, is it?

8              MR. MORROW:  Objection.

9         A.   It all depends on what else is going on with

10   the company, I would say.  So it's -- of course, if it

11   doesn't happen, that is better.  The fact that it does

12   happen is known.  It's predictable.  Maybe you're going

13   to show me what their revenues worldwide were each of

14   the following years, what the profitability was.  But

15   it's -- it's all --

16        Q.   Something you have to plan for, right?

17        A.   You have to plan for, correct.

18        Q.   And there's a couple of different ways that

19   you can plan to confront generic entrants into the

20   market.  Correct?

21        A.   Yes.

22        Q.   Okay.  One of those ways is that you can

23   develop your own generic pharmaceuticals.  Correct?

24        A.   Yes.

Confidential - Subject to Protective Order

```
 1              (Deposition Exhibit 228 - New York Times

 2               article titled "Merck Sets Generic Drug

 3               Sales" - marked for identification.)

 4      Q.   Okay.  Let me show you what I've marked as

 5  Exhibit 228.  Keep 227 there.  We're going to come back

 6  to it.

 7              This is an article from the New York Times

 8  dated September 8th, 1992 entitled "Merck Sets Generic

 9  Drug Sales".

10              (Discussion held off the record.)

11      Q.   It's a long table.  I've give you two, and

12  you can just pass one to Chip.

13              All right.  So recognizing that it was going

14  to face a number of key drugs going off patent, Merck

15  developed some strategies to -- to backfill in the

16  revenue it anticipated to lose from those particular

17  products.  Correct?

18      A.   Yes.

19      Q.   And one of the methods it chose to undertake

20  was to develop or enter into the generic market.

21  Correct?

22      A.   Yes.

23      Q.   Okay.  Specifically, the very first paragraph

24  of this article says, quote, "An announcement by Merck
```

Confidential - Subject to Protective Order

```
 1    & Company that it would market lower-priced generic

 2    versions of its products signals that even the world's

 3    most powerful drug companies cannot ignore the

 4    possibility of sharp revenue decline when important

 5    drugs lose patent protection."

 6            Did I read that correctly?

 7       A.   Yes.

 8       Q.   Okay.  So one of the things that you did to

 9    fend off that loss of revenue was to start to compete

10    in the generic marketplace.

11            MR. MORROW:  Objection.

12       Q.   True?

13            MR. MORROW:  Objection.

14       A.   Yes.

15       Q.   Turn to the next page of the packet.

16       A.   (Witness complies.)

17       Q.   The last paragraph of this article says,

18    "Merck also has a joint venture with Johnson & Johnson

19    to sell over-the-counter versions of Merck drugs,

20    notably Pepcid, an ulcer treatment whose patent expires

21    in August 2000.  Analysts said Merck might end up

22    selling Pepcid in three forms; the original, a generic,

23    and a non-prescription version."

24            Did I read that correctly?
```

Confidential - Subject to Protective Order

1       A.   Yes.

2       Q.   Okay.  So a second way that you can compete

3    with expiring patents is that you can take a drug and

4    make it -- or ask the FDA to make it non-prescription.

5    Correct?

6       A.   Yes.

7       Q.   That means over-the-counter.  Right?

8       A.   Correct.

9       Q.   And, in fact, that's what you did with

10   Pepcid.  Right?

11      A.   With a different strength of the Pepcid.

12      Q.   Right.  So today -- I mean, if the jury goes

13   out and is looking for acid reflux medicine, they can

14   buy Pepcid AC over the counter.  Right?

15      A.   Yes.

16      Q.   Okay.  And that's a revenue source for Merck.

17   Right?

18      A.   Yes.

19      Q.   But it's fair to say that of the three types

20   of revenue sources you have, brand, generic, and over

21   the counter, the way you make the most money, the most

22   revenue, is through the sale of brand drugs.  Correct?

