Elizabeth Round, M.D.

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF NEW YORK

3                    -   -   -

4   IN RE:                    : Master File No.:

    PROPECIA (FINASTERIDE)  : 1:12-md-02331-JG-

5   PRODUCTS LIABILITY       : VVP

    LITIGATION               : MDL No. 2331

6   _____

    This Document Relates To: Honorable John Gleeson

7                            : Magistrate Judge

    ALL CASES                 : Viktor Pohorelsky

8

9                    -   -   -

                 DECEMBER 17, 2015

10                   -   -   -

11          Videotape deposition of

12  ELIZABETH ROUND, M.D., taken pursuant to

13  notice, was held at the law offices of

14  Venable LLP, 1270 Avenue of the Americas,

15  24th Floor, New York, New York 10020,

16  beginning at 9:06 a.m., on the above

17  date, before Amanda Dee Maslynsky-Miller,

18  a Certified Realtime Reporter and Notary

19  Public in and for the State of New York.

20

21                   -   -   -

            GOLKOW TECHNOLOGIES, INC.

22      877.370.3377 ph | 917.591.5672 fax

                deps@golkow.com

23

24

Elizabeth Round, M.D.

1          A.     Uh-huh.

2          Q.     Yes?

3          A.     Yes.

4          Q.     This document appeared in

5    your custodial production, okay.

6          A.     Okay.

7          Q.     Referring to Exhibit-55,

8    this is a peer-reviewed article from

9    Traish, et al., entitled, "Adverse Side

10   Effects of Five Alpha Reductase Inhibitor

11   Therapy, Persistent Diminished Libido and

12   Erectile Dysfunction and Depression in a

13   Subset of Patients."

14              Do you see that there?

15         A.     Yes.

16         Q.     And it's got a date code of

17   2010 under -- right before the abstract.

18              Do you see that?

19         A.     Yes.

20         Q.     Why did you have this in

21   your file?

22         A.     Finasteride is a five alpha

23   reductase inhibitor.  PROPECIA® is a five

24   alpha reductase inhibitor.

Elizabeth Round, M.D.

1        Q.    So what?

2        A.    The title says, Adverse Side

3    Effects of Alpha Reductase Inhibitors.

4        Q.    So were you evaluating --

5    were you reviewing this article to get an

6    understanding of what the authors'

7    conclusions were with respect to the

8    impact of finasteride on persistent

9    dysfunction of diminished libido and

10   erectile dysfunction?

11               MR. MORROW:  Objection.

12               THE WITNESS:  It was a

13        published paper about drugs that

14        act as finasteride does, as a five

15        alpha reductase inhibitor.

16   BY MR. BECKER:

17        Q.    But it's a paper

18   specifically on PROPECIA®, right?

19               MR. MORROW:  Objection.

20               THE WITNESS:  Five alpha

21        reductase inhibitors.  I believe

22        it also includes dutasteride.

23   BY MR. BECKER:

24        Q.    It included PROPECIA®,

1  right?

2          A.    Correct.

3          Q.    You read the paper?

4          A.    Yes.

5          Q.    What, if anything, did you

6   do -- what did you do after you read it?

7               MR. MORROW:  Objection.

8   BY MR. BECKER:

9          Q.    What did you do with the

10  information?

11              MR. MORROW:  Same objection.

12  BY MR. BECKER:

13         Q.    Did you do anything with the

14  information after you read it?

15              MR. MORROW:  Same.

16              THE WITNESS:  We assimilated

17         the information.  We acknowledged

18         that we had this information.

19  BY MR. BECKER:

20         Q.    Do you know who Dr. Traish

21  is?

22         A.    Not personally.  I know -- I

23  mean, I just see him as the author here.

24         Q.    I want to go through part of

Elizabeth Round, M.D.

1    this document with you.

2              Directing your attention to

3    the results section.  For the --

4         A.    What page?

5         Q.    The results on the abstract.

6              But before we do that, let

7    me -- let me go back.

8              So you had a copy of this

9    document in your file, correct?

10        A.    Yes.

11        Q.    And you read it, right?

12        A.    Yes.

13        Q.    And it's fair to say that

14   the conclusion of this document is that

15   Dr. Traish expressed some concern about

16   persistent diminished libido and erectile

17   dysfunction following discontinuation of

18   use, correct?

19        A.    Yes.

20              MR. MORROW:  Objection.

21        Document speaks for itself.

22   BY MR. BECKER:

23        Q.    And after reviewing this

24   document, is it fair to say that Merck

Elizabeth Round, M.D.

1    took no action?

2              MR. MORROW:  Objection.

3    BY MR. BECKER:

4         Q.    To change the label?

5              MR. MORROW:  Same.

6              THE WITNESS:  There was no

7         change to the label.

8    BY MR. BECKER:

9         Q.    Okay.  Let's go through the

10   document.  In the results section of the

11   abstract, it says, Prolonged adverse

12   effects on sexual dysfunction such as

13   erectile dysfunction and diminished

14   libido are reported by a subset of men,

15   raising the possibility of a causal

16   relationship.

17             Did I read that correctly?

18        A.    Yes.

19        Q.    What's your opinion on that?

20             MR. MORROW:  Objection.

21   BY MR. BECKER:

22        Q.    Well, you were -- or are a

23   clinician, clinical researcher at Merck

24   for the better part of the last quarter

Elizabeth Round, M.D.

1    century, right?

2         A.    Right.

3         Q.    Your job, part in part, is

4    to identify causal risks associated with

5    known drugs, right?

