UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
PAUL DAWSON,                                    :
                                                :        **ORDER ON MOTION TO UNSEAL**
                        Plaintiff,              :
                                                :        1:12-CV-1876 (BMC)(PK)
-against-                                       :
                                                :
MERCK & CO., INC. and MERCK SHARP &:
DOHME CORP.,                                    :
                                                :
                        Defendants.             x
-------------------------------------------------------------

**Peggy Kuo, United States Magistrate Judge:**

Intervenor Reuters America LLC ("Reuters") moves this Court seeking an order unsealing

certain documents filed by the parties in this case. ("Motion," Dkt. 121.)  Defendants Merck & Co.,

Inc. and Merck Sharp & Dohme Corp. (together "Defendants" or "Merck") and Plaintiff Paul

Dawson opposed the Motion.  For the reasons stated herein, the Motion is GRANTED.

## BACKGROUND

On August 18, 2011, Plaintiff filed a complaint against Defendants in the Western District of

Washington, alleging that the prescription drug Propecia, manufactured and marketed by Defendants

to treat male pattern baldness, caused injury to Plaintiff, including sexual dysfunction.  (Dkt. 1 ¶¶ 9,

45, 47.)  In 2012, Plaintiff's complaint was consolidated into a multi-district litigation and transferred

to the Eastern District of New York.  (Dkt. 11.)  In 2016, Plaintiff's case was selected as one of four

"bellwether" cases to represent the first tranche of plaintiffs.  (*In Re Propecia Finasteride Product Liability*

*Litigation*, 12-md-2331 (BMC)(PK) Dkt. 350.)

On November 21, 2017, in anticipation of dispositive motions and *Daubert* motions, the parties

sought leave to file documents under seal.  (Dkt. 108.)  The parties argued that good cause for sealing

existed because the anticipated submissions "contain[] confidential information that is subject to the

Stipulation and Order Regarding Confidential Information." *Id.* The request was granted, and the parties were directed to "file the exhibits under seal in the first instance, and, in the final paragraph of the motion to which the sealed exhibits are attached, the filing party must explain why the exhibits should remain under seal." (Dkt. Order dated Nov. 21, 2017.)

On November 27, 2017, Defendants filed a Motion for Summary Judgment (Dkt. 110) and a Motion to Preclude Plaintiff's Experts ("Daubert Motion," Dkt. 111), which Defendants "adopt[ed] and incorporate[d] by reference" into their Motion for Summary Judgment. (*See* Dkt. 110-7 at 1 n.1, 10.) On December 27, 2017, Plaintiff filed an Opposition to the Motion for Summary Judgment (Dkt. 114) and an Opposition to the Daubert Motion (Dkts. 113 and 115), which Plaintiff incorporated into his Opposition to the Motion for Summary Judgment. (*See* Dkt. 114 at 5.)

Plaintiff's Opposition to the Daubert Motion was filed in redacted form at Dkt. 113 and full unredacted form, under seal, at Dkt. 115. Dkt. 113 attached 46 unsealed exhibits, while Dkt. 115 attached 29 sealed exhibits. References in Dkt. 115 to sealed exhibits are redacted from the publicly visible filing at Dkt. 113 using computer-generated redactions. (*See generally* Dkts. 113, 115.) Nevertheless, Reuters has stated that it was able to read the entirety of Plaintiff's briefing filed at Dkt. 113, including the content obscured by the redactions, by copying the redacted text from the PDF version available on the Court's electronic case filing website and pasting the text into Microsoft Word. (*See* Dkt. 121-1 at 4.)

Before a ruling was made on either the Daubert Motion or the Motion for Summary Judgment, the parties informed the Court of a settlement agreement, and the case was dismissed. (*See* Order dated Sept. 7, 2018.) The parties thereafter filed a Stipulation of Dismissal on December 17, 2018. (Dkt. 118.)

On September 12, 2019, Reuters moved to intervene and to unseal certain documents, specifically to remove the redactions in Plaintiff's Opposition to the Daubert Motion at Dkt. 113 and

to unseal the sealed exhibits at Dkt. 115.  (*See* "Memorandum of Law in Support of Proposed Intervenor Reuters' Motion to Intervene and Unseal," Dkt. 121-1.)  Plaintiff and Defendants opposed the Motion.  (Dkts. 122, 123.)

Reuters was granted leave to intervene.  (*See* Order dated Feb. 6, 2020.)

After Reuters clarified that it was not seeking to unseal Plaintiff's confidential medical records[1] (*see* "Reuters's Reply Memo," Dkt. 124; Oral Argument Tr. at 14:5-11, 23:10-22, Dkt. 135), Plaintiff took no further position on the Motion.  Accordingly, only Defendants currently oppose the Motion.