23      A.   Correct.

24           MR. MORROW:  Objection.

Confidential - Subject to Protective Order

```
1       Q.    And so the third way that you decided -- that

2    the company tried to fend off this loss of patent

3    protection was to, in fact, develop new drugs.  True?

4       A.    Yes.

5       Q.    Go back to Exhibit 227, if you would.

6       A.    (Witness complies.)

7       Q.    Directing your attention to the first page of

8    the document, about two-thirds of the way down, do you

9    see the sentence that starts with "to avert calamity"?

10      A.    Um-hum.

11      Q.    It says, "To avert calamity, major

12   pharmaceutical companies are racing to find new drugs

13   to replace the billions in dollars in sales they stand

14   to lose.  They are embracing risky new technology more

15   quickly and scouting the world for alliances and

16   drug-licensing deals."

17            Did I read that correctly?

18      A.    Yes.

19      Q.    Okay.  And as we just discussed, that was one

20   of Merck's strategies as well; to, quote, develop new

21   drugs.  Right?

22            MR. MORROW:  Objection.

23      A.    Yes.

24      Q.    Or find new drugs.  Right?
```

Confidential - Subject to Protective Order

1     A.    Um-hum.

2     Q.    And that's what they did with Propecia.

3  Right?

4           MR. MORROW:  Objection.

5     A.    I'm not sure I understand the question.

6  Could you clarify it, please.

7     Q.    Sure.  Merck developed Propecia in the hopes

8  that it would help to backfill some of the loss of

9  revenue from these expiring patents.

10    A.    Merck developed Propecia because it already

11  had the molecule finasteride, and it discovered through

12  research that this product grew hair.  That's why it

13  developed the product; to meet an unmathematical need.

14  In meeting unmathematical needs, the company can earn

15  revenue and sustain itself.

16    Q.    Okay.  We'll get there in just a minute.  But

17  what I want to be clear on is the development of

18  Propecia and the launch of it in early 1998 allowed

19  Merck to sell that drug for male hair loss at a brand

20  rate.  Correct?

21    A.    Yes.

22    Q.    Okay.  Now, if you see the sentence where it

23  says "still some observers".

24    A.    Yes.

Confidential - Subject to Protective Order

```
1         Q.   It says, "Still some observers doubt all of

2    this effort will be enough.  It can take 15 years to

3    turn a newly created molecule into an improved product

4    with many more failures than successes along the way.

5    Only about one in 250 chemical compounds that go into

6    the laboratory and animal testing ultimately make it to

7    the pharmacy shelves."

8              Did I read that correctly?

9         A.   Yes.

10        Q.   All right.  So at the time that Merck was

11   facing these expiring patents, it had the happy

12   fortuitiveness that it just happened to have a molecule

13   it could distribute in a completely different way for a

14   completely different use.  True?

15             MR. MORROW:  Objection.

16        A.   Yes.

17        Q.   Okay.  And that molecule then, which became

18   Propecia, allowed it to sell that product at a brand

19   rate throughout the life of the patent.  Correct?

20        A.   Correct.

21        Q.   And that was, what, roughly 15 years?

22        A.   Probably.

23        Q.   Okay.  So unlike most drugs that Merck's

24   developed, it did not have to go through the 15-year
```

Confidential - Subject to Protective Order

1  process to develop Propecia through finding a new

2  chemical compound and then engaging in the R & D it

3  would take to bring that to market.  Correct?

4       MR. MORROW:  Object to the form.  You can

5       answer.

6     A.  It would have had to do the same level of

7  clinical testing that it would for any new molecule.

8  It -- it could benefit from some of the work that had

9  been done on Proscar, but not all of it.

10     Q.  Right.

11     A.  Because that was a urol -- urological

12  product.

13     Q.  Right.  But it didn't take, in fairness, Mr.

14  Howes, 15 years for Propecia to come from idea to sale.

15  Correct?

16       MR. MORROW:  Objection.

17     A.  I don't know how long it took.

18     Q.  Do you know when Merck first identified the

19  need or the potential to be able to use Propecia as a

20  hair replacement drug?

21     A.  No.

22     Q.  Okay.  Would it surprise you that that

23  occurred sometime in the mid '90s?

24       MR. MORROW:  Objection.

Confidential - Subject to Protective Order

```
 1        A.   That's entirely possible, sure.

 2        Q.   You were at the company when Proscar came

 3   online, right?

 4        A.   Yes.

 5        Q.   Okay.  To the best of your knowledge, as you

 6   sit here today, nobody was talking about using

 7   finasteride as a hair replacement therapy prior to the

 8   launch of Proscar, right?

 9             MR. MORROW:  Objection.

10        A.   I'm not aware of that.

11        Q.   Okay.

12        A.   I'm not aware that that statement is correct.

13        Q.   You're just not aware of whether it's correct

14   or incorrect?

15        A.   Correct.

16        Q.   Okay.

17        A.   Yes.

18        Q.   All right.  So let's assume, for the sake of

19   argument, that the concept of developing a hair loss

20   drug first started to be talked about at Merck sometime

21   in the '90s.

22             MR. MORROW:  Objection.

23        Q.   It's fair to say that that time period

24   from the mid '90s to the launch of Propecia was
```

Confidential - Subject to Protective Order

1    not a 15-year time frame.  Correct?