6              MR. MORROW:  Objection.

7    BY MR. BECKER:

8         Q.    Right?

9         A.    Yes.

10        Q.    Okay.  So what I'm asking

11   you is, did this give you any concern,

12   Dr. Traish's report, that there may, in

13   fact, be a causal relationship between

14   finasteride and persistent ongoing sexual

15   dysfunction?

16             MR. MORROW:  Objection.

17             THE WITNESS:  He raised the

18        possibility, the possibility of a

19        causal relationship.

20   BY MR. BECKER:

21        Q.    I'm sorry, I didn't mean to

22   interrupt you.

23        A.    No.  I mean, he didn't

24   really have a lot of objective evidence

Elizabeth Round, M.D.

1    in this paper.

2         Q.    So he raised the possibility

3    of a causal relationship, right?

4         A.    Yes.

5         Q.    And armed with that

6    knowledge, Merck did nothing to change

7    the label, true?

8              MR. MORROW:  Object to the

9         form.

10             THE WITNESS:  We did not

11        change the label based on this

12        paper.

13   BY MR. BECKER:

14        Q.    Turn to the next page of the

15   document, if you would.

16             Do you see in the second

17   column?

18        A.    Yes.

19        Q.    The paragraph that starts

20   with, The potential widespread.

21        A.    Uh-huh.

22        Q.    Okay.  About six sentences

23   down, Dr. Traish writes, To date.

24             Do you see that?

Elizabeth Round, M.D.

1          A.    Yes.

2          Q.    To date the adverse side

3    effects of five alpha reductase

4    inhibitors on sexual function,

5    gynecomastia and the impact on the

6    overall health have received minimal

7    attention.  However, in some patients,

8    these side effects are persistent with

9    regard to sexual function and with

10   emotional toll, including decreased

11   quality of life.

12              Did I read that correctly?

13         A.    Yes.

14         Q.    Do you agree or disagree

15   with that statement?

16              MR. MORROW:  Objection.

17              THE WITNESS:  I don't have a

18         basis to agree or disagree with

19         that statement.

20   BY MR. BECKER:

21         Q.    Well, didn't you testify

22   earlier that your job was to figure out

23   causal relationships of identified risks

24   associated with the pharmaceutical?

Elizabeth Round, M.D.

```
 1                    MR. MORROW:  Object to the

 2          form.

 3                    THE WITNESS:  Yes.

 4    BY MR. BECKER:

 5          Q.    And one of the risks

 6    associated with the use of PROPECIA® that

 7    Dr. Traish is raising is persistence with

 8    regard to sexual -- decreased sexual

 9    function and emotional issues, right?

10                    MR. MORROW:  Object to the

11          form.

12    BY MR. BECKER:

13          Q.    That's one of the things

14    he's talking about; isn't that true?

15                    MR. MORROW:  Same objection.

16                    THE WITNESS:  That's one of

17          the things he's talking about.

18    BY MR. BECKER:

19          Q.    So I'm asking, as a

20    clinician who has worked at Merck for the

21    better part of 25 years, do you agree or

22    disagree with that statement?

23                    MR. MORROW:  Same objection.

24          Asked and answered.
```

Elizabeth Round, M.D.

```
 1              THE WITNESS:  He's making an
 2          introductory statement here.
 3  BY MR. BECKER:
 4          Q.    That doesn't answer my
 5  question, ma'am.
 6          A.    He's not --
 7              MR. MORROW:  Let her finish
 8          her answer.
 9  BY MR. BECKER:
10          Q.    My question is a yes-or-no
11  question.  It's you either agree or
12  disagree with the statement, Doctor?
13              MR. MORROW:  That's not
14          necessarily true.  Objection.
15              THE WITNESS:  He makes the
16          statement:  However, in some
17          patients these side effects are
18          persistent.
19  BY MR. BECKER:
20          Q.    That's right.  And I'm
21  asking whether or not you agree with
22  that.
23              MR. MORROW:  Objection.
24              THE WITNESS:  I don't know
```

Elizabeth Round, M.D.

```
 1              that he's proved to me they're

 2              persistent.

 3    BY MR. BECKER:

 4         Q.    So you do not agree to with,

 5    then?

 6                   MR. MORROW:  Object to the

 7              form.

 8                   THE WITNESS:  I said he has

 9              not proved to me these are

10              persistent.

11    BY MR. BECKER:

12         Q.    Let me see if I can do it

13    this way.

14              If he hasn't proved it to

15    you, are you taking the position that you

16    don't believe him?

17                   MR. MORROW:  Objection.

18                   THE WITNESS:  I believe that

19              some of this data is very flawed.

20    BY MR. BECKER:

21         Q.    That's not my question,

22    Doctor.  My question is simply, do you

23    believe the statement that these effects,

24    sexual dysfunction, are persistent with
```

Elizabeth Round, M.D.

```
 1    regard to some patients?  Do you believe
 2    that?
 3                    MR. MORROW:  Object to the
 4             form.  Asked and answered.
 5    BY MR. BECKER:
 6             Q.    Do you believe that some men
 7    who take finasteride will, in fact, have
 8    ongoing sexual dysfunction following
 9    discontinuation of use?
10                    MR. MORROW:  Object to the
11             form.
12                    THE WITNESS:  I do not know
13             that that has been definitively
14             proved.
15    BY MR. BECKER:
16             Q.    That wasn't my question.
17                    My question was, do you
18    believe it's possible?
19                    MR. MORROW:  Objection.
20             Speculation.  She answered your
21             question.  You just don't like the
22             answer.
23                    THE WITNESS:  I believe men
24             can get persistent sexual
```