Oral argument was held on April 15, 2020, at the end of which Defendants were ordered to submit supplemental briefs stating specific reasons each sealed document should remain sealed.  (*See* Minute Entry dated April 15, 2020.)  Defendants submitted a supplemental brief in which they withdrew their opposition to certain documents being unsealed (Dkt. 138-3 at 7), and those documents were unsealed.  (*See* Order Dated Sept. 24, 2020.)  However, Defendants continued to oppose the unsealing of at least some portions of eleven exhibits, claiming that they contain confidential business information that merited continued sealing.  (*See* Defs.' Revised Supp. Brief at 6, Dkt. 138-3.)

This Order thus considers Reuters's request to (1) remove the redactions from Dkt. 113, and (2) unseal the eleven exhibits filed at Dkts. 115-5, 115-6, 115-7, 115-10, 115-11, 115-12, 115-18, 115-21, 115-23, 115-25, and 115-28 (the "Documents").  (Dkt. 121-1 at 6.)

## DISCUSSION

The public, including the press, has both a common law and qualified First Amendment right of access to certain court proceedings and filings.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110,

---

[1] Defendants represented that Dkts. 115-29 and 115-30 "are Plaintiff's medical records."  (Dkt. 140 at 1.)  On that basis, Reuters does not seek to unseal Dkts. 115-29 or 115-30.  As discussed below, however, these documents are not Plaintiff's medical records, but the medical records of a plaintiff in another of the bellwether cases.

3

119-20 (2d Cir. 2006).

The Second Circuit has prescribed a three-part test to determine whether the common law right of access applies to court documents. First, the documents must be "judicial documents." *See id.* at 119. If they are judicial documents, there is a presumption of access to them, and the court must determine the weight of the presumption. *Id.* The court must then balance that presumption against any reasons for keeping the documents under seal. *See United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) ("*Amodeo II*").

The more stringent First Amendment analysis is "somewhat different." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 141 (2d Cir. 2016). There is a presumptive, qualified First Amendment right of access to documents under either the "experience and logic" test or the "necessary corollary" test. *Lugosch*, 435 F.3d at 120. The experience and logic test "asks both whether the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question." *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013) (quoting *Lugosch*, 435 F.3d at 120) (internal quotations omitted). The necessary corollary test applies "only when analyzing judicial documents related to judicial proceedings covered by the First Amendment right [and] asks whether the documents at issue are derived from or are a necessary corollary of the capacity to attend the relevant proceedings." *Newsday LLC*, 730 F.3d at 164 (quoting *Lugosch*, 435 F.3d at 120) (internal quotations omitted) (alteration added). If the court finds a qualified First Amendment right of access, documents may only "be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120 (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

## I.    Judicial Documents

A presumptive right of access attaches to judicial documents. *Lugosch*, 435 F.3d at 119-20.

4

Judicial documents are those documents "relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 119 (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*")); *see also Newsday LLC*, 730 F.3d at 167.

The Second Circuit has concluded that "documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents… under both the common law and the First Amendment." *Lugosch*, 435 F.3d at 121.

The presumption of public access also attaches to documents submitted in connection with several other types of motions, including "filings related to, *inter alia*, motions to compel testimony, to quash trial subpoenae, and to exclude certain deposition testimony." *Brown v. Maxwell*, 929 F.3d 41, 50 (2d Cir. 2019). The Second Circuit reasoned

> All such motions, at least on their face, call upon the court to exercise its Article III powers. Moreover, erroneous judicial decision-making with respect to such evidentiary and discovery matters can cause substantial harm. Such materials are therefore of value to those monitoring the federal courts. Thus, all documents submitted in connection with, and relevant to, such judicial decision-making are subject to at least some presumption of public access.

*Id.* (footnotes and internal quotations omitted). District courts in this Circuit have also found that a presumption of access attaches to *Daubert* motions. *See, e.g.*, *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 512 (S.D.N.Y. 2015); *Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 221 (S.D.N.Y. 2019).

Defendants contend there is no public right of access to the Documents because they were "not relevant to the performance of any judicial function necessary to resolve Merck's [Daubert] Motion." (Dkt. 123 at 9.) According to Defendants, the Documents supported only "speculation" that was not relevant to whether Plaintiff's experts were qualified to testify, and are thus irrelevant to the ultimate disposition of Merck's Daubert Motion. (Dkt. 123 at 9-10.) Defendants argue that resolution of the Daubert Motion would be based on the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), not on arguments the Documents were offered to

support.  (Dkt. 123 at 9-10.)  Therefore, Defendants argue, the court would not have relied on the Documents in deciding the Daubert Motion, and they are not judicial documents.  (Dkt. 123 at 9-10.) Separately, Defendants contend that the Documents are not judicial documents because settlement of the case precluded any judicial decision on the motion, and therefore there was no "live case or controversy" or "judicial decision-making process" to be monitored.  (Dkt. 131-2 at 7; *see also* Dkt. 138-3 at 2-3.)

Reuters argues that the Documents were incorporated into Plaintiff's Opposition to Defendants' Motion for Summary Judgment and are therefore judicial documents.  (Dkt. 121-1 at 9-10; Dkt. 124 at 4.)  Even if the Documents were not incorporated in the summary judgment filings, Reuters argues that the presumption of access would still attach.  (Dkt. 124 at 3-4.)  Reuters further argues that the presumption attached at the time the Documents were filed, and therefore survived settlement.  (Dkt. 124 at 7-8.)