2          MR. MORROW:  Objection.

3    A.   I would assume that even if they did not have

4    to do Phase I clinical trials, they would have had to

5    do Phase II and Phase III.  And if the product was

6    launched in 1998, it would have been filed maybe at the

7    end of '96.  And those trials probably started in 1990,

8    at the latest.  So it was the better part of a decade,

9    even with the molecule that had a strong body of

10   scientific data already.

11   Q.   Okay.  We'll look at some documents about

12   that a little later on in the deposition.  But the

13   bottom line is -- and I think you would agree with

14   this -- that Merck was able to build off of the R & D

15   it did related to Proscar when it started to develop

16   Propecia.  Right?

17   A.   Yes.

18   Q.   So it didn't have to go through the complete

19   process.

20   A.   Correct.

21   Q.   Okay.  Now, at the time that this drug was

22   being developed, Merck looked at it as a potential

23   blockbuster-type drug.  Correct?

24          MR. MORROW:  Objection.

Confidential - Subject to Protective Order

1      A.   Yes.

2      Q.   Tell the jury what a blockbuster drug is.

3      A.   Well, when I first joined the company, that

4  would have been defined as a product that had more than

5  $100 million in sales.  Today's definition would

6  probably be more like a billion.  And so 1998 may have

7  been somewhere in the middle of that.

8      Q.   So -- but, generally speaking -- and I get

9  your point that the term "blockbuster" and the amount

10  of revenue that's tied to it has evolved over time.

11  Blockbuster drugs are big deals to big pharmaceutical

12  companies, correct?

13      A.   Yes.

14      Q.   And, in fact, big pharmaceutical companies

15  like Merck rely on blockbuster drugs to keep the

16  company afloat.  True?

17          MR. MORROW:  Objection.

18      A.   They -- they rely on any first-in-class

19  medication.  You've -- you've got to be good at

20  something in order to sustain yourself and continue the

21  operation.

22      Q.   Right.  But those blockbuster drugs,

23  in particular, are really what sustains the company so

24  it can go on to do non-blockbuster-type things.  Right?

Confidential - Subject to Protective Order

```
 1      A.    Yes.

 2            MR. MORROW:   Objection.

 3      Q.    That was a yes, right?

 4      A.    Yes.

 5            (Deposition Exhibit 229 - Merck Publication

 6             titled "The Daily" - MRKP0001704574 through

 7             MRKP0001704577 - marked for identification.)

 8      Q.    Let me show you what has been marked as

 9   Exhibit 229.  Can you tell us, sir, is this an internal

10   Merck publication?

11      A.    Yes.  It may only be U.S. --

12      Q.    It's --

13      A.    -- but it's a daily publication.  Or it was

14   at that point in time.

15      Q.    So I'm assuming that Merck, like most

16   companies, has a way that it communicates information

17   with its employees and staff.  Correct?

18      A.    Yes.

19      Q.    And one of the ways it does it is through

20   articles and publications like this.  Correct?

21      A.    Correct.

22      Q.    All right.  Turn to the third page of the

23   document, which is Bates-numbered MRKP0001704576.

24            First, just so you know -- have you ever had
```

1   your deposition taken before?

2      A.   No.

3      Q.   Okay.  So then that code that I just rattled

4   off is probably pretty Greek to you.  These are what we

5   call Bates numbers at the bottom.  It's just a way for

6   us to track pages.  Okay?  So I will from time to time

7   refer to these type of codes.

8      A.   (Witness nods head.)

9      Q.   Just as a "go to this page".

10     A.   Yes.

11     Q.   All right.  So you're on Bates Page No. 4576.

12  Correct?

13     A.   Correct.

14     Q.   Do you see the column that says "Enthusiasm

15  for Propecia Comes from Many Voices"?