Elizabeth Round, M.D.

```
 1           dysfunction, whether it's related
 2           to finasteride therapy or not, I
 3           don't know.
 4    BY MR. BECKER:
 5           Q.    Now, we looked at an e-mail
 6    earlier, right, where you had evidence of
 7    a man who had persistent sexual
 8    dysfunction following discontinuation of
 9    use, right?
10                MR. MORROW:  Objection.
11                THE WITNESS:  I had evidence
12           of a man whose sexual AE was still
13           present 66 days after he finished
14           therapy.
15    BY MR. BECKER:
16           Q.    Does 66 days fit into your
17    definition of --
18           A.    I don't have a definition.
19           Q.    Turn to Page 4 of document.
20                Do you see this highlighted
21    section here, Doctor?  Dr. Traish writes,
22    Additional evidence is found in clinical
23    studies and in the Merck database, which
24    strongly suggest that in some patients
```

Elizabeth Round, M.D.

1   these sexual adverse effects are

2   persistent.

3            Did I read that correctly?

4        A.    Yes.

5        Q.    Do you agree with that

6   statement?

7            MR. MORROW:  Objection.

8            THE WITNESS:  I have no idea

9        what he's referring to there.

10  BY MR. BECKER:

11       Q.    We looked at a document that

12  had -- we looked at the document

13  regarding the Phase 3 clinical trials

14  that reported, from the trials --

15       A.    Yes.

16       Q.    -- persistent ongoing sexual

17  dysfunction, correct?

18            MR. MORROW:  Objection.

19            THE WITNESS:  I'm not sure

20       how -- where he's making this

21       statement from.  Additional

22       evidence is found in the clinical

23       studies and in the Merck database.

24            MR. BECKER:  I'm going to --

Elizabeth Round, M.D.

```
 1              I have to object to that.

 2                   THE WITNESS:  All right.

 3    BY MR. BECKER:

 4         Q.    Doctor, I need you to listen

 5    to the question that I'm answering -- I'm

 6    asking and answer those.

 7         A.    Okay.

 8         Q.    Okay.  If your lawyer wants

 9    to ask you questions at the end, he's

10    free to do that.

11         A.    Okay.

12         Q.    But I need you to answer my

13    questions.

14         A.    Okay.

15         Q.    And my question is this:  We

16    looked at a document that was an e-mail

17    to you and Dr. Kaufman that said, or

18    evidenced, persistent ongoing sexual

19    dysfunction from the Phase 3 clinical

20    trials, right?

21                   MR. MORROW:  Objection.

22                   THE WITNESS:  From years

23         three to five, yes.

24    BY MR. BECKER:
```

Elizabeth Round, M.D.

```
 1          Q.    And you testified earlier
 2   that Sweden amended the label in 2009 to
 3   reflect persistent ongoing sexual
 4   dysfunction, correct?
 5                MR. MORROW:  Objection.
 6                THE WITNESS:  Yes.
 7   BY MR. BECKER:
 8          Q.    And that information was
 9   corroborated by Merck's adverse event
10   database and reports of ongoing sexual
11   dysfunction in that database, right?
12                MR. MORROW:  Objection.
13                THE WITNESS:  Yes.
14   BY MR. BECKER:
15          Q.    And that information was
16   reported publicly, correct?
17          A.    Yes.
18          Q.    Isn't that what he's talking
19   about here, that there was evidence from
20   the Merck database, that's the adverse
21   event database, suggesting persistent
22   ongoing sexual dysfunction?
23                MR. MORROW:  Object to the
24           form.
```

Elizabeth Round, M.D.

```
 1                    THE WITNESS:  That's why I

 2            asked the question, I didn't know

 3            what he was referring to.

 4    BY MR. BECKER:

 5            Q.    Well, you have an

 6    understanding, Doctor, as a 25-year

 7    employee of Merck, that there is an

 8    adverse event database, right?

 9            A.    Correct.

10                    MR. MORROW:  Objection.

11    BY MR. BECKER:

12            Q.    And that adverse event

13    database is put in place so that Merck

14    and regulatory agencies can identify

15    signals of potential causative risks

16    associated with the use of a drug, right?

17                    MR. MORROW:  Objection.

18                    THE WITNESS:  It's put in

19            place to collect adverse events in

20            postmarketing.

21    BY MR. BECKER:

22            Q.    So as to identify potential

23    causative risks of the use of a drug,

24    right?
```

Elizabeth Round, M.D.

```
 1                MR. MORROW:  Objection.

 2                THE WITNESS:  Yes.

 3   BY MR. BECKER:

 4        Q.    That was a yes, right?

 5                MR. MORROW:  Objection.

 6                THE WITNESS:  Yes.

 7   BY MR. BECKER:

 8        Q.    And upon reviewing that

 9   information, Sweden required you to

10   change the label to reflect persistent

11   erectile dysfunction following

12   discontinuation of use?

13        A.    Yes.

14        Q.    Okay.  So my question is, do

15   you agree or disagree that additional

16   evidence is found in the clinical studies

17   and in the Merck database which strongly

18   suggests that in some patients the sexual

19   adverse effects are persistent?

20                MR. MORROW:  Objection.

21                THE WITNESS:  I'm not -- I'm

22           not clear what studies he's

23           referring to when he says "in

24           clinical studies;" what studies he
```

Elizabeth Round, M.D.

1          has access to, what he's talking

2          about.