A.    **Whether a Presumption of Public Access Attached to the Documents**

The Court finds that a presumption of access attaches to the Documents under both the common law and First Amendment because they were "submitted to a court for its consideration in a summary judgment motion…"  *Lugosch*, 435 F.3d at 121.   Both Plaintiff and Defendants incorporated the filings related to the Daubert Motion into the filings related to the Motion for Summary Judgment.  (Dkt. 110-7 at 1 n.1, 10; Dkt. 114 at 5.)  Moreover, Defendants emphasized the centrality of the Daubert Motion to the summary judgment motion, stating

> As set forth in Merck's Motion to Exclude Plaintiff's Experts, filed simultaneously with this Motion, the general and specific causation testimony proffered by Plaintiff's experts does not meet Daubert standards and should be excluded. Should the Court exclude such opinions, then Plaintiff has no proof of either general or specific causation, and his failure to warn claims should be dismissed. Indeed, failure of either general or specific causation is sufficient to render judgment to Defendants.

(Dkt. 110-7 at 10.)  The Daubert Motion was explicitly and inextricably linked to the Motion for Summary Judgment by both parties.

Even if the Documents are not considered part of the summary judgment record, they would still be entitled to a presumption of access. *See, e.g.*, *Brown*, 929 F.3d at 49-50 (even documents that play only a negligible role in the performance of Article III duties are entitled to some presumption of access); *Louis Vuitton*, 97 F. Supp. 3d at 512 (presumption of access attaches to briefing in support of motion to preclude expert); *Republic of Turkey*, 425 F. Supp. 3d at 221 (same). Defendants' argument that the Documents are irrelevant—because they were provided in support of "speculation" that would not have been part of the court's adjudication of the motion—goes to the merits of the underlying Daubert Motion, not to the issue of whether the Documents themselves are relevant to the performance of the judicial function invoked by the parties. *See Brown*, 929 F.3d at 49 (document is "'relevant to performance of the judicial function' if it would reasonably have the *tendency* to influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately, in fact, influences the court's decision.") Whether the Court in deciding the Daubert Motion would have relied on these documents or agreed with the arguments they were offered to support is not pertinent to whether the Documents are judicial documents. One of the parties properly filed these materials in an effort to persuade the court of its position, and therefore they are judicial documents entitled to a presumption of access under both the common law and the First Amendment.

### B. Whether the Presumption of Public Access Survives Settlement

Defendants further challenge the categorization of the Documents as judicial documents based on the timing of Reuters's Motion to unseal. They argue that because the case had already settled, the court could no longer render any decision on the motion for which the Documents were filed, and the Documents cannot be judicial documents. (*see* Dkt. 131-2 at 1; Dkt. 138-3 at 4.) In support of this argument, Defendants rely heavily on *Giuffre v. Maxwell*, No. 15-CV-7433 (LAP), 2020 WL 133570 (S.D.N.Y. Jan. 13, 2020), *reconsideration denied*, 2020 WL 917057 (S.D.N.Y. Feb. 26, 2020).

The district court in *Giuffre* held that documents filed in support of undecided motions in a settled case were not judicial documents. The court reasoned that "[t]he essence of the judicial power is … adjudicative" and because the case had settled by the time the motion to unseal was filed, "[a]ll disputes regarding the underlying merits of the action have been rendered moot by the settlement." *Id.* at *2 (quotations omitted). Lacking "clear guidance from the Court of Appeals," the court in *Giuffre* "cho[se] the path that adheres most closely to the overarching purpose of the presumption of public access. That is, the presumption exists to monitor judicial *decision-making*." *Id.* at *3 (citing *Amodeo II*) (emphasis in original). It concluded that, "[w]ith respect to motions left undecided by [the district judge], there was never, and now never can be, a judicial decision-making process that would trigger the public's right to access the undecided motions and the documents relevant to them." *Id.* at *2 (footnote omitted). The court accordingly found that the motion papers were not judicial documents and denied the request to unseal them.

Reuters argues that *Giuffre* is contrary to "well-established Second Circuit precedent," and that "[t]he documents attached to the parties' *Daubert* briefing were 'judicial documents' at the moment they were filed with this Court, and they did not lose this status merely because the case settled without a decision on the motion." (Dkt. 132 at 4.) Ruling otherwise "would lead to the absurd result that a media organization that intervenes prior to settlement would be entitled to a First Amendment presumption of access, while the same entity, seeking the exact same documents, would be entitled to a lesser presumption after the case has settled." (Dkt. 124 at 8.)

While the Second Circuit has not expressly addressed the precise timing question here— whether documents filed in connection with an undecided motion retain their status as judicial documents after the parties settle the case—it has held that a "presumption of *immediate* public access attaches…" upon filing of a judicial document. *See Lugosch*, 435 F.3d at 126; *see also United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 141–42 (2d Cir. 2017). Thus, the Court has held that a judicial

decision is not a prerequisite to finding a presumptive right of public access. *See, e.g., Lugosch*, 435 F.3d at 120-121.