16     A.   Yes.

17     Q.   Okay.  Directing your attention to the second

18  paragraph down, there's a quote by ABB Aros Security.

19  Do you see that?

20     A.   Yes.

21     Q.   It says, "This could be a blockbuster.  It

22  might take a little while, but you will -- you'll see

23  this as a very high-profile product.  Many physicians,

24  for instance, will use this as ammunition to attract

Confidential - Subject to Protective Order

1   new patients.  For many men it will be a very viable

2   treatment."

3           Did I read that correctly?

4       A.   Yes.

5       Q.   Okay.  And then at the bottom of the page,

6   you see the quote from the Wall Street Journal?

7       A.   (No response.)

8       Q.   Bottom of the column.

9       A.   Yes.

10      Q.   It says, "Whatever drawbacks there may be of

11  Propecia, the possibility of combating one of the most

12  common signs of aging in a culture addicted to

13  youthfulness has some analysts predicting that Propecia

14  will become one of the pharmaceutical industry's most

15  successful drugs."

16          Did I read that correctly?

17      A.   Yes.

18      Q.   Okay.  This article is dated January 6th,

19  1998.  True?

20      A.   Yes.

21      Q.   This is on the eve of the launch of Propecia.

22  Correct?

23      A.   Correct.

24      Q.   So at the time that the product is being

1   launched, the expectation in the company, as well as on

2   the street, was that this drug was going to be a big

3   deal to Merck.

4       A.   I -- I don't know if that was the expectation

5   in the company.  It's clearly the external expectation.

6   Analysts and -- and others.

7       Q.   One of the ways those analysts got that

8   expectation was because Merck promotes its products.

9   Correct?

10           MR. MORROW:  Objection.

11      Q.   Right?

12      A.   Merck does promote its products, yes.

13      Q.   And so these analysts didn't just pull this

14  information out of thin air, did they?

15      A.   No.  But, also, none of them had seen the

16  label of the product either.

17      Q.   Okay.  So the point being that when analysts

18  are reporting on what they anticipate a particular

19  pharmaceutical will do, how much it will make in terms

20  of gross revenue, some of that information was coming

21  from the pharmaceutical company itself.  Correct?

22      A.   True.

23      Q.   So, in other words, ABB Aros Security and the

24  Wall Street Journal was getting some of its information

```
1    related to the likely success of Propecia from Merck

2    directly.

3             MR. MORROW:  Objection.

4         A.   Likely, yes.

5         Q.   Okay.  Turn, if you would, to the first page

6    of the document.

7         A.   (Witness complies.)

8         Q.   Now, one of the reasons why Merck thought

9    that this product was going to be particularly

10   successful is because there was a large, untapped

11   market of men who might actually buy Propecia.

12   Correct?

13        A.   Yes.

14        Q.   In fact, if you look at the first column, the

15   article reports, about two-thirds of the way down,

16   "with a target audience".  Do you see that?

17        A.   On the left side or the --

18        Q.   On the far left side, first column.

19        A.   Yes.

20        Q.   "With a target audience of 33 million U.S.

21   men, analysts hold high hopes for Propecia."

22             Did I read that correctly?

23        A.   Yes.

24        Q.   Okay.  So Merck saw a large opportunity with
```

Confidential - Subject to Protective Order

1    lots and lots of potential consumers or customers to

2    buy this particular product that, really, nobody else

3    was in this area at the time.  Correct?

4        A.   Correct.

5        Q.   Okay.  And it thought at the time that if it

6    could capture a significant portion of those 33 million

7    men, it could, in fact, develop a blockbuster drug.

8    Correct?

9        A.   Yes.

10        Q.   Turn to the next page, if you will.

11        A.   (Witness complies.)

12        Q.   And direct your attention to the far

13    left-hand column.  Third paragraph down, starting with

14    "even a scarcity".  Do you see that?

15        A.   Um-hum.

16        Q.   It says, "Even with a scarcity of proven

17    remedies, men spend some $1 billion annually on

18    treatment."