3    BY MR. BECKER:

4          Q.    I'm simply asking, Doctor,

5    whether you agree or disagree with this

6    statement?  You either do or you don't.

7                MR. MORROW:  Object to the

8          form.

9                THE WITNESS:  I'm not sure

10         that it's strong evidence.

11   BY MR. BECKER:

12         Q.    How about some evidence?

13               MR. MORROW:  Objection.

14   BY MR. BECKER:

15         Q.    The fact of the matter is,

16   Doctor, there is evidence in your

17   database, in Merck's database and in the

18   Phase 3 year three through five clinical

19   trials that suggests that some -- that in

20   some patients, the sexual adverse effects

21   are persistent; isn't that true?

22               MR. MORROW:  Objection.

23               THE WITNESS:  There are

24         reports of persistent sexual

Elizabeth Round, M.D.

1          adverse events in the Merck

2          database.

3    BY MR. BECKER:

4          Q.    So is that a yes, that is

5    true?

6                MR. MORROW:  Objection.

7                THE WITNESS:  That -- that

8          is true.  I would not put it in

9          this context.  You're asking me to

10         agree with the whole sentence.

11   BY MR. BECKER:

12         Q.    He goes on to say, Clearly

13   the sexual adverse events do not

14   necessarily resolve completely in all

15   patients who discontinue use of

16   finasteride, again supporting the

17   premises that in some patients, these

18   sexual side effects remain persistent.

19               Did I read that correctly?

20         A.    Yes.

21         Q.    Do you agree or disagree

22   with that statement, Doctor?

23               MR. MORROW:  Objection.

24               THE WITNESS:  He's talking

Elizabeth Round, M.D.

1           about in the postmarketing

2           reports, yes.

3    BY MR. BECKER:

4           Q.     So you agree --

5           A.     In the postmarketing

6    reports.

7           Q.     Let me finish my question,

8    Doctor.

9                  You agree that -- that

10   sexual adverse events do not necessarily

11   resolve completely in all patients who

12   discontinue use of finasteride?

13                 MR. MORROW:  Object to the

14          form.

15                 THE WITNESS:  Based on the

16          postmarketing reports.  He

17          introduces that section by talking

18          about postmarketing.

19   BY MR. BECKER:

20          Q.     You agree with that

21   statement?  That's all I'm asking.

22                 MR. MORROW:  Objection.

23                 THE WITNESS:  That's the AEs

24          that are in the label now.

Elizabeth Round, M.D.

1    BY MR. BECKER:

2          Q.    Well, but, Doctor, in

3    fairness, the AEs that are in the label

4    are buffered by the sentence that they

5    discontinue upon -- that they go away --

6    they resolve upon discontinuation, right?

7                MR. MORROW:   Object to the

8          form.

9                THE WITNESS:   I was

10         referring to the postmarketing

11         section.

12   BY MR. BECKER:

13         Q.    Well, but this is prior to

14   the amendment to the U.S. label, right?

15         A.    What is?  This paper?

16         Q.    This article is written in

17   2010, is it not?

18         A.    Yes.

19         Q.    Okay.  And you had yet to --

20   Merck had yet to amend the United States

21   label to reflect the fact that

22   postmarketing surveillance reported

23   persistent ongoing sexual dysfunction

24   following discontinuation of use, right?

Elizabeth Round, M.D.

```
 1          A.    Correct.

 2          Q.    And armed with this article,

 3    you did nothing?

 4                MR. MORROW:  Objection.

 5                THE WITNESS:  Correct.

 6    BY MR. BECKER:

 7          Q.    Let me show you --

 8                     -  -  -

 9                (Whereupon, Exhibit-56,

10          Irwig Article, "Persistent Sexual

11          Side Effects of Finasteride for

12          Male Pattern Hair Loss," Bates

13          MRKP0002137734-40, was marked for

14          identification.)

15                     -  -  -

16                MR. BECKER:  Sorry, guys, I

17          only have two of these.  No, I

18          have three.

19                56.

20                MR. MORROW:  Give me a

21          minute.

22                MR. BECKER:  Take your time.

23                So I've got two or three

24          more documents before a natural
```

Elizabeth Round, M.D.

```
 1          stopping point.  Do you want to
 2          press forward to, like, 12:30-ish?
 3          It's up to all you.  You're the
 4          witness and you guys --
 5               MR. MORROW:  I'm sorry, say
 6          it again.
 7               MR. BECKER:  I have, like,
 8          two or three more documents until
 9          a natural break.  We'll go to
10          about 12:30?  But you have a
11          witness and you guys are the court
12          reporter.  So whatever you want to
13          do.
14               MR. MORROW:  How do you
15          feel?  Do you want to keep going
16          or do you want to take a break?
17               MR. BECKER:  The faster we
18          go, the faster we end.
19               THE WITNESS:  Let's see what
20          it looks like.
21                    -  -  -
22               (Whereupon, a discussion off
23          the record occurred.)
24                    -  -  -
```

Elizabeth Round, M.D.

```
 1    BY MR. BECKER:

 2         Q.    So I have in front of you

 3    there, Doctor, Exhibit-56.

 4              Do you see that there?

 5         A.    Yes.

 6         Q.    Okay.  This also appeared in

 7    your custodial file.

 8              Do you recall reviewing this

 9    document or reading this article?

10         A.    I recall the article.

11         Q.    Okay.  It's an article from

12    Dr. Irwig, of the George Washington

13    University, entitled, "Persistent Sexual

14    Side Effects for Finasteride For Male

15    Pattern Hair Loss."

16              Did I read that correctly?

17         A.    Yes.

18         Q.    And it appears in the

19    Journal of Sexual -- Sex Medicine,

20    correct?

21              MR. MORROW:  Objection.

22              THE WITNESS:  Yes.

23    BY MR. BECKER:

24         Q.    The article is dated 2011.
```