The Second Circuit has also found that a *complaint* remains a judicial document after settlement even if it was not the subject of a judicial opinion. *Bernstein*, 814 F.3d at 140 ("The fact that a suit is ultimately settled without a judgment on the merits does not impair the 'judicial record' status of pleadings"). In support of that conclusion, the Second Circuit reasoned that, "[e]ven in the settlement context, the inspection of pleadings allows 'the public [to] discern the prevalence of certain types of cases, the nature of the parties to particular kinds of actions, information about the settlement rates in different areas of law, and the types of materials that are likely to be sealed.'" *Id.* at 140 (citing *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 96 (2d Cir. 2004)). These insights into the judicial process are essential to the public's understanding of, and ability to monitor, the functioning of the judiciary, even though no actual or potential judicial *decision-making* is involved.

Although documents in connection with motions are not as central to a case as pleadings, the factors the Second Circuit in *Bernstein* identified as favoring the post-settlement survival of the presumption of access for pleadings apply with similar force to motions. *See HSBC Bank*, 863 F.3d at 141–42 (noting that presumption of immediate access upon filing applies to both pleadings and summary judgment papers because both "by definition[] ask the court to grant (or reject) some relief").

Here, the parties invoked the court's decision-making authority to adjudicate the Daubert Motion, and Plaintiff filed the Documents in an attempt to persuade the court of his position. "Simply because the parties later filed a stipulation of dismissal does not mean that the parties did not invoke the judicial power upon the initial filing of these documents." *Eagle Star Ins. So. Ltd. F. Arrowood Indem. Co.*, No. 13 Civ. 3410, 2013 WL 5322573, at *2 (S.D.N.Y. Sept. 23, 2013) (finding that papers filed in connection with a petition to confirm arbitration award remained judicial documents even though the parties settled before a decision could be rendered); *see also Steele v. City of Burlington, Iowa*, 334 F. Supp.

3d 972, 979 (S.D. Iowa 2018) (documents filed in support of undecided summary judgment motions remain judicial documents even after case settles).  Once filed on the docket, the presumption of access attaches to a document and does not disappear.  To conclude otherwise would permit the parties in a case to summarily close the curtain on the public's view into the judicial branch of government without the court's ability to weigh the presumption of access against any countervailing interests.  The continuing presumption of access allows the public to see what is going into the sausage factory, even if a particular sausage is never made.

For watchdogs who focus not on the immediate news of the day but take a longer view of the judicial process, the Court's ruling alleviates the need to constantly monitor docket filings in real-time and race to make requests to unseal before the parties settle.  Reuters claims to be in such a situation, as it seeks information in the Documents for reporting not only on Propecia but also the role that courts have played in the course of the years-long nationwide litigation concerning the drug.  (*See* Reuters Article "Court let Merck hide secrets about a popular drug's risks," provided as Exhibit A to Reuters's Motion, Dkt. 121-3.)  Even in a fast-moving world, a presumptive right to access should not be fleeting, lasting only as long as the parties wish it to exist.  The disappearance of a case or controversy for the court to decide does not mean that its existence at some point and the parties' conduct of that dispute are no longer newsworthy.

Accordingly, the Court finds that the Documents are judicial documents to which a presumption of access immediately attached and remains attached notwithstanding settlement by the parties.

## II.      The Weight of the Presumption of Access

Once documents are found to be judicial documents, the Court must determine the weight of the presumption of access.  *See Lugosch*, 435 F.3d at 119-20.

Documents with a qualified First Amendment right of access have the highest presumption

of access. *See, e.g., id.* at 124 ("Since we have concluded that the more stringent First Amendment framework applies, continued sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim.").

To determine the weight of the presumption of access under the common law, the court must evaluate "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* at 119 (quoting *Amodeo II*, 71 F.3d at 1049). The presumption lies along a continuum, from an "especially strong" presumption that can only be overcome by "extraordinary circumstances" to a "low" presumption that "amounts to little more than a prediction of public access absent a countervailing reason." *See Stern v. Cosby*, 529 F. Supp. 2d 417, 420 (S.D.N.Y. 2007) (quoting *Amodeo II*, 71 F.3d at 1048, 1050).

Summary judgment documents are entitled to a strong presumption of access under both the common law and First Amendment. *Lugosch*, 435 F.3d at 124; *see also Joy v. North*, 692 F.2d 880, 893 (2d Cir.1982) ("documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons"). Filings in support of *Daubert* motions to preclude experts are also entitled to a "significant" presumption of access. *Republic of Turkey*, 425 F. Supp. 3d at 221.

Because the Court concludes that the Documents were filed in support of a motion for summary judgment, they are entitled to the highest presumption of access. Even if these documents are considered only as part of Plaintiff's opposition to the Daubert Motion, they are nevertheless entitled to a significant presumption of access.