19             Did I read that correctly?

20        A.   Yes.

21        Q.   So at the time that Merck was developing

22    Propecia and was getting ready to launch it, it knew

23    that sales related to hair replacement therapy,

24    generally, in the U.S. market exceeded a billion

Confidential - Subject to Protective Order

```
 1   dollars annually.  Correct?

 2        A.   Yes.

 3        Q.   So it saw a huge opportunity for potential

 4   revenue within that market.  Correct?

 5        A.   Correct.

 6        Q.   And if you go down to the next paragraph,

 7   there's a quote by Mr. Casola, who was your subordinate

 8   at this time, correct?

 9        A.   Not at this time, but he was.

10        Q.   I'm sorry.  You're right.

11        A.   Six months later.

12        Q.   I'm sorry.  You're correct.  At this point he

13   was actually -- you weren't working on this particular

14   project.

15        A.   Correct.

16        Q.   Okay.  So he was in charge of it from a

17   marketing standpoint?

18        A.   Yes.

19        Q.   Okay.  So Mr. Casola states, quote, "There is

20   definitely a large group of men searching for help.  We

21   just need to communicate the benefits of Propecia to

22   them and motivate them to see their physicians."

23             Did I read that correctly?

24        A.   Yes.
```

Confidential - Subject to Protective Order

```
1              MR. BECKER:  Hey, whoever is typing, can you

2              put your phone on mute.

3              (Discussion held off the record.)

4       Q.   I'm sorry.  Let me just start over.  So you

5   have Exhibit 236 in front of you.  Correct?

6       A.   Yes.

7       Q.   It's stamped September 7, 1994.  True?

8       A.   Yes.

9       Q.   And you appear as one of the recipients of

10  this particular document.  Correct?

11      A.   Yes.

12      Q.   All right.  So prior to the last document,

13  almost a -- well, in fact a year before that, you had

14  received a communication from Dr. M.F. Malkin to you

15  and a group of other folks regarding "Worldwide

16  Marketing Needs Report for Finasteride for Androgenic

17  Alopecia in Men".  Correct?

18             MR. MORROW:  Objection.

19      A.   Correct.

20      Q.   So you received a document several years

21  prior to the launch, as the president of Merck Canada,

22  that discussed marketing issues related to Propecia.

23  True?

24      A.   Yes.
```

```
 1        Q.   All right.  First of all, who is Dr. M.F.

 2   Malkin?

 3        A.   I don't know.

 4        Q.   Do you know, if you look at the first page,

 5   who P. Wold-Olsen is?

 6        A.   Yes.

 7        Q.   Who is that?

 8        A.   He was the head of a group called WHHM;

 9   Worldwide Human Health Marketing.

10        Q.   Okay.  Was he a high-level executive at

11   Merck?

12        A.   Yes.

13        Q.   Okay.  So if we look at the first page of the

14   document -- I'm sorry -- second page of the document,

15   Bates No. 583758, do you see the section entitled

16   "Purpose"?

17        A.   Yes.

18        Q.   It says, "The purpose of this document is to

19   express WHHM's needs with regard to the development of

20   finasteride for the treatment and prevention of

21   androgenic alopecia in men."

22             Do you see that there?

23        A.   Yes.

24        Q.   Okay.  And then it goes on to have a
```

Confidential - Subject to Protective Order

```
 1   discussion about certain topics including marketing

 2   needs.  Correct?

 3       A.   Correct.

 4       Q.   All right.  Turn to Page 3 of the document.

 5       A.   (Witness complies.)

 6       Q.   Do you see the section entitled "Marketing

 7   Needs"?  Page 3 at the top.

 8       A.   Marketing --

 9       Q.   Section C there.

10       A.   Yes.

11       Q.   All right.  Directing your attention to the

12   C-2 Dosage Administration Formulation, do you see that?

13       A.   Yes.

14       Q.   All right.  The second full paragraph reads,

15   "As described in recommendation, WHHM supports the

16   introduction of the lowest dose that has the highest

17   efficacy with the best safety profile.  However, if it

18   is not possible to eliminate the safety concerns, use

19   of a condom and sexual adverse events in the label

20   inherited from Proscar, we support the introduction of

21   the dosage with the highest efficacy that has a safety

22   profile no worse than that of Proscar.  This last

23   scenario will result in a lower sales forecast than the

24   ones submitted in the SOI."
```