Elizabeth Round, M.D.

```
 1                    Do you see that there?

 2         A.    Yes.

 3         Q.    I want to go through just

 4    some of his results.

 5                    All right.  You recall

 6    reading this article at the time you

 7    received it?

 8         A.    I read it at the time I

 9    received it, yes.

10         Q.    And in connection with that,

11    you had an understanding that Dr. Irwig

12    had evaluated a cohort of men who

13    believed that they had persistent ongoing

14    sexual dysfunction following

15    discontinuation of use, correct?

16         A.    Yes.

17         Q.    And he reported, after that

18    review, that 94 percent of the subjects

19    developed low libido, correct?

20                    MR. MORROW:  Objection.

21                    THE WITNESS:  That's what

22         the statement says here.

23    BY MR. BECKER:

24         Q.    And 92 percent developed
```

Elizabeth Round, M.D.

```
 1   erectile dysfunction.

 2              Do you see that?

 3        A.    Yes.

 4              MR. MORROW:  Form.

 5   BY MR. BECKER:

 6        Q.    92 developed decreased

 7   arousal?

 8              MR. MORROW:  Object to the

 9        form.

10              THE WITNESS:  Yes.

11   BY MR. BECKER:

12        Q.    And 69 percent developed

13   problems with orgasms.

14              Do you see that there?

15              MR. MORROW:  Object to the

16        form.

17              THE WITNESS:  Yes.

18   BY MR. BECKER:

19        Q.    Do you have any evidence, as

20   you sit here today, that that data was,

21   in fact, inaccurate?

22              MR. MORROW:  Objection.

23        This is.

24              THE WITNESS:  This is a
```

Elizabeth Round, M.D.

```
 1              selected group of patients with

 2              sexual AEs following finasteride.

 3    BY MR. BECKER:

 4         Q.    Right.  I mean, it's men who

 5    are saying, I continue to have adverse

 6    events -- I continue to have sexual

 7    dysfunction following the time I stopped

 8    taking PROPECIA®, right?

 9         A.    Yes.

10              MR. MORROW:  Objection.

11    BY MR. BECKER:

12         Q.    And they're reporting these

13    are their symptoms, true?

14         A.    Yes.

15         Q.    What, if anything, did Merck

16    do with this data?

17              MR. MORROW:  Object to the

18         form.

19              THE WITNESS:  We reviewed

20         the paper.

21    BY MR. BECKER:

22         Q.    And based upon your review,

23    what did you do?

24         A.    I don't recall that we took
```

Elizabeth Round, M.D.

```
 1    any action, if that's what you're asking.

 2         Q.    He reports that, The mean

 3    duration of finasteride use was 28 months

 4    and the mean duration of persistent

 5    sexual side effects was 40 months from

 6    the time of finasteride cessation to the

 7    interview date.

 8              Do you see that?

 9         A.    I do.

10         Q.    Would 40 months constitute

11    persistent ongoing sexual dysfunction?

12              MR. MORROW:  Objection.

13              THE WITNESS:  I don't have a

14         definition for persistent.

15    BY MR. BECKER:

16         Q.    So if a label talks about

17    symptoms being resolved upon

18    discontinuation of use, don't you think

19    it would be fair to tell doctors and

20    patients what the temporal nexus was

21    between the time the person discontinued

22    the use and the date when the symptoms

23    actually went away?

24              MR. MORROW:  Objection.
```

Elizabeth Round, M.D.

```
 1                THE WITNESS:  Well, we
 2           didn't.  We stated they were
 3           resolved upon discontinuation.
 4   BY MR. BECKER:
 5           Q.    But let's assume for
 6   argument's sake that these men's symptoms
 7   resolved at 40 months.  Isn't there a
 8   difference between a label that says your
 9   symptoms will resolve 40 months after you
10   discontinue use versus your symptoms will
11   ultimately resolve?
12                Isn't there a fundamental
13   difference between those two statements?
14                MR. MORROW:  Object to the
15           form.
16                THE WITNESS:  There is a
17           difference.
18   BY MR. BECKER:
19           Q.    Is Merck putting patient
20   safety first when it refuses to identify
21   the temporal connection between
22   discontinuation of drugs and how long it
23   takes for those symptoms to actually
24   resolve?
```

Elizabeth Round, M.D.

```
 1                  MR. MORROW:  Object to the

 2          form.

 3                  THE WITNESS:  No.  The

 4          persistence of sexual AEs has been

 5          added to the label based on

 6          postmarketing.  We've also

 7          established that postmarketing

 8          data is limited.  And this author

 9          himself cites the limitations of

10          this study; the post hoc approach,

11          selection bias, record bias, no

12          serum hormone level.

13                  MR. BECKER:  Objection,

14          nonresponsive.  Move to strike

15          everything after "no."

16                  MR. MORROW:  Objection.

17   BY MR. BECKER:

18          Q.    My question is, Doctor, if

19   we can agree that time from

20   discontinuation to resolution is

21   important, shouldn't you tell patients

22   what that time is?

23                  MR. MORROW:  Object to the

24          form.  That's a different
```

Elizabeth Round, M.D.

1          question.