### III.  Identification and Balancing of "Higher Values"

"Once the weight of the presumption is determined, a court must balance competing considerations against it." *Amodeo II*, 71 F.3d at 1050. "Notwithstanding the presumption of access

under both the common law and the First Amendment, the documents may be kept under seal if 'countervailing factors' in the common law framework or 'higher values' in the First Amendment framework so demand." *Lugosch*, 435 F.3d at 124 (quotations in original). Where "the more stringent First Amendment framework applies," the Court may only allow the documents to remain under seal if it makes "specific, on the record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Id.* at 124 (citing *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

There is significant overlap between the common law countervailing factors and First Amendment higher values that weigh in favor of sealing, and courts often do not distinguish between the two. For example, when describing "higher values" that would support the requisite findings that sealing is necessary, the Second Circuit in *Brown* referred interchangeably to "countervailing values." 929 F.3d at 47 n.13. Thus, cases that weigh "higher values" under the First Amendment analysis are instructive when evaluating "countervailing factors" in the common law analysis, and vice versa.

Defendants argue that their interest in keeping their business information confidential and their privacy interests outweigh any presumption of access. (Dkt. 123 at 12-15; Dkt. 138-3 at 5-6.) Higher values that weigh in favor of sealing include, among other things, confidential business information, *see Standard Inv. Chartered, Inc. v. Fin. Indus. Regulatory Auth., Ind.*, 347 F. App'x 615, 617 (2d Cir. 2009), and privacy interests, *see Amodeo II*, 71 F.3d at 1050.[2]

Confidential business information only merits sealing if disclosure of that information would

---

[2] Defendants correctly note that "[t]rade secrets are another category of competitive business information which would warrant sealing." (Dkt. 123 at 13; *see also* Dkt. 135 at 32:15-17; Dkt. 138-3 at 9 (referencing trade secrets).) However, Defendants make only passing references to trade secrets, and do not make any specific arguments that any of the Documents constitute trade secrets, instead citing *Uni-Sys., LLC v. U.S. Tennis Ass'n*, No. 17-cv-147, 2019 WL 3753780, at *4 (E.D.N.Y. Aug. 8, 2019) for the proposition that "[b]usiness information need not be a trade secret in order to warrant protection from disclosure under a protective order." (Dkt. 138-3 at 7.) Accordingly, there is no need for the Court to consider whether any of the Documents constitutes a trade secret.

be harmful to the business. *See Tomassini v. FCA US LLC*, No. 14-CV-1226 (MAD)(DEP), 2017 WL 9400672, at *4 (N.D.N.Y. Jan. 6, 2017). Adverse publicity on the business, by itself, is not sufficient. *See In re Parmalat Sec. Litig.*, 258 F.R.D. at 244. Similarly, a draft document is not entitled to sealing simply because it was not previously made public or only meant for internal consideration. *See Tropical Sails Corp. v. Yext, Inc.*, No. 14 CIV. 7582, 2016 WL 1451548, at *4 (S.D.N.Y. Apr. 12, 2016) ("'implicit in the notion of 'confidential business information' is something beyond the mere fact that the particular datum has not previously been made available to the public.'") (quoting *Salomon Smith Barney, Inc. v. HBO & Co.*, 98 Civ. 8721(LAK), 2001 WL 225040, at *3 (S.D.N.Y. Mar. 7, 2001)). The conclusory assertion that a document is "proprietary" also cannot support sealing absent a specific showing of harm. *See Rensselaer Polytechnic Inst. v. Amazon.com, Inc.*, No. 18-CV-00549 (BKS)(CFH), 2019 WL 2918026, at *4 (N.D.N.Y. June 18, 2019) (refusing to seal document defendant described as proprietary without tailored explanation of harm).

"The party opposing disclosure must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Nycomed US, Inc. v. Glenmark Generics, Inc.*, No. 08-CV-5023 CBA, 2010 WL 889799, at *6 (E.D.N.Y. Mar. 8, 2010) (quoting *In re Parmalat Secs. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009)); *see also New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 5353774, at *4 (S.D.N.Y. Oct. 21, 2014) ("[T]he party seeking the sealing has the burden of establishing the competitive disadvantage" that would result from the publication of the documents).

Stale business records cannot support the necessary finding of harm, and therefore "cannot overcome the public's strong interest in disclosure." *Alcon Vision, LLC v. Lens.com*, No. 18-CV-0407 (NG), 2020 WL 3791865, at *8 (E.D.N.Y. July 7, 2020); *see also Saint-Jean v. Emigrant Mortg. Co.*, No. 11-CV-2122 (SJ), 2016 WL 11430775, at *7 (E.D.N.Y. May 24, 2016) (information from eight years