Confidential - Subject to Protective Order

```
1              Did I read that correctly?

2       A.   Yes.

3       Q.   What is SOI?

4       A.   The first two words -- first two letters

5  would be "statement of", and I think the last letter is

6  "interest".  Statement of interest.

7       Q.   Okay.  So was that a document that

8  essentially laid out the pros and cons of developing

9  Propecia?

10      A.   It is more a wish list of what you would like

11 the profile to look like at the conclusion of the Phase

12 III study.

13      Q.   Got it.  Okay.  So what this paragraph was

14 basically saying was that if Merck had to inherit the

15 Proscar label, then -- then the group was advocating to

16 go to as high of an efficacy that it believed would be

17 effective.  Correct?

18      A.   Yes.

19      Q.   But that that scenario would, in fact, result

20 in lower sales than what was forecasted.  True?

21      A.   Yes.

22      Q.   And that's, in fact, what happened.  Correct?

23           MR. MORROW:  Objection.

24      A.   Yes.
```

1    Q.   And --

2    A.   There was an expectation that in going to

3  one-fifth the dose of Proscar, there would be fewer

4  side effects.  And I don't recall at this stage,

5  because it's 15 years ago for me.  But I don't recall

6  the percentage of sexual side effects in Propecia

7  versus Proscar.  I think they were less, but not

8  substantially less.

9    Q.   So at the time that you were contemplating --

10 Merck was contemplating developing this particular

11 product, it had certain scenarios with respect to

12 labeling and warnings that it was --

13   A.   Yes.

14   Q.   -- that it was facing.  True?

15   A.   Yes.

16   Q.   Okay.  And one of those was a safety profile

17 that included reference to sexual adverse events.

18 Correct?

19   A.   Yes.

20   Q.   And what Merck was essentially saying in this

21 document is that if we have to do that, our sales are

22 going to take a hit.

23   A.   Correct.

24        (Deposition Exhibit 237 - Email -

Confidential - Subject to Protective Order

```
 1   symptoms to resolve while off therapy?

 2            MR. MORROW:  Objection.

 3       A.   Well, they also didn't define who might have

 4   had sexual dysfunction before they even entered the

 5   study.  So --

 6       Q.   Well, that's actually not true.  They did,

 7   when they called them out for who was eligible and who

 8   was not.

 9            So my question to you, sir, is:  Were you

10   surprised, or did you know that Merck never defined how

11   long resolution would take?

12            MR. MORROW:  Objection.

13       A.   I wasn't -- I'm not an expert in clinical

14   trial design.

15       Q.   As a marketer, if you had to sell a drug

16   where the symptoms resolved a day after you got off

17   versus a year after you got off, which would be harder

18   to sell?

19            MR. MORROW:  Objection.

20       A.   It depends on --

21       Q.   Well, let's --

22       A.   -- what the side effect is.

23       Q.   Sexual dysfunction and erectile dysfunction.

24   If you had to market a product for the sale of -- that
```

Confidential - Subject to Protective Order

```
 1   had an adverse event that everybody concedes can happen

 2   while on the drug, that can range from erectile

 3   dysfunction, loss of libido, loss of sensation, sexual

 4   dysfunction, and you had to tell the public that those

 5   events could take a year or longer to resolve, versus a

 6   day, which one would be easier to sell?

 7           MR. MORROW:  Objection.

 8       A.   The latter.

 9       Q.   And that's because men had an understanding

10   that sex and the ability to have sex was important to

11   them.  Right?

12       A.   Yes.

13       Q.   And if they knew that it could take a year or

14   that they may never recover from these symptoms, they

15   weren't going to buy this drug, were they?

16           MR. MORROW:  Objection.

17       A.   They would have to make a tradeoff between

18   that and how important their hair loss was to them.

19       Q.   Well, you had data that showed that there was

20   a substantial number of men who, based on the threat

21   that they might get it, wouldn't even touch the stuff.

22   Right?

23           MR. MORROW:  Objection.

24       A.   Correct.
```

Confidential - Subject to Protective Order

```
 1        Q.   All right.  So you knew internally that if

 2   these sexual adverse events were prolonged or

 3   lengthened or never went away, that that would be

 4   something that would impact sales in a negative way.

 5   Right?

 6             MR. MORROW:  Objection.

 7        A.   Yes.

 8             (Deposition Exhibit 238 - Report -

 9              MRKP0001787636 through MRKP0001787644 -

10              marked for identification.)

11        Q.   Let me show you what I have marked as Exhibit

12   238.

13             MR. MORROW:  I'm sorry.  238?

14             MR. BECKER:  8.

15        Q.   Do you have that documents there in front of

16   you, sir?

17        A.   Yes.

18        Q.   Okay.  It's a document that is -- the subject

19   is entitled "Evaluation of the 1998 Direct-to-Consumer

20   Advertising Campaign for Propecia, End-of-Year Report

21   on the Consumer Awareness and Action Study" dated

22   March 15, 1999.  Do you see that?

23        A.   Yes.

24        Q.   And you are listed in the distribution list.
```