2                    THE WITNESS:  It would

3          appear to be very variable for

4          each of these patients.

5     BY MR. BECKER:

6          Q.    That didn't answer my

7     question.

8                    You either should or

9     shouldn't have to tell them what the time

10    is.

11                   What's your view?

12                   MR. MORROW:  Objection.

13                   THE WITNESS:  I don't think

14         there's a need to tell them the

15         time.

16    BY MR. BECKER:

17         Q.    So in Merck's view, if the

18    time to resolution was three and-a-half

19    years, it would be okay to withhold that

20    information from patients?

21                   MR. MORROW:  Object to the

22         form.  Mischaracterizes the

23         testimony.

24                   You may answer.

Elizabeth Round, M.D.

```
 1                THE WITNESS:  No, that

 2           shouldn't be withheld from the

 3           patient.

 4   BY MR. BECKER:

 5        Q.    So at what point in time

 6   does persistence become -- at what point

 7   in time do you believe Merck should alert

 8   patients that it takes to resolve these

 9   symptoms after discontinuation?

10                MR. MORROW:  Object to the

11           form.

12                MR. BECKER:  Let me start

13           over because I agree with his

14           objection on that one.

15   BY MR. BECKER:

16        Q.    It's fair there's no --

17   there's no indication in the label that

18   symptoms will resolve after a given

19   amount of time has passed, right?

20        A.    Right.

21        Q.    All the label says is that

22   stop taking the drug and the symptoms go

23   away?

24        A.    Uh-huh.
```

Elizabeth Round, M.D.

1          Q.    Yes?

2          A.    Yes.  In the clinical

3    trials --

4                MR. MORROW:  Objection.

5                THE WITNESS:  -- yes.

6    BY MR. BECKER:

7          Q.    Isn't it a fair inference

8    from that, that the symptoms resolve

9    quickly after you discontinue use?

10               MR. MORROW:  Objection.

11           Speculation.

12               THE WITNESS:  Based on the

13           clinical trials, I don't believe

14           it was a long time.

15   BY MR. BECKER:

16         Q.    That wasn't my question.

17               My question was, wasn't the

18   inference that Merck was making was that

19   symptoms would quickly resolve upon

20   discontinuation of use?

21               MR. MORROW:  Object to the

22           form.

23               THE WITNESS:  I don't know

24           that the argument was quickly

Elizabeth Round, M.D.

```
 1              resolve.  We just said that they
 2              would -- they resolved on
 3              discontinuation, what we saw in
 4              the clinical trials.
 5       BY MR. BECKER:
 6              Q.   Can we -- would you agree
 7       with me that the longer it takes to have
 8       these symptoms resolve after
 9       discontinuation of use, the more
10       obligation Merck has to alert patients of
11       that -- of that issue?
12                   MR. MORROW:  Object to the
13              form.
14                   THE WITNESS:  We now have
15              reports in the adverse experiences
16              section that talk about
17              persistence.  We don't put a
18              qualifying -- a qualifying time
19              period on that.
20                   MR. BECKER:  Objection.
21              Hold on.  Nonresponsive.  Move to
22              strike.
23       BY MR. BECKER:
24              Q.   Let me see if I can do it
```

1    this way, Doctor.

2              Would you agree that if in

3    some men these symptoms occurred six

4    months after discontinuation of use, that

5    Merck would have an obligation to report

6    that in the label?

7              MR. MORROW:  Objection.

8              THE WITNESS:  Do you mean

9         that these events had a new onset

10         six months after?

11   BY MR. BECKER:

12         Q.    No, no.  I'm asking you,

13   Merck does not dispute the fact that

14   sexual -- adverse sexual events can occur

15   while on a drug; you don't dispute that,

16   do you?

17         A.    No.

18         Q.    Merck takes the position

19   that at some point following

20   discontinuation of use, those symptoms go

21   away, right?

22         A.    As observed in the trials,

23   yes.

24         Q.    What I'm trying to get at

Elizabeth Round, M.D.

```
 1    is, how long after discontinuation of use

 2    should Merck tell patients and doctors

 3    those symptoms take to resolve?

 4                Do you understand my

 5    question?

 6          A.    I do understand the

 7    question.

 8                MR. MORROW:  Objection.

 9                You can answer.

10    BY MR. BECKER:

11          Q.    And my question is, would

12    you agree that if the symptoms did not

13    resolve for a month, that Merck should

14    alert patients who take the drug that it

15    may take up to a month for their sexual

16    dysfunction -- for their sexual function

17    to return?

18                MR. MORROW:  Objection.

19    BY MR. BECKER:

20          Q.    Should you tell patients

21    that?

22                MR. MORROW:  Objection.

23    BY MR. BECKER:

24          Q.    Should you tell patients
```

Elizabeth Round, M.D.

1    that?

2              MR. MORROW:  Objection.

3              THE WITNESS:  If we had that

4         information, yes.

5    BY MR. BECKER:

6         Q.    Okay.  Now, you have a

7    worldwide adverse event database, right?

8         A.    Yes.

9         Q.    And you had clinical trials,

10   right?

11        A.    Yes.

12        Q.    And in those clinical

13   trials, the data reported resolution

14   after discontinuation of use for some

15   patients, right?

16        A.    Yes, yes.

17        Q.    And sometimes that

18   resolution took several hundred days or

19   up to a year, right?

20              MR. MORROW:  Objection.

21              THE WITNESS:  I don't know

22        that.