earlier concerning mostly discontinued practices does not support sealing); *Zavala v. Wal-Mart Corp.*, No. CIV.A.03-5309 JAG, 2007 WL 2688934, at *4 (D.N.J. Sept. 12, 2007) (same, for three-year-old documents). While a document's age is a strong indicator of staleness, a party seeking to keep a document under seal may nevertheless show that the information is not stale with a particularized showing of harm from disclosure. *Compare In re Parmalat*, 258 F.R.D. at 256 (defendant failed to "come forward with specific facts showing that disclosure of the specific fees that it charged … would tend to be damaging now, seven to fourteen years after the fact") *and Saint-Jean*, 2016 WL 11430775, at *7 (refusing to seal eight-year-old documents where defendants "made no particularized showing of a need for continued secrecy sufficient to overcome the presumption of access") (internal quotations omitted) *with W. Penn Allegheny Health Sys., Inc. v. UPMC*, No. 2:12-CV-0692-JFC, 2013 WL 12141532, at *12, 13, 18, 25, 30, 32 (W.D. Pa. Sept. 16, 2013) (allowing sealing of old information where moving party showed particularized allegations of future business harm from unsealing). The party must cite to "specific information contained in the documents that would cause [harm] if it were disclosed today." *In re Parmalat*, 258 F.R.D. at 256 (alteration added).

When evaluating privacy interests, "courts should first consider the degree to which the subject matter is traditionally considered private rather than public." *Amodeo II*, 71 F.3d at 1051. Privacy interests are generally limited to documents containing "medical or psychological information about the named individual ... [or] bank account numbers, [S]ocial [S]ecurity numbers and information the disclosure of which could raise a personal safety issue." *Nycomed*, 2010 WL 889799 at *8 (alterations in original, internal quotations omitted). "[T]he mere broad and general invocation of a privacy interest does not warrant" sealing. *Guzik v. Albright*, No. 16-CV-2257 (JPO), 2018 WL 6011612, at *3 (S.D.N.Y. Nov. 16, 2018) (internal quotations and alterations omitted).

Defendants claim that unsealing the documents at issue here "would reveal Merck's internal business, regulatory and clinical strategies and undermine its competitive interests." (Dkt. 123 at 13.)

In response, Reuters argues that Defendants cannot offer any evidence that outweighs the presumption of access (Dkt. 121-1 at 13), and that, to the extent these documents reveal Defendants' confidential business information, that information is stale. (Dkt. 124 at 8-9.)

The Court analyzes each of the Documents below using the stringent First Amendment standard. However, the Court concludes that Defendants' arguments in favor of continued sealing are so weak that they would not overcome even a low presumption of access under the common law.

### A.    Dkt. 115-5

Dkt. 115-5 consists of a 2009 email attaching the agenda of a Risk Management Safety Team Meeting for June 4, 2009, listing as an agenda item, "Discussion of Update of Propecia Risk Management Plan." A 70-page risk management plan is attached. Defendants argue that the document is "highly proprietary" and discusses "Merck's unique, internal processes for evaluating risks of their own products…" (Dkt. 138-3 at 8.) However, Defendants do not explain what internal process is revealed in the document or how such information is unique. They also do not show any ongoing relevance of this eleven-year-old document, or any future harm from its disclosure which outweighs the presumption in favor of access. Accordingly, the motion to unseal Dkt. 115-5 is granted.

### B.    Dkts. 115-6 and 115-7

Dkt. 115-7 is a document dated August 29, 1994 with a subject line, "Worldwide Marketing Needs Report – Finasteride for Androgenetic Alopecia in Men," which Defendants seek to seal in its entirety. Dkt. 115-6 is the deposition transcript of a former Merck employee, on pages 71-75 of which the document at Dkt. 115-7 is referenced; Defendants seek to seal only these pages. Defendants argue that these documents should remain under seal because Merck intended them to remain within their business by marking them "RESTRICTED" and "DISCLOSE ONLY ON A NEED TO KNOW BASIS", and because the documents were produced at great expense and "would not be easily

duplicated by others." (Dkt. 138-3 at 9.)

Dkt. 115-7 is over a quarter century old. It does not discuss highly unique, proprietary clinical trials or marketing techniques. It includes sales projections through 1996 (at 2-3), a description of the product (at 2), a preliminary marketing strategy that largely discusses the product's publicly marketed qualities (at 3), and various marketing needs, including proposed marketing studies and studies comparing Propecia to its primary pharmaceutical competitor (at 4-7)—all of which are long outdated, public, or specific to Propecia. While Defendants explain why the document was valuable to Merck, they fail to provide any evidence of harm from its unsealing now. Defendants' arguments in favor of sealing do not overcome the presumption in favor of access.

Because the arguments for continued sealing of pages 71-75 of Dkt. 115-6 are premised on those for Dkt. 115-7, those arguments also fail. The motion to unseal Dkts. 115-6 and 115-7 is granted.

### C.     Dkt. 115-10

Dkt. 115-10 is a one-page memorandum inviting listed participants to a "Task Force" meeting on October 23, 2000 and stating the purpose of that meeting. Defendants argue that this document should be kept under seal because the selection of "these specific individuals" to attend the meeting is "proprietary business information." (Dkt. 138-3 at 10.) Defendants argue in the alternative that the names and telephone numbers of the employees should be redacted because their names and numbers "are collateral to the inquiry here." (Dkt. 138-3 at 10.)