Confidential - Subject to Protective Order

1    Correct?

2         A.   Yes.

3         Q.   Okay.  Let me direct your attention to the

4    top of the page.  Do you see where it says, "This is an

5    information report.  Please destroy by March 1st, 2001.

6    Available from the MIC after this date."?

7              Do you see that there?

8         A.   Yes.

9         Q.   Okay.  What is the MIC?

10        A.   I believe it stands for Marketing Information

11   Center.

12        Q.   Okay.  So the author of this -- well, let me

13   ask you this:  Was it company policy that this type of

14   an internal market analysis be destroyed by its

15   recipients?

16        A.   I don't know.

17        Q.   Do you know whether or not Merck had a

18   document destruction policy?

19        A.   It has a records retention policy.

20        Q.   Okay.  Do you know, were these type of

21   documents slated for destruction within that retention

22   policy?

23        A.   I don't know.

24        Q.   Okay.

Confidential - Subject to Protective Order

```
 1        A.   I mean, it wasn't -- it was obviously

 2   retained in a repository.

 3        Q.   Do you know how -- were -- were emails

 4   subject to that document retention policy?

 5        A.   I don't know.

 6        Q.   Okay.  Do you remember if you saved a copy of

 7   this document?  Or would you have destroyed it per

 8   these instructions?

 9        A.   I don't know.

10        Q.   All right.  You had an understanding at the

11   time --

12        A.   The objective is that it's -- it's

13   proprietary market research information, and you don't

14   want it ending up in an analyst report.  Whatever it is

15   on any product.  It's proprietary.  So that's why they

16   want to keep it in one location and not have it lying

17   around people's desks, and when people leave the

18   company, they join -- leave Merck, go join Pfizer, they

19   take all this stuff with them.  That's why they have

20   policies like that.

21        Q.   So that's the point.  It was intended to be

22   only for internal Merck use.  Correct?

23        A.   Yes.

24        Q.   And the vast majority of the copies were to
```

Confidential - Subject to Protective Order

1    be destroyed.  Right?

2         A.   Yes.

3         Q.   All right.  So let me direct your attention

4    to the first page of the document titled "Summary".  Do

5    you see that?

6         A.   Yes.

7         Q.   Directing you to the third -- sorry -- fourth

8    and fifth bullet point, the fifth one says, "Sexual

9    side effects and side effects associated with pregnant

10   women (women not handling Propecia) are the predominant

11   side effects recalled by respondents."

12        Did I read that correctly?

13        A.   Yes.

14        Q.   And then the bullet point above that says,

15   "40 percent of those men aware of Propecia are aware of

16   side effects associated with taking the product.  Of

17   those, side effects would prevent 50 percent of the men

18   from taking the product."  Correct?

19        A.   Yes.

20        Q.   Okay.  So 40 percent of the -- of the mean

21   who had an understanding or a brand awareness of

22   Propecia were aware of the fact that sexual side

23   effects could occur if they took the drug.  Right?

24        A.   Yes.

Confidential - Subject to Protective Order

```
1        Q.    And of those people who were aware,

2    50 percent said I'm not touching it.  Right?

3        A.    Yes.

4        Q.    Okay.  So, in other words, 20 percent of the

5    guys who had awareness of Propecia said, we are

6    absolutely never taking this thing.  Right?

7        A.    Yes.

8        Q.    All right.  And at the time that they had

9    that view of the drug, there was no warning for

10   persistent to permanent erectile or sexual dysfunction.

11   Correct?

12       A.    Correct.

13       Q.    Does it stand to reason that if 20 percent of

14   the men who were in the pool of guys who could use the

15   drug would not touch it, recognizing that the symptoms

16   could go away, that that percentage would have gone

17   even higher if they thought that use of the drug could

18   cause permanent, persistent problems for them?

19             MR. MORROW:  Object to the form.

20       A.    Yes.  The converse is also true, though.

21       Q.    Turn to -- turn to Page 7641.

22       A.    (Witness complies.)

23       Q.    And, specifically, I want to direct you to

24   the section "Awareness of Side Effects".  Do you see
```

Confidential - Subject to Protective Order

1    the heading there, "Awareness of Side Effects"?