23   BY MR. BECKER:

24        Q.    If the data demonstrates

Elizabeth Round, M.D.

```
 1    that resolution took a long time

 2    following discontinuation of use,

 3    shouldn't you have told patients and

 4    doctors that?

 5              MR. MORROW:  Object to the

 6         form.

 7              THE WITNESS:  I don't

 8         remember the data on how long it

 9         took to -- for resolution.

10    BY MR. BECKER:

11         Q.    That wasn't my question,

12    though.

13         A.    I understand.

14         Q.    So I'd like an answer to my

15    question.

16              MR. MORROW:  Same objection.

17              THE WITNESS:  If -- it may

18         have been useful to put that in.

19                   -  -  -

20              (Whereupon, Exhibit-57,

21         4/6/11 E-mail to Cynthia Silber

22         from Christine Alberts,

23         Bates MRKP0001390080-81, was

24         marked for identification.)
```

Elizabeth Round, M.D.

1   was drawing a distinction between Europe

2   and the U.S., so I was trying to talk to

3   you about that.

4               So let me see if I can do it

5   this way.

6               MR. MORROW:  Objection.

7   BY MR. BECKER:

8        Q.    Why did you conduct this

9   review in April of 2011?

10       A.    I don't recall.

11       Q.    Do you think it might have

12  been in response to the mounting evidence

13  from the Traish article, the Irwig

14  article and Merck's own experience with

15  sale and distribution of the drug?

16              MR. MORROW:  Object to the

17       form.

18              THE WITNESS:  I don't

19       recall.

20  BY MR. BECKER:

21       Q.    Okay.  Now, if you look at

22  Exhibit 58 --

23       A.    Yes.

24       Q.    -- it says, in Paragraph 2,

Elizabeth Round, M.D.

```
 1    To identify cases that may represent

 2    persistent sexual dysfunction, the MAH

 3    reviewed the reports with an outcome of

 4    not recovered in whom finasteride therapy

 5    was discontinued.

 6                 Do you see that there?

 7         A.    Yes.

 8         Q.    And it found a total of 446

 9    reports, right?

10         A.    Yes.

11         Q.    You then went back and

12    looked at the Worldwide Adverse

13    Experience System, right?

14                 MR. MORROW:  Objection.

15    BY MR. BECKER:

16         Q.    Or that was in context with

17    the Worldwide Adverse Experience System,

18    true?

19         A.    Yes.

20                 MR. MORROW:  Objection.

21                 THE WITNESS:  Yes.

22    BY MR. BECKER:

23         Q.    And this memo indicates, The

24    Worldwide Adverse Experience System, WAES
```

Elizabeth Round, M.D.

1    database, was searched for spontaneous

2    reports of sexual dysfunction received

3    from healthcare providers, including

4    regulatory agencies and consumers and

5    patients on therapy with finasteride, 1

6    milligram, and .2 milligram tablet

7    PROPECIA®, from market introduction, 11

8    September 1998, to 31 December 2010.

9              Do you see that?

10   A.    Yes.

11   Q.    Did I read that correctly?

12   A.    Yes.

13   Q.    And then it goes on to

14   identify the search terms, right?

15   A.    Yes.

16   Q.    Persistence is not included

17   in this search term, is it?

18   A.    There is no term for

19   persistence.

20   Q.    That was my next question.

21             The reason why it's not

22   included is because you didn't have a

23   field in the MedDRA database to chronicle

24   persistence, right?

Elizabeth Round, M.D.

```
 1              MR. MORROW:  Object to the
 2         form.
 3              THE WITNESS:  It's not that
 4         we don't have a field, MedDRA
 5         doesn't have the field.
 6    BY MR. BECKER:
 7         Q.   You could have created one,
 8    right?
 9              MR. MORROW:  Objection.
10              THE WITNESS:  I'm not sure
11         of the process for creating terms.
12    BY MR. BECKER:
13         Q.   Are you saying that you were
14    absolutely precluded from looking or --
15    at a term that existed within the
16    narrative reports of the adverse event
17    database?
18              MR. MORROW:  Objection.
19              THE WITNESS:  I'm not saying
20         we were precluded.  I think the
21         next paragraph explains what --
22         what the CREMS group did to
23         uncover adverse experiences that
24         were continuing after the
```

Elizabeth Round, M.D.

```
 1          discontinued -- not recovered
 2          after they discontinued the drug.
 3          That's how they did it.
 4   BY MR. BECKER:
 5          Q.    Doctor, I really need you to
 6   answer the questions I'm asking.
 7                MR. MORROW:  She is
 8          answering the questions.
 9                MR. BECKER:  She is not
10          answering.  She is not.
11                MR. MORROW:  You just don't
12          like it.
13                MR. BECKER:  Believe me,
14          there's plenty in this depo I
15          like.
16                MR. MORROW:  Move to strike.
17   BY MR. BECKER:
18          Q.    There -- there was no term
19   for persistence in the MedDRA database,
20   right?
21                MR. MORROW:  Objection.
22                THE WITNESS:  There was no
23          term.
24   BY MR. BECKER:
```

Elizabeth Round, M.D.

```
 1          Q.     There was no term for

 2   withdrawal syndrome in the MedDRA

 3   database, right?

 4          A.     I don't know that.

 5          Q.     There was no term for not

 6   recovered in the MedDRA database, right?

 7          A.     I don't know that.

 8                 MR. MORROW:  Objection.

 9   BY MR. BECKER:

10          Q.     The term you searched was

11   not recovered, right?

12                 MR. MORROW:  Objection.

13                 THE WITNESS:  We searched

14          for an outcome of not recovered on

15          the adverse experience reports.

16   BY MR. BECKER:

17          Q.     So the only way that you

18   could do that was if you actually found

19   all of the reports and read all of the

20   narratives, right?

21                 MR. MORROW:  Object to the

22          form.

23                 THE WITNESS:  I'm not sure

24          about that.
```