Defendants' arguments concerning Dkt. 115-10 are unavailing. Defendants fail to show any ongoing harm from the disclosure of this document sufficient to overcome the presumption of access. The document contains no information other than a telephone conference line presumably 20 years out of date and a list of high-level employees (and their phone numbers) who participated in a meeting to discuss updated drug labeling. High-level meetings about drug studies and labeling are not unique

to Merck, and Defendants do not describe how the document's disclosure would harm the company.

Defendant's arguments in favor of sealing the Merck employee names and telephone numbers are similarly unpersuasive. The Merck employees were involved in the development, marketing, and/or sale of Propecia and are identified by first initial and last name. The telephone numbers listed in the document appear (based on the similarity of multiple numbers) to be business numbers which are now more than two decades old. Merck points to no private information about these individuals that warrants redaction.

The motion to unseal Dkt. 115-10 is granted.

### D.     Dkts. 115-11 and 115-12

Dkt. 115-11 is a redline draft of updated Propecia labeling based on data from 5-year extension studies discussed at the October 23, 2000 meeting referenced in Dkt. 115-10. Dkt. 115-12 is a redline draft of updated Propecia labeling discussed at a subsequent November 3, 2000 Task Force meeting. Defendants contend that these documents should remain under seal because the documents reveal "the types of decisions and the ways in which Merck organizes and mobilizes its resources … throughout its product line…" (Dkt. 138-3 at 11-12). According to Defendants, this information, "if publicized, would reveal Merck's confidential discussion and commentary about proposed language— in essence, allowing Merck's competitors to have a seat at the Task Force's conference table." (Dkt. 138-3 at 12.)

Defendants' arguments concerning Dkts. 115-11 and Dkt. 115-12 are unpersuasive. The documents show proposed revisions specific to Propecia labeling. While a comparison of the two draft documents—perhaps with the final document—may indicate changes that occurred over time, even such an examination does not reveal any specific process for revising or approving revisions. Defendants fail to show how a competitor having a seat at a table convened two decades ago would result in harm today. The mere fact that these documents are drafts does not outweigh the

presumption in favor of access.

The motion to unseal Dkts. 115-11 and 115-12 is granted.

### E.     Dkt. 115-18

Dkt. 115-18 includes an email chain from August 2000 and attached PowerPoint presentations entitled "Propecia: 5-Year End-of-Study Phase III Controlled Data," containing data from studies from December 1994 through May 2000, and "Propecia: Regulatory Strategy for Filing 5-Year Data," containing related regulatory strategies for filing that data, with a timeline through the end of 2001. Defendants only oppose unsealing the regulatory strategies discussed at pages 23-30 of the document, and the reference to "EU Regulatory Strategy" in the introductory email.   (Dkt. 138-3 at 12-13.) Defendants argue that the document contains "proprietary processes for communicating with regulatory agencies" which allow competitors to gain an "advantage in a highly competitive marketplace."  (*Id.* at 13.)

Defendants' suggestion of ongoing harm is not persuasive.  The slides Defendants seek to keep under seal relate entirely to Propecia; they do not contain any generalized regulatory strategies. Furthermore, they do not reveal unique or highly unusual methods or procedures, instead suggesting common-sense strategies such as "Meet with agencies in outstanding countries to discuss new data and any remaining concerns" (Dkt. 115-18 at 28) and "Plan to file label change supported by CSRs in US and other (non-EU) countries in 1Q01" (*id.* at 29).  Any concern about information in this two-decades-old presentation does not outweigh the presumption of access.

The motion to unseal Dkt. 115-18 is granted.

### F.     Dkt. 115-21

Dkt. 115-21 is a January 2006 email exchange between two Merck employees responding to a question from a healthcare provider about decreased libido related to use of Propecia.  Defendants claim that this "proposed or draft language" represents "internal and strategic decision-making…"

(Dkt. 138-3 at 14.)

The email is fourteen years old and contains no information about decision-making. One email asks whether a certain statement used to respond to inquiries about what appears to be a different drug can also be used for inquiries regarding Propecia. The second email provides language for responding to such inquiries. Defendants fail to explain how this email exchange between two employees about such an inquiry, which contains no reference to any strategy or procedure for decision-making, would put Merck at a competitive disadvantage. Defendants do not allege any ongoing harm from the disclosure of this document. Without more, Defendants' arguments do not outweigh the presumption of access.

The motion to unseal Dkt. 115-21 is granted.

### G. Dkt. 115-23

Dkt. 115-23 consists of a letter to the Swedish Medical Products Agency from Defendants' manager of regulatory affairs in Europe, dated June 18, 2007, attaching a response to the regulator's previous request for information. Defendants do not oppose unsealing the letter, but oppose unsealing the attachment, arguing that because Plaintiff only cites to the letter in his briefing, the remainder of the document is not a judicial document. (Dkt. 138-3 at 14-15.)