2         A.   Yes.

3         Q.   There's a figure under that, Figure 5, "Side

4    Effects, Components, Total Ad Recall".

5         A.   Yes.

6         Q.   And it starts out in -- at the bottom June

7    and goes to late December on the -- on the -- on the

8    lower axis.  Do you --

9         A.   Yes.

10        Q.   -- see that?

11        A.   Yes.

12        Q.   And then on the -- on the left side tracks

13   the -- a percentage number.  Right?

14        A.   Okay.

15        Q.   Do you see that there?

16        A.   Yes.

17        Q.   Okay.  And then the first graph is the graph

18   of people who were aware of sexual side effects.

19   Correct?

20        A.   The first bar?

21        Q.   The first bar.

22        A.   Okay.

23        Q.   And if you look at that, you basically --

24   well, describe for us what this chart is laying out.

Confidential - Subject to Protective Order

```
 1       A.   I -- I can't read the labeling on the bars.

 2       Q.   Okay.  So -- I have that same problem.  These

 3   are relatively new.

 4            (Discussion held off the record.)

 5       Q.   Okay.  Here's how I read it:  The first

 6   bullet point is "sexual side effects".  Do you see

 7   that?

 8       A.   Yes.

 9       Q.   The second graph is "pregnant women shouldn't

10   handle".  The black --

11       A.   Yes.

12       Q.   And on the clear one --

13       A.   That one goes up over time.

14       Q.   -- is birth defects to unborn children.  And

15   general warning has a side effect, health warning.

16   Those are the bars that are denoted.

17       A.   Yes.

18       Q.   Do you see that there?  So, basically, this

19   chart is graphing the number of men in the focus groups

20   you looked at who had a recognition of the brand

21   Propecia, along with certain side effects that were

22   disclosed in the labeling.  Correct?

23       A.   Yes.

24       Q.   Okay.  And if you turn to the next page, it
```

Confidential - Subject to Protective Order

```
1    tracks -- the Figure 6 indicates, "Would side effects

2    prevent you from using Propecia?"  Do you see that?

3         A.    Yes.

4         Q.    Okay.  And then it's "yes", "no", "don't

5    know".  Do you see that?

6         A.    Um-hum.

7         Q.    And the lowest that "no" answer ever -- or

8    "yes" answer ever appears to be is just below

9    40 percent baseline.  Do you see that?

10        A.    Yes.

11        Q.    And then every other month thereafter hovers

12   around the 50 percent or higher number.  Correct?

13        A.    Yes.

14        Q.    And that led to the conclusion that if you

15   were aware of sexual side effects, those men who were

16   aware of it, around half would not take the drug.

17        A.    Right.

18        Q.    Turn to Page --

19        A.    And it wasn't just the sexual side effects.

20   It was the combination of the two; the fact that it was

21   dangerous to be even touched by a female of

22   child-bearing years, that affects men's behavior as

23   well as women's -- I mean, women don't use this

24   product.
```

Confidential - Subject to Protective Order

1    Q.   Right.

2    A.   But they didn't want it in the house.

3    Q.   But this chart charts it out specifically

4  for -- strike that.  I -- I hear what you're saying.

5  Fair enough.

6         Go to Page 87644; the last page of the

7  document.

8    A.   (Witness complies.)

9    Q.   Do you see the heading that says "Next Step"?

10   A.   Yes.

11   Q.   It says, "Fear of side effects is one barrier

12  of action that the TBG is interested in better

13  understanding.  A & A questions have been revised to

14  understand the role of side effects in preventing men

15  from acting and how the -- and how the product in DTC

16  campaign can be revised to minimize these concerns."

17        Do you see that there?

18   A.   Yes.

19   Q.   So the walkaway from this was that we

20  understand we have a problem with sexual side effects,

21  and we, as a company, have to figure out how to address

22  that.

23   A.   Yes.

24   Q.   Okay.  That never really worked, did it?