Elizabeth Round, M.D.

```
 1   BY MR. BECKER:

 2          Q.    You don't have any -- with

 3   these other terms, you can run a query

 4   within MedDRA to actually pull up these

 5   various adverse events, right?

 6          A.    All these adverse experience

 7   terms, yes.

 8          Q.    Wouldn't it have been

 9   easier, from a postmarketing surveillance

10   standpoint, to actually include a term

11   for persistence?

12              MR. MORROW:  Object to the

13          form.

14              THE WITNESS:  I don't know

15          whether it would have been easier.

16   BY MR. BECKER:

17          Q.    But you knew that

18   persistence might be a problem as early

19   as 1998, right?

20              MR. MORROW:  Objection.

21              THE WITNESS:  We knew --

22          1998?

23   BY MR. BECKER:

24          Q.    Dr. Kaufman wrote about
```

Elizabeth Round, M.D.

1    ejaculate disorders in 1998, that

2    reversibility was impossible --

3    reversibility upon discontinuation was

4    impossible, due to postmarketing reports,

5    right?  You remember that document?

6              MR. MORROW:  Objection.

7              THE WITNESS:  It was

8         impossible to establish based on

9         postmarketing reports.

10   BY MR. BECKER:

11        Q.    So you knew as early as 1998

12   that some men were continuing to

13   experience sexual dysfunction following

14   discontinuation of use, right?

15             MR. MORROW:  Object to the

16        form.  Mischaracterizes prior

17        testimony.

18             You may answer.

19             THE WITNESS:  Could you

20        repeat that question?

21   BY MR. BECKER:

22        Q.    Based on Dr. Kaufman's

23   e-mail, Merck was aware of the fact, as

24   early as 1998, that there were reports of

Elizabeth Round, M.D.

```
 1   persistent ongoing sexual dysfunction

 2   following discontinuation of use, true?

 3                  MR. MORROW:  Same objection.

 4                  THE WITNESS:  I understood

 5           Dr. Kaufman's e-mail to mean that

 6           you couldn't prove reversibility

 7           from postmarketing reports, not --

 8   BY MR. BECKER:

 9           Q.    Let's go to something you do

10   understand.

11                  MR. MORROW:  Are you

12           finished with your answer?

13   BY MR. BECKER:

14           Q.    Were you finished with your

15   answer?

16           A.    Yes.

17           Q.    You received an e-mail in

18   2000 that provided evidence of persistent

19   ongoing sexual dysfunction from the

20   clinical trial itself, right?

21                  MR. MORROW:  Objection.

22                  THE WITNESS:  We reviewed

23           that e-mail.  We had an e-mail,

24           with no data on it, that said that
```

Elizabeth Round, M.D.

1        A.      No.

2                MR. MORROW:  Objection.

3    BY MR. BECKER:

4        Q.      The drug is on the market

5    with a label that talks about

6    persistence?

7        A.      It has a label, adverse

8    events in the postmarketing --

9        Q.      So a doctor reading that --

10       A.      -- section.  It does not

11   contain that in the warning section of

12   the label.

13       Q.      A doctor reading that would

14   be able to counsel his or her patient on

15   reports of ongoing persistent erectile

16   dysfunction so as the patient could make

17   an informed choice, right?

18               MR. MORROW:  Object to the

19          form.

20               THE WITNESS:  Yes.

21   BY MR. BECKER:

22       Q.      That wasn't in the label

23   prior to 2012 in the United States,

24   right?

Elizabeth Round, M.D.

```
 1            A.    No.

 2                  MR. MORROW:  Objection.

 3    BY MR. BECKER:

 4            Q.    So prior to 2012, when that

 5    finally made it into the label, does the

 6    benefit of hair growth outweigh the risk

 7    of persistent to permanent erectile

 8    dysfunction?

 9                  MR. MORROW:  Object to the

10            form.

11                  THE WITNESS:  That has to be

12            a choice for the patient seeking

13            treatment.

14    BY MR. BECKER:

15            Q.    How does a patient make an

16    informed choice if they don't know the

17    risk is present?

18            A.    They can't.

19                  MR. MORROW:  Object to the

20            form.

21    BY MR. BECKER:

22            Q.    Exactly.  And so prior to

23    2012 when the FDA approved the label, the

24    only person or people that could make
```

Elizabeth Round, M.D.

1    that assessment was Merck, right?

2                    MR. MORROW:  Objection.

3                    THE WITNESS:  Based on the

4            label in the U.S., the physician

5            did not have that information.

6    BY MR. BECKER:

7            Q.    Right.  So the only people

8    that had that information at their

9    disposal were, in fact, Merck, right?

10                   MR. MORROW:  Objection.

11                   THE WITNESS:  It was in the

12           EU label.

13   BY MR. BECKER:

14           Q.    Right.  But you testified

15   earlier, you have no idea if you gave

16   this document to the FDA, right?

17                   MR. MORROW:  Objection.

18                   THE WITNESS:  I did.

19   BY MR. BECKER:

20           Q.    And so if the FDA didn't

21   have this data, there would be no way

22   they could evaluate it, right?

23                   MR. MORROW:  Objection.

24                   THE WITNESS:  The FDA -- I'm