Dkt. 115-23 was submitted in its entirety in connection with Plaintiff's Opposition to the Daubert Motion and incorporated into Plaintiff's Opposition to the Motion for Summary Judgment. The letter references and incorporates the attachment. (Dkt. 115-23 at 1 ("A response document addressing the comments made in the Assessment Report is submitted herewith").) Pursuant to the discussion above, the entirety of Dkt. 115-23 is considered a judicial document. Defendants cite no ongoing harm, privacy interests or other countervailing factors or higher values that outweigh the presumption of access. Accordingly, the motion to unseal Dkt. 115-23 is granted.

**H.      Dkt. 115-25**

Dkt. 115-25 is a draft press release concerning the June 2008 update to the prescribing information for Propecia.  Defendants' only argument for this document to remain under seal is that it is a draft.  (Dkt. 138-3 at 15.)  It contains no sensitive, non-public information, and there is no indication that its disclosure would cause harm that outweighs the presumption of access.  The motion to unseal Dkt. 115-25 is granted.

**I.      Dkt. 115-28**

Dkt. 115-28 is an April 2011 email between Merck employees with an attachment containing a document entitled "Persistent Sexual Dysfunction DRAFT."  Defendants argue that this document was intended only as an internal document and that the processes referenced in the draft are not limited to Propecia, and therefore constitute confidential business information.  (Dkt. 138-3 at 16.)

The mere fact that a document is a draft does not outweigh the presumption of access.  Moreover, the document references only extremely general strategies (*i.e.*, searching an adverse experience database with specific search terms) or processes expressly connected to Propecia and the allegations in the underlying matter (*i.e.*, draft search terms referencing sexual dysfunction).  Defendants' general concerns, without a specific showing of ongoing harm from the document's disclosure, do not outweigh the presumption of access.  The motion to unseal Dkt. 115-28 is therefore granted.

**J.      Corrected Information About Contents of Dkts. 115-29 and 115-30**

Reuters does not seek to unseal Dkts. 115-29 or 115-30 because Defendants represented to Reuters that these documents "are Plaintiff's medical records."  (Dkt. 140 at 1.)  However, the Court notes that they are not Plaintiff's medical records.  Rather, Dkt. 115-29 contains medical records of Christopher Hathaway, the plaintiff in another of the bellwether cases in the multi-district litigation, *Hathaway v. Merck & Co, Inc.*, 13-civ-7412 (BMC)(PK).  Dkt. 115-30 is a deposition excerpt that

discusses the medical history of only Mr. Hathaway, except for a single inadvertent reference to Plaintiff Dawson's name.  (Dkt. 115-30 at 456:10.)  While Plaintiff cites to Dkt. 115-29 in his brief, (Dkt. 113 at 46, 48, 49), those citations clearly reference different parts of the deposition, not those provided in Dkt. 115-30.  The documents at Dkts. 115-29 and 115-30 appear to have been mistakenly filed in this matter, and therefore might not be subject to the same presumption of access as the other documents discussed above, since the Second Circuit's holdings in *Lugosch* and its progeny do not necessarily apply to documents filed in error.  *See Brown*, 929 F.3d at 47 n. 12 (citing *Lugosch*, 435 F.3d at 122); *see also Amodeo I*, 44 F.3d at 145 (the "mere filing of a paper or document with the court is insufficient to render that paper a judicial document").

Nevertheless, Dkt. 115-29, Mr. Hathaway's medical records, along with the medical records of the other bellwether plaintiffs, were ordered sealed in the consolidated MDL because "they contain personal medical information of the plaintiffs.  The plaintiffs' privacy interest outweighs the public's qualified right of access to documents filed in court."  (Dkt. Entry dated October 26, 2016 in *Propecia Finasteride Product Liability Litigation,* 12-md-2331 (BMC)(PK).)  This specific, on-the-record finding justifies maintaining the seal on this document.  *See Lugosch*, 435 F.3d at 120; *Nycomed*, 2010 WL 889799 at \*8.  The discussion of Mr. Hathaway's records contained at Dkt. 115-30 merits continued sealing because it discusses the same personal medical information, and the same privacy interests outweigh the public's qualified right of access to it.

## K.    Unsealing of Dkt. 113 Redactions

Dkt. 113 is Plaintiff's redacted Opposition to Defendant's Daubert Motion.  The redactions in Dkt. 113 are limited to references to now-unredacted documents and to the eleven sealed exhibits discussed above (and do not include references related to Dkts. 115-29 or 115-30).  Because the Court grants the motion to unseal those exhibits, there is no longer any justification for maintaining the redactions to Dkt. 113, and the Motion is granted as to Dkt. 113.  Because Dkt. 115 is the unredacted

version of Dkt. 113, the Court orders that Dkt. 115 be unsealed, effectively unredacting Dkt. 113.

## CONCLUSION

For the reasons above, Reuters's Motion to Unseal the Documents is granted. Dkt. 115 shall be unsealed, and Dkts. 115-5, 115-6, 115-7, 115-10, 115-11, 115-12, 115-18, 115-21, 115-23, 115-25, 115-28 shall be unsealed. Dkts. 115-29 and 115-30 shall remain under seal.

**SO ORDERED:**

*Peggy Kuo*

United States Magistrate Judge

Dated:    Brooklyn, New York
          January 24, 